# EXHIBIT A

# EXHIBIT A

Case 2:22-cv-09389-MWF-RAO Document 1-1 Filed 12/28/22 Page 2 of 166 Page ID #:8
Electronically FILED by Superior Court of California, County of Los Angeles on 11/16/2022 02:29 PM Sherri R. Carter, Executive Officer/Clerk of Court, by J. Ballesteros, Deputy Clerk
22LBCV00814

**SUM-100**

# SUMMONS
## *(CITATION JUDICIAL)*

| | *FOR COURT USE ONLY*<br>*(SOLO PARA USO DE LA CORTE)* |
|---|---|

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
ALBERTSON'S LLC, a Delaware limited liability company, and DOES
1 through 10, inclusive,

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
KFT ENTERPRISES, NO. 1 L.P., a California limited partnership

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

The name and address of the court is:
*(El nombre y dirección de la corte es):*
Los Angeles Superior Court, Governor George Deukmejian Courthouse,
275 Magnolia Ave, Long Beach, CA 90802

CASE NUMBER:
*(Número del Caso):*
**22LBCV00814**

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Robert S. Chapman                                                     Fax No.: 310-712-8108
Sauer & Wagner LLP, 1801 Century Park East, Suite 1150,              Phone No.: 310-712-8100
Los Angeles, CA 90067

DATE:
*(Fecha)* 11/16/2022

Clerk, by _____ J. Ballesteros _____, Deputy
*(Secretario)*                                              *(Adjunto)*

Sherri R. Carter Executive Officer / Clerk of Court

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☒ on behalf of *(specify):*

   under: ☒ CCP 416.10 (corporation)              ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)      ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person)

          ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
www.courtinfo.ca.gov
*LexisNexis® Automated California Judicial Council Forms*

Ex. A
Page 008

Electronically FILED by Superior Court of California, County of Los Angeles on 11/16/2022 02:14 PM Sherri R. Carter, Executive Officer/Clerk of Court, by J. Ballesteros,Deputy Clerk

Case 2:22-cv-09389-MWF-RAO Document 1 Filed 12/28/22 Page 3 of 166 Page ID #:9

**CM-010**

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address):

Robert S. Chapman [SBN 70428]; Gregory P. Barchie [SBN 235022]
Sauer & Wagner, LLP, 1801 Century Park East, Suite 1150, Los Angeles, CA 90067

TELEPHONE NO.: 310-712-8100    FAX NO. (Optional): 310-712-8108
E-MAIL ADDRESS: rchapman@swattys.com; gbarchie@swattys.com
ATTORNEY FOR (Name): KFT Enterprises, No. 1 L.P.

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**
STREET ADDRESS: 275 Magnolia Avenue
MAILING ADDRESS: 275 Magnolia Avenue
CITY AND ZIP CODE: Long Beach, CA 90802
BRANCH NAME: Governor George Deukmejian Courthouse

CASE NAME:
KFT Enterprises, No. 1 L.P. v. Albertson's LLC

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER: 22LBCV00814 |
|---|---|---|
| [X] **Unlimited** (Amount demanded exceeds $25,000)   [ ] **Limited** (Amount demanded is $25,000 or less) | [ ] Counter   [ ] Joinder<br>Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | JUDGE:<br>DEPT.: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

| **Auto Tort** | **Contract** | **Provisionally Complex Civil Litigation** (Cal. Rules of Court, rules 3.400–3.403) |
|---|---|---|
| [ ] Auto (22) | [X] Breach of contract/warranty (06) | [ ] Antitrust/Trade regulation (03) |
| [ ] Uninsured motorist (46) | [ ] Rule 3.740 collections (09) | [ ] Construction defect (10) |
| **Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort** | [ ] Other collections (09) | [ ] Mass tort (40) |
| [ ] Asbestos (04) | [ ] Insurance coverage (18) | [ ] Securities litigation (28) |
| [ ] Product liability (24) | [ ] Other contract (37) | [ ] Environmental/Toxic tort (30) |
| [ ] Medical malpractice (45) | **Real Property** | [ ] Insurance coverage claims arising from the above listed provisionally complex case types (41) |
| [ ] Other PI/PD/WD (23) | [ ] Eminent domain/Inverse condemnation (14) | **Enforcement of Judgment** |
| **Non-PI/PD/WD (Other) Tort** | [ ] Wrongful eviction (33) | [ ] Enforcement of judgment (20) |
| [ ] Business tort/unfair business practice (07) | [ ] Other real property (26) | **Miscellaneous Civil Complaint** |
| [ ] Civil rights (08) | **Unlawful Detainer** | [ ] RICO (27) |
| [ ] Defamation (13) | [ ] Commercial (31) | [ ] Other complaint (not specified above) (42) |
| [ ] Fraud (16) | [ ] Residential (32) | **Miscellaneous Civil Petition** |
| [ ] Intellectual property (19) | [ ] Drugs (38) | [ ] Partnership and corporate governance (21) |
| [ ] Professional negligence (25) | **Judicial Review** | [ ] Other petition (not specified above) (43) |
| [ ] Other non-PI/PD/WD tort (35) | [ ] Asset forfeiture (05) | |
| **Employment** | [ ] Petition re: arbitration award (11) | |
| [ ] Wrongful termination (36) | [ ] Writ of mandate (02) | |
| [ ] Other employment (15) | [ ] Other judicial review (39) | |

2. This case [ ] is [X] is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties
   b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [ ] Substantial amount of documentary evidence
   d. [ ] Large number of witnesses
   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought (check all that apply): a. [X] monetary  b. [ ] nonmonetary; declaratory or injunctive relief  c. [ ] punitive
4. Number of causes of action (specify): Two (2)
5. This case [ ] is [X] is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. (You may use form CM-015.)

Date: November 14, 2022

Gregory P. Barchie, Esq.
_____
(TYPE OR PRINT NAME)    ▶    (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Ex. A
Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. September 1, 2021]

**CIVIL CASE COVER SHEET**

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
www.courts.ca.gov

*LexisNexis® Automated California Judicial Council Forms*

**INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET** CM-010

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the Civil Case Cover Sheet contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the Civil Case Cover Sheet to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

**CASE TYPES AND EXAMPLES**

**Auto Tort**
Auto (22)–Personal Injury/Property Damage/Wrongful Death
Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
Asbestos (04)
    Asbestos Property Damage
    Asbestos Personal Injury/ Wrongful Death
Product Liability *(not asbestos or toxic/environmental)* (24)
Medical Malpractice (45)
    Medical Malpractice– Physicians & Surgeons
    Other Professional Health Care Malpractice
Other PI/PD/WD (23)
    Premises Liability (e.g., slip and fall)
    Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
    Intentional Infliction of Emotional Distress
    Negligent Infliction of Emotional Distress
    Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business Practice (07)
Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
Defamation (e.g., slander, libel) (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
    Legal Malpractice
    Other Professional Malpractice *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)

**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
    Breach of Rental/Lease Contract *(not unlawful detainer or wrongful eviction)*
    Contract/Warranty Breach–Seller Plaintiff *(not fraud or negligence)*
    Negligent Breach of Contract/ Warranty
    Other Breach of Contract/Warranty
Collections (e.g., money owed, open book accounts) (09)
    Collection Case–Seller Plaintiff
    Other Promissory Note/Collections Case
Insurance Coverage *(not provisionally complex)* (18)
    Auto Subrogation
    Other Coverage
Other Contract (37)
    Contractual Fraud
    Other Contract Dispute

**Real Property**
Eminent Domain/Inverse Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
    Writ of Possession of Real Property
    Mortgage Foreclosure
    Quiet Title
    Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
    Writ–Administrative Mandamus
    Writ–Mandamus on Limited Court Case Matter
    Writ–Other Limited Court Case Review
Other Judicial Review (39)
    Review of Health Officer Order
    Notice of Appeal–Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
    Abstract of Judgment (Out of County)
    Confession of Judgment *(non-domestic relations)*
    Sister State Judgment
    Administrative Agency Award *(not unpaid taxes)*
    Petition/Certification of Entry of Judgment on Unpaid Taxes
    Other Enforcement of Judgment Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified above)* (42)
    Declaratory Relief Only
    Injunctive Relief Only *(non-harassment)*
    Mechanics Lien
    Other Commercial Complaint Case *(non-tort/non-complex)*
    Other Civil Complaint *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
Partnership and Corporate Governance (21)
Other Petition *(not specified above)* (43)
    Civil Harassment
    Workplace Violence
    Elder/Dependent Adult Abuse
    Election Contest
    Petition for Name Change
    Petition for Relief From Late Claim
    Other Civil Petition

*LexisNexis® Automated California Judicial Council Forms*

Ex. A
Page 010

| SHORT TITLE | CASE NUMBER |
|---|---|
| KFT Enterprises, No. 1 L.P. v. Albertson's LLC | |

# CIVIL CASE COVER SHEET ADDENDUM AND STATEMENT OF LOCATION

### (CERTIFICATE OF GROUNDS FOR ASSIGNMENT TO COURTHOUSE LOCATION)

**This form is required pursuant to Local Rule 2.3 in all new civil case filings in the Los Angeles Superior Court**

**Step 1:** After completing the Civil Case Cover Sheet (Judicial Council form CM-010), find the exact case type in Column A that corresponds to the case type indicated in the Civil Case Cover Sheet.

**Step 2:** In Column B, check the box for the type of action that best describes the nature of the case.

**Step 3:** In Column C, circle the number which explains the reason for the court filing location you have chosen.

| Applicable Reasons for Choosing Courthouse Location (Column C) | |
|---|---|
| 1. Class Actions must be filed in the Stanley Mosk Courthouse, Central District. | 7. Location where petitioner resides. |
| 2. Permissive filing in Central District. | 8. Location wherein defendant/respondent functions wholly. |
| 3. Location where cause of action arose. | 9. Location where one or more of the parties reside. |
| 4. Location where bodily injury, death or damage occurred. | 10. Location of Labor Commissioner Office. |
| 5. Location where performance required, or defendant resides. | 11. Mandatory filing location (Hub Cases – unlawful detainer, limited non-collection, limited collection). |
| 6. Location of property or permanently garaged vehicle. | |

| | **A** Civil Case Cover Sheet Case Type | **B** Type of Action (check only one) | **C** Applicable Reasons (see Step 3 above) |
|---|---|---|---|
| **Auto Tort** | Auto (22) | ☐ 2201 Motor Vehicle – Personal Injury/Property Damage/Wrongful Death | 1, 4 |
| | Uninsured Motorist (46) | ☐ 4601 Uninsured Motorist – Personal Injury/Property Damage/Wrongful Death | 1, 4 |
| **Other Personal Injury/ Property Damage/ Wrongful Death** | Other Personal Injury/ Property Damage/ Wrongful Death (23) | ☐ 2301 Premise Liability (e.g., dangerous conditions of property, slip/trip and fall, dog attack, etc.) | 1, 4 |
| | | ☐ 2302 Intentional Bodily Injury/Property Damage/Wrongful Death (e.g., assault, battery, vandalism, etc.) | 1, 4 |
| | | ☐ 2303 Intentional Infliction of Emotional Distress | 1, 4 |
| | | ☐ 2304 Other Personal Injury/Property Damage/Wrongful Death | 1, 4 |
| | | ☐ 2305 Elder/Dependent Adult Abuse/Claims Against Skilled Nursing Facility | 1, 4 |
| | | ☐ 2306 Intentional Conduct – Sexual Abuse Case (in any form) | 1, 4 |

LASC CIV 109 Rev. 11/22

For Mandatory Use

CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION

LASC Local Rule 2.3

Ex. A
Page 011

| SHORT TITLE | CASE NUMBER |
|---|---|
| KFT Enterprises, No. 1 L.P. v. Albertson's LLC | |

| | **A**<br>Civil Case Cover Sheet Case Type | **B**<br>Type of Action<br>(check only one) | **C**<br>Applicable Reasons (see Step 3 above) |
|---|---|---|---|
| **Other Personal Injury/ Property Damage/ Wrongful Death** | | ☐ 2307 Construction Accidents | 1, 4 |
| | | ☐ 2308 Landlord – Tenant Habitability (e.g., bed bugs, mold, etc.) | 1, 4 |
| | Product Liability (24) | ☐ 2401 Product Liability (not asbestos or toxic/ environmental) | 1, 4 |
| | | ☐ 2402 Product Liability – Song-Beverly Consumer Warranty Act (CA Civil Code §§1790-1795.8) (Lemon Law) | 1, 3, 5 |
| | Medical Malpractice (45) | ☐ 4501 Medical Malpractice – Physicians & Surgeons | 1, 4 |
| | | ☐ 4502 Other Professional Health Care Malpractice | 1, 4 |
| **Non-Personal Injury/Property Damage/Wrongful Death Tort** | Business Tort (07) | ☐ 0701 Other Commercial/Business Tort (not fraud or breach of contract) | 1, 2, 3 |
| | Civil Rights (08) | ☐ 0801 Civil Rights/Discrimination | 1, 2, 3 |
| | Defamation (13) | ☐ 1301 Defamation (slander/libel) | 1, 2, 3 |
| | Fraud (16) | ☐ 1601 Fraud (no contract) | 1, 2, 3 |
| | Professional Negligence (25) | ☐ 2501 Legal Malpractice | 1, 2, 3 |
| | | ☐ 2502 Other Professional Malpractice (not medical or legal) | 1, 2, 3 |
| | Other (35) | ☐ 3501 Other Non-Personal Injury/Property Damage Tort | 1, 2, 3 |
| **Employment** | Wrongful Termination (36) | ☐ 3601 Wrongful Termination | 1, 2, 3 |
| | Other Employment (15) | ☐ 1501 Other Employment Complaint Case | 1, 2, 3 |
| | | ☐ 1502 Labor Commissioner Appeals | 10 |
| **Contract** | Breach of Contract / Warranty (06) (not insurance) | ☑ 0601 Breach of Rental/Lease Contract (not unlawful detainer or wrongful eviction) | 2, 5 |
| | | ☐ 0602 Contract/Warranty Breach – Seller Plaintiff (no fraud/negligence) | 2, 5 |
| | | ☐ 0603 Negligent Breach of Contract/Warranty (no fraud) | 1, 2, 5 |
| | | ☐ 0604 Other Breach of Contract/Warranty (no fraud/ negligence) | 1, 2, 5 |
| | | ☐ 0605 Breach of Rental/Lease Contract (COVID-19 Rental Debt) | 2, 5 |
| | Collections (09) | ☐ 0901 Collections Case – Seller Plaintiff | 5, 6, 11 |
| | | ☐ 0902 Other Promissory Note/Collections Case | 5, 11 |
| | | ☐ 0903 Collections Case – Purchased Debt (charged off consumer debt purchased on or after January 1, 2014) | 5, 6, 11 |
| | | ☐ 0904 Collections Case – COVID-19 Rental Debt | 5, 11 |
| | Insurance Coverage (18) | ☐ 1801 Insurance Coverage (not complex) | 1, 2, 5, 8 |

LASC CIV 109 Rev. 11/22

For Mandatory Use

CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION

LASC Local Rule 2.3

Ex. A
Page 012

| SHORT TITLE | CASE NUMBER |
|---|---|
| KFT Enterprises, No. 1 L.P. v. Albertson's LLC | |

| | **A**<br>Civil Case Cover Sheet Case Type | **B**<br>Type of Action<br>(check only one) | **C**<br>Applicable Reasons (see Step 3 above) |
|---|---|---|---|
| **Contract** (Continued) | Other Contract (37) | ☐ 3701 Contractual Fraud | 1, 2, 3, 5 |
| | | ☐ 3702 Tortious Interference | 1, 2, 3, 5 |
| | | ☐ 3703 Other Contract Dispute (not breach/insurance/fraud/negligence) | 1, 2, 3, 8, 9 |
| **Real Property** | Eminent Domain/ Inverse Condemnation (14) | ☐ 1401 Eminent Domain/Condemnation<br><br>Number of Parcels _____ | 2, 6 |
| | Wrongful Eviction (33) | ☐ 3301 Wrongful Eviction Case | 2, 6 |
| | Other Real Property (26) | ☐ 2601 Mortgage Foreclosure | 2, 6 |
| | | ☐ 2602 Quiet Title | 2, 6 |
| | | ☐ 2603 Other Real Property (not eminent domain, landlord/tenant, foreclosure) | 2, 6 |
| **Unlawful Detainer** | Unlawful Detainer – Commercial (31) | ☐ 3101 Unlawful Detainer – Commercial (not drugs or wrongful eviction) | 6, 11 |
| | Unlawful Detainer – Residential (32) | ☐ 3201 Unlawful Detainer – Residential (not drugs or wrongful eviction) | 6, 11 |
| | Unlawful Detainer – Post Foreclosure (34) | ☐ 3401 Unlawful Detainer – Post Foreclosure | 2, 6, 11 |
| | Unlawful Detainer – Drugs (38) | ☐ 3801 Unlawful Detainer – Drugs | 2, 6, 11 |
| **Judicial Review** | Asset Forfeiture (05) | ☐ 0501 Asset Forfeiture Case | 2, 3, 6 |
| | Petition re Arbitration (11) | ☐ 1101 Petition to Compel/Confirm/Vacate Arbitration | 2, 5 |
| | Writ of Mandate (02) | ☐ 0201 Writ – Administrative Mandamus | 2, 8 |
| | | ☐ 0202 Writ – Mandamus on Limited Court Case Matter | 2 |
| | | ☐ 0203 Writ – Other Limited Court Case Review | 2 |
| | Other Judicial Review (39) | ☐ 3901 Other Writ/Judicial Review | 2, 8 |
| | | ☐ 3902 Administrative Hearing | 2, 8 |
| | | ☐ 3903 Parking Appeal | 2, 8 |
| **Provisionally Complex Litigation** | Antitrust/Trade Regulation (03) | ☐ 0301 Antitrust/Trade Regulation | 1, 2, 8 |
| | Asbestos (04) | ☐ 0401 Asbestos Property Damage | 1, 11 |
| | | ☐ 0402 Asbestos Personal Injury/Wrongful Death | 1, 11 |

LASC CIV 109 Rev. 11/22

For Mandatory Use

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

LASC Local Rule 2.3

| SHORT TITLE | CASE NUMBER |
|---|---|
| KFT Enterprises, No. 1 L.P. v. Albertson's LLC | |

| | **A**<br>Civil Case Cover Sheet Case Type | **B**<br>Type of Action<br>(check only one) | **C**<br>Applicable Reasons (see Step 3 above) |
|---|---|---|---|
| **Provisionally Complex Litigation** (Continued) | Construction Defect (10) | ☐ 1001 Construction Defect | 1, 2, 3 |
| | Claims Involving Mass Tort (40) | ☐ 4001 Claims Involving Mass Tort | 1, 2, 8 |
| | Securities Litigation (28) | ☐ 2801 Securities Litigation Case | 1, 2, 8 |
| | Toxic Tort Environmental (30) | ☐ 3001 Toxic Tort/Environmental | 1, 2, 3, 8 |
| | Insurance Coverage Claims from Complex Case (41) | ☐ 4101 Insurance Coverage/Subrogation (complex case only) | 1, 2, 5, 8 |
| **Enforcement of Judgment** | Enforcement of Judgment (20) | ☐ 2001 Sister State Judgment | 2, 5, 11 |
| | | ☐ 2002 Abstract of Judgment | 2, 6 |
| | | ☐ 2003 Confession of Judgment (non-domestic relations) | 2, 9 |
| | | ☐ 2004 Administrative Agency Award (not unpaid taxes) | 2, 8 |
| | | ☐ 2005 Petition/Certificate for Entry of Judgment Unpaid Tax | 2, 8 |
| | | ☐ 2006 Other Enforcement of Judgment Case | 2, 8, 9 |
| **Miscellaneous Civil Complaints** | RICO (27) | ☐ 2701 Racketeering (RICO) Case | 1, 2, 8 |
| | Other Complaints (not specified above) (42) | ☐ 4201 Declaratory Relief Only | 1, 2, 8 |
| | | ☐ 4202 Injunctive Relief Only (not domestic/harassment) | 2, 8 |
| | | ☐ 4203 Other Commercial Complaint Case (non-tort/noncomplex) | 1, 2, 8 |
| | | ☐ 4204 Other Civil Complaint (non-tort/non-complex) | 1, 2, 8 |
| **Miscellaneous Civil Petitions** | Partnership Corporation Governance (21) | ☐ 2101 Partnership and Corporation Governance Case | 2, 8 |
| | Other Petitions (not specified above) (43) | ☐ 4301 Civil Harassment with Damages | 2, 3, 9 |
| | | ☐ 4302 Workplace Harassment with Damages | 2, 3, 9 |
| | | ☐ 4303 Elder/Dependent Adult Abuse Case with Damages | 2, 3, 9 |
| | | ☐ 4304 Election Contest | 2 |
| | | ☐ 4305 Petition for Change of Name/Change of Gender | 2, 7 |
| | | ☐ 4306 Petition for Relief from Late Claim Law | 2, 3, 8 |
| | | ☐ 4307 Other Civil Petition | 2, 9 |

LASC CIV 109 Rev. 11/22

For Mandatory Use

CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION

LASC Local Rule 2.3

Ex. A
Page 014

| SHORT TITLE | CASE NUMBER |
|---|---|
| KFT Enterprises, No. 1 L.P. v. Albertson's LLC | |

**Step 4: Statement of Reason and Address:** Check the appropriate boxes for the numbers shown under Column C for the type of action that you have selected. Enter the address, which is the basis for the filing location including zip code. (No address required for class action cases.)

| REASON:<br>☐ 1. ☑ 2. ☐ 3. ☐ 4. ☑ 5. ☐ 6. ☐ 7. ☐ 8. ☐ 9. ☐ 10. ☐ 11 | ADDRESS:<br>6235 East Spring Street |
|---|---|

| CITY:<br>Long Beach | STATE:<br>CA | ZIP CODE:<br>90808 | |
|---|---|---|---|

**Step 5: Certification of Assignment:** I certify that this case is properly filed in the ___South___ District of the Superior Court of California, County of Los Angeles [Code of Civ. Proc., 392 et seq., and LASC Local Rule 2.3(a)(1)(E)]

Dated: __11/14/2022__

_____
(SIGNATURE OF ATTORNEY/FILING PARTY

**PLEASE HAVE THE FOLLOWING ITEMS COMPLETED AND READY TO BE FILED IN ORDER TO PROPERLY COMMENCE YOUR NEW COURT CASE:**

1. Original Complaint or Petition.
2. If filing a Complaint, a completed Summons form for issuance by the Clerk.
3. Civil Case Cover Sheet Judicial Council form CM-010.
4. Civil Case Cover Sheet Addendum and Statement of Location form LASC CIV 109 (10/22).
5. Payment in full of the filing fee, unless there is a court order for waiver, partial or schedule payments.
6. A signed order appointing a Guardian ad Litem, Judicial Council form CIV-010, if the plaintiff or petitioner is a minor under 18 years of age will be required by Court to issue a Summons.
7. Additional copies of documents to be conformed by the Clerk. Copies of the cover sheet and this addendum must be served along with the Summons and Complaint, or other initiating pleading in the case.

LASC CIV 109 Rev. 11/22

For Mandatory Use

CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION

LASC Local Rule 2.3

Ex. A
Page 015

Electronically FILED by Superior Court of California, County of Los Angeles on 11/16/2022 02:14 PM Sherri R. Carter, Executive Officer/Clerk of Court, by J. Ballesteros,Deputy Clerk

Case 2:22-cv-09389-MWF-RAO   Document 1-1   Filed 12/28/22   Page 10 of 166   Page ID #:16

Assigned for all purposes to: Governor George Deukmejian Courthouse, Judicial Officer: Mark Kim

1  ROBERT S. CHAPMAN (State Bar No. 70428)
2  GREGORY P. BARCHIE (State Bar No. 235022)
   SAUER & WAGNER LLP
3  1801 Century Park East, Suite 1150
   Los Angeles, California 90067
4  Tel: (310) 712-8100 Fax: (310) 712-8108
   Email: rchapman@swattys.com; gbarchie@swattys.com
5
6  Attorneys for KFT Enterprises, No. 1 L.P.
7

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                   FOR THE COUNTY OF LOS ANGELES

10        GOVERNOR GEORGE DEUKMEJIAN COURTHOUSE (LONG BEACH)

11

12 | KFT ENTERPRISES, NO. 1 L.P., a California ) | CASE NO.
    limited partnership                       )
13 |                                          ) |
    |                   Plaintiff,            ) | **COMPLAINT FOR BREACH OF LEASE**
14 |                                          )
    |          v.                             )
15 |                                          )
    | ALBERTSON'S LLC, a Delaware limited     )
16 | liability company, and DOES 1 through 10,)
    | inclusive,                              )
17 |                                          )
    |                                         )
18 |                   Defendants.            )
    |                                         )
19 |_____)

20

21

22

23

24

25

26

27

28

SAUER & WAGNER LLP
1801 CENTURY PARK EAST, SUITE 1150
LOS ANGELES, CA 90067

SAUER & WAGNER LLP
1801 CENTURY PARK EAST, SUITE 1150
LOS ANGELES, CA 90067

1        Plaintiff KFT Enterprises, No. 1 L.P. ("KFT" or "Plaintiff") complains against

2   Albertson's LLC ("Albertson's") and Does 1-10, inclusive as follows:

3

4                        **INTRODUCTION**

5

6        1.     This is a commercial landlord-tenant dispute concerning a grocery store.  The

7   parties are the tenant, Albertson's, the country's second largest grocery store chain, and KFT, a

8   family-owned landlord.  This is the second litigation between the same parties, concerning the

9   same lease and the same property in which Albertson's is, again, attempting to use its

10  overwhelming economic position to gain concessions by withholding sums it knows are due.

11

12       2.     In the first litigation, this Court saw through Albertson's subterfuge and ruled,

13  after trial and in a final judgment in May 2017 (Exhibit A attached, the "Judgment") that

14  Albertson's was in material breach of the lease having failed to pay its rent, CAM, and insurance

15  charges.  This Court awarded to KFT the full amount of damages requested plus interest and

16  attorney's fees.  That finding of material breach is *res judicata*.

17

18       3.     During the first litigation, Albertson's conceded that it remained liable for all

19  charges due under the lease through the end of the lease term pursuant to California *Civil Code* §

20  1951.4 and represented that it would keep making those payments.  From June 2017 through

21  September 1, 2020, Albertson's complied with its representation and paid the rent and related

22  charges.  However, from then onward, Albertson's stopped paying, just like in the first litigation,

23  and has forced KFT to again sue.  Currently Albertson's owes a sum in excess of $800,000 in

24  past-due rent, CAM charges, insurance, and interest.  Albertson's has no defense for its failure to

25  pay those past-due sums.

26

27       4.     In the first litigation, Albertson's improperly attempted to avoid its liability under

28  California *Civil Code* § 1951.4 by claiming it had assigned the lease to an entity that quickly

SAUER & WAGNER LLP
1801 CENTURY PARK EAST, SUITE 1150
LOS ANGELES, CA 90067

1  went into bankruptcy.  This Court saw through that sham and will no doubt do so again since the

2  finding of liability under California *Civil Code* § 1951.4 is *res judicata*.

3

4    5.    Now, Albertson's is also claiming, again without basis, that it does not owe the

5  additional amounts due under California *Civil Code* § 1951.2.  As part of its unsuccessful failure-

6  to-pay scheme, Albertson's abandoned the property and, after the Judgment, made no attempt to

7  obtain a replacement tenant.  It simply decided to deprive the local community of the benefits of

8  a grocery store.  KFT, on the other hand, has spent millions of dollars in order to modify the

9  property and obtain a new grocery store tenant to provide the community with the grocery store

10  option that Albertson's apparently wants to suppress.

11

12    6.    Because KFT obtained a new, replacement tenant, which took possession and

13  started to pay rent as of March 18, 2021, KFT saved Albertson's over $8,000,000 in future rent

14  obligations. Now KFT wants Albertson's to pay its fair share of the cost of obtaining the

15  replacement tenant, as required by the Lease and California *Civil Code* § 1951.2. Accordingly,

16  KFT gave Albertson's notice of termination of the lease and notified Albertson's of the amount it

17  owed through the end of the lease term with credit for the rent KFT has and will receive from the

18  new tenant.  The amount due from Albertson's pursuant to California *Civil Code* § 1951.2 is in

19  excess of $6.2 million.   Again, Albertson's is in material breach of the lease and has no defense

20  to the California *Civil Code* § 1951.2 damages.  Nonetheless, Albertson's has decided to use its

21  superior economic position to litigate again.

22

23    **GENERAL ALLEGATIONS**

24

25    7.    KFT is, and at all relevant times was, a California limited partnership, with its

26  principal place of business in Los Angeles, California.  KFT owns certain real property

27  commonly referred to as 6235 East Spring Street in Long Beach, California, property which is

28  ///

2

**SAUER & WAGNER LLP**
1801 CENTURY PARK EAST, SUITE 1150
LOS ANGELES, CA 90067

1    improved by a commercial shopping center commonly known as the Lakewood Plaza

2    Marketplace ("Lakewood Plaza").

3

4    8.    Albertson's is a Delaware limited liability company with its principal place of

5    business located at 250 Parkcenter Boulevard, Boise, Idaho.  Albertson's is, and at all relevant

6    times herein was, doing business in the State of California, County of Los Angeles.  Albertson's

7    previously occupied and operated a grocery store located within Lakewood Plaza pursuant to a

8    long-term lease, as explained in greater detail below.

9

10   9.    The true names and capacities of defendants named herein as DOES 1 through 10,

11   inclusive, are unknown to KFT, who therefore sues these defendants by such fictitious names.

12   KFT will amend this Complaint to show their true names and capacities when the same have

13   been ascertained.  KFT is informed and believes, and on that ground alleges, that DOES 1

14   through 10, inclusive, were responsible in some manner for the acts and transactions hereinafter

15   alleged and are indebted and liable to KFT.

16

17   10.   KFT is informed and believes, and on that ground alleges, that at all times herein

18   mentioned, each of the named defendants and DOES 1 through 10, inclusive, were acting in

19   concert, and each defendant was the agent of each remaining defendant and was acting within the

20   scope and purpose of such agency.

21

22   **JURISDICTION AND VENUE**

23

24   11.   This Court has jurisdiction over Albertson's because Albertson's entered into a

25   lease to occupy real property located in Long Beach, California.  Albertson's is registered to do

26   business in the State of California, and Albertson's does business throughout the City of Long

27   Beach, both currently and at all times relevant to the claims asserted in this Complaint.

28

COMPLAINT

12.     Venue is proper in the Long Beach division of the Los Angeles Superior Court because the real property at issue is located in the City of Long Beach, County of Los Angeles. Further, Albertson's conduct giving rise to this complaint occurred within the City of Long Beach, County of Los Angeles.

**FACTUAL ALLEGATIONS**

13.     On August 16, 1985, predecessors-in-interest to KFT and Albertson's entered into a written Lease (the "Lease") to occupy a store within the Lakewood Plaza (the "Store"). A true and correct copy of the Lease is attached hereto as Exhibit "B."

14.     On May 1, 2006, KFT and Albertson's predecessor-in-interest entered into a First Amendment to Lease ("First Amendment") which amended the Lease. A true and correct copy of the First Amendment is attached hereto as Exhibit "C" and is incorporated herein by reference.

15.     On May 8, 2007, KFT and Albertson's predecessor-in-interest entered into a Second Amendment to Lease ("Second Amendment"), which amended the First Amendment to the Lease. A true and correct copy of the Second Amendment is attached hereto as Exhibit "D" and is incorporated herein by reference.

16.     On March 29, 2013, Albertson's predecessor-in-interest, American Stores Company, LLC, assigned its interest under the Lease, First Amendment, and Second Amendment to Albertson's as part of an internal reorganization. American Stores Company, LLC and Albertson's are affiliated entities with common ownership. A true and correct copy of the notice of that assignment is attached hereto as Exhibit "E" and incorporated herein by reference.

SAUER & WAGNER LLP
1801 CENTURY PARK EAST, SUITE 1150
LOS ANGELES, CA 90067

4

17.     Paragraph 13.1 of the Second Amendment extended the term of the Lease through May 8, 2027, with three options to further extend the term of the Lease.

18.     Paragraph 14.1 of the Second Amendment and the Rental Rates Schedule, attached as Exhibit D to the Second Amendment, provided that Albertson's was to pay annual "Base Rent" and set forth the amounts.  The Base Rent was to be paid in equal monthly installments in advance on the first day of each calendar month, pursuant to Paragraph 14.1.2 of the Second Amendment.

19.     Paragraph 14.2 of the Second Amendment provided that in addition to the Base Rent, Albertson's was to pay a portion of "Common Area Maintenance Costs" ("CAM"). CAM charges are billed quarterly and are payable within thirty days of being invoiced subject to a year-end reconciliation.

20.     Paragraph 14.3 of the Second Amendment provided that in addition to the Base Rent and CAM, Albertson's was to pay a "Percentage Rent" based on a percentage of Albertson's gross sales.

21.     Paragraph 22 of the Second Amendment, amending Paragraph 17.3 of the Lease, provided as follows:

> **17.3     Termination Remedies**.  Upon the occurrence of a Material Default by Tenant that is not cured by Tenant within the grace periods specified herein, Landlord shall, have the following rights and remedies in addition to all other rights and remedies available to Landlord at law or in equity:
> …
> **17.3.2.** The rights and remedies provided by California Civil Code Section 1951.4, that allows Landlord to continue this Lease in effect and to enforce all of its rights and remedies under this Lease, including the right to recover rent as they become due, for so long as the Landlord does not terminate Tenant's right to possession.

///

5

SAUER & WAGNER LLP
1801 CENTURY PARK EAST, SUITE 1150
LOS ANGELES, CA 90067

22.     Paragraph 22 of the Second Amendment, amending Paragraph 17.3 of the Lease, provided as follows:

> ***17.3.  Termination Remedies***.  Upon the occurrence of a Material Default by Tenant that is not cured by Tenant within the grace periods specified herein, Landlord shall, have the following rights and remedies in addition to all other rights and remedies available to Landlord at law or in equity:
>
> ***17.3.1.***  The rights and remedies provided by California *Civil Code* Section 1951.2 to terminate Tenant's right to possession of the Premises and to recover (i) the worth at the time of award of the unpaid rent which had been earned at the time of termination; (ii) the worth at the time of award of the amount by which the unpaid rent which would have been earned after termination until the time of award exceeds the amount of such rental loss that Tenant proves could be have been reasonably avoided; (iii) the worth at the time of award of the amount by which the unpaid rent for the balance of the Term after the time of award exceeds the amount of loss of such rental loss that Tenant proves could be reasonably avoided; and (iv) any other amount necessary to compensate Landlord for all the detriment proximately caused by Tenant's failure to perform its obligations under this Lease.  The "worth at the time of award" of the amounts referred to in subsections (i) and (ii) above shall be computed by allowing interest at the discount rate of the Federal Reserve Bank of San Francisco at the time of award plus one percent (1%).  The "worth at the time of award" of the amount referred to in subsection (iii) above shall be computed by discounting such amount at the discount rate of the Federal Reserve Bank of San Francisco at the time of award plus one (1) percent.

23.     Pursuant to the Judgment, Albertson's paid the amounts due under the Lease through May 2017.  Pursuant to California *Civil Code* § 1951.4, Albertson's paid the Base Rent, CAM charges, and insurance charges due through September 1, 2020.  Thereafter, and despite demand therefor, Albertsons has failed, without basis, to pay the rent and related charges due under the Lease through March 18, 2021.

24.     On March 18, 2021, KFT served a notice of further default and lease termination on Albertson's in which KFT elected to proceed pursuant to California *Civil Code* § 1951.2, terminate the lease, and seek damages that are detailed in that section.  A true and correct copy of the California *Civil Code* § 1951.2 notice is attached hereto as Exhibit "F."  On the same date, the replacement tenant opened the grocery store and paid rent for the first time.

6

SAUER & WAGNER LLP
1801 CENTURY PARK EAST, SUITE 1150
LOS ANGELES, CA 90067

25.     As of the date of the termination of the Lease, Albertson's had 6 years and 2 months left of rent and related obligations.  The discounted value of those obligations would have been approximately $8.25 million had KFT not obtained a replacement tenant.  Due to KFT's efforts to obtain that replacement tenant, Albertson's reduced rental obligation under the Lease is $397,736.  In order to obtain and accommodate the new tenant, KFT had to make certain repairs to the property, the cost of which is Albertson's responsibility under the Lease.  Those repairs were to the damaged roof, electrical feeds, gas lines, and insulation.  In addition, the HVAC system and the slab were so badly damaged and in disrepair that they had to be replaced.  The total cost of those repairs and replacements was $1,309,628.

26.     The replacement tenant required KFT to reduce the usable space from 52,327 ft. to 42,689 ft.  The cost to prepare the reduced space, including direct costs of construction, demolition, building abatement, permits and fees, legal and accounting, tenant improvement allowance, and leasing commission totaled $7,288,821.

27.     The lease term for the replacement tenant is 15 years.  As of the date of termination of the Lease, Albertson's had 6 years 2 months left on its term.  Given the ratio of the two lease terms, Albertson's share of the total cost to release the property is $2,988,417.

**FIRST CAUSE OF ACTION**

**(Breach of Lease – California *Civil Code* § 1951.4 Against Albertson's and Does 1-5)**

28.     KFT hereby incorporates paragraphs 1 through 21 and 23 hereof as though set forth in full.

29.     KFT performed each and every covenant and condition required of it under and pursuant to the terms and conditions of the Lease, First Amendment, and Second Amendment, ///

7

SAUER & WAGNER LLP
1801 CENTURY PARK EAST, SUITE 1150
LOS ANGELES, CA 90067

1    except those conditions and covenants which may have been excused or rendered impossible of

2    performance by Albertson's and Does 1-5's wrongful conduct.

3

4         30.      As a result of Albertson's failure to pay rent, CAM charges, interest, and

5    insurance from September 1, 2020 through March 18, 2021 and pursuant to California *Civil*

6    *Code* § 1951.4 and the Judgment, KFT has been damaged in an amount to be proven at trial, but

7    not less than the sum of $813,570 plus interest thereon and attorney's fees.

8

9                        **SECOND CAUSE OF ACTION**

10   **(Breach of Lease – California *Civil Code* § 1951.2 Against Albertson's and Does 6-10)**

11

12        31.      KFT hereby incorporates paragraphs 1 through 20, 22 through 27, and 29 hereof

13   as though set forth in full.

14

15        32.      Pursuant to the Lease and California *Civil Code* § 1951.2, Albertson's and Does

16   6-10 owe KFT $4,695,781 plus attorney's fees.  The $4,695,781 consists of $1,309,628 to repair

17   damage for which Albertson's is responsible to restore the premises, $397,736 for the remainder

18   of the discounted value of the rent obligation under the Lease, and $2,988,417 for the prorated

19   cost of putting the replacement tenant into possession.  Demand has been made on Albertson's

20   for these sums, but Albertson's has further breached its obligations under the Lease by failing to

21   pay.

22

23   **WHEREFORE**, KFT prays for judgment as follows:

24

25        1.       On the First Cause of Action for damages in the sum of at least $813,570 plus

26   interest thereon according to proof;

27

28   ///

8

2.    On the Second Cause of Action for damages in the sum of at least $4,695,781 plus interest thereon according to proof;

3.    For attorney's fees;

4.    For expenses and costs of suit; and

5.    Such other and further relief as the court may deem just and proper.

DATED:  November 14, 2022            SAUER & WAGNER LLP

By: _____
            Gregory P. Barchie
Attorneys for Plaintiff KFT Enterprises, No. 1 L.P.

9

# EXHIBIT A



CONFORMED COPY
ORIGINAL FILED
Superior Court of California
County of Los Angeles

MAY 02 2017

Sherri R. Carter, Executive Officer/Clerk

By: _____ , Deputy
Brooke Viola

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

GOVERNOR GEORGE DEUKMEJIAN COURTHOUSE (LONG BEACH)

| | |
|---|---|
| KFT ENTERPRISES, NO. 1 L.P., a California limited partnership | CASE NO. NC060339 [Hon. Ross Klein, Dept. S27] |
| Plaintiff, | [PROPOSED] JUDGMENT |
| v. | Complaint filed:  October 28, 2015 |
| ALBERTSON'S LLC, a Delaware limited liability company, and DOES 1 through 10, inclusive, | Trial Date:  March 21, 2017 |
| Defendants. | Judicial Referee: Hon. Patricia Collins (Ret.) |
| ALBERTSON'S LLC, a Delaware limited liability company | |
| Cross-Complainant, | |
| v. | |
| KFT ENTERPRISES, NO. 1 L.P., a California limited partnership, and ROES 1 through 20, inclusive, | |
| Cross-Defendants. | |

[PROPOSED] JUDGMENT

This case came on regularly for trial on March 21, 2017, at ADR Services, 1900 Avenue of the Stars, Suite 425, Los Angeles, California 90067, the Judicial Referee, Hon. Patricia Collins (Ret.), presiding.  Plaintiff/Cross-Complainant/Cross-Defendant KFT Enterprises, No. 1 L.P. ("KFT") appeared by its attorneys, Robert S. Chapman and Gregory P. Barchie of Sauer & Wagner LLP.  Defendant/Cross-Complainant/Cross-Defendant Albertson's LLC ("Albertson's") appeared by its attorneys, David Jacobs and Susan Graham of Epstein, Becker & Green LLP.

KFT's complaint filed on October 28, 2015 asserted one cause of action for breach of the lease based on Albertson's failure to pay rent for September, 2015, CAM charges for the second quarter of 2015 and insurance charges due in September, 2015.  KFT sought damages of $116,116.23 plus interest at the rate of 10% per annum, costs and attorney's fees.  KFT's cross-complaint filed on September 6, 2016 asserted one cause of action for breach of the lease based on Albertson's failure to pay rent for December, 2015 through July, 2016, and CAM charges for the third and fourth quarters of 2015 and the first and second quarters of 2016.  KFT sought damages of $757,150.38 plus interest at the rate of 10% per annum, costs and attorney's fees.

Albertson's filed a first amended cross-complaint on July 11, 2016 and sought damages for breach of the covenant of good faith and fair dealing contained in the lease and declaratory relief governing the lease.

On August 8, 2016, the Judicial Referee granted summary judgment in favor of KFT on its complaint for breach of the lease.  The Judicial Referee found that Albertson's had breached the lease by failing to timely pay $81,542.91 for rent that was due on September 1, 2015, $26,575.91 for CAM charges for the second quarter of 2015, and $7,997.41 for insurance charges due in September, 2015, for a total sum of $116,116.23, and that KFT was damaged in those amounts plus interest, costs of suit and attorney's fees.

On March 20, 2017, the Judicial Referee granted KFT's motion *in limine* No. 1 thereby excluding the evidence underlying Albertson's claims and defenses.  Albertson's has conceded that by reason of exclusion of that evidence, it was unable to establish the necessary elements of the causes of action in its first amended cross-complaint and affirmative defenses.

1

[PROPOSED] JUDGMENT

1        On March 21, 2017, the Judicial Referee tried this matter and accepted the parties'

2  stipulation of facts.  The Judicial Referee found that KFT should be awarded final judgment on

3  its claims for relief in its complaint and cross-complaint against Albertson's in the respective

4  sums of $116,116.23, $757,150.38, and $84,321.44 in interest, for a total sum of $957,588.05

5  ($116,116.23 + $652,343.28 + $104,807.10 + $84,321.44).  In addition, the Judicial Referee

6  found that KFT was entitled to attorney's fees and costs of the suit as the prevailing party in this

7  action pursuant to Paragraph 32.1 of the Second Amendment.

8       The Judicial Referee also found that KFT is entitled to judgment on Albertson's first

9  amended cross-complaint and Albertson's is to take nothing on its first amended cross-

10  complaint.

11       The Judicial Referee ordered KFT to prepare and file a Proposed Statement of Decision

12  providing its rationale for its ruling and Proposed Judgment, and KFT has done so. The Judicial

13  Referee thereafter executed and filed a Statement of Decision and Proposed Judgment.

14  NOW, THERFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED:

15       KFT is hereby awarded judgment on its claims for relief against Albertson's in the sum

16  of $957,588.05, plus attorney's fees and costs of the suit as the prevailing party in this action

17  pursuant to Paragraph 32.1 of the Second Amendment to Lease dated May 8, 2007.  Attorney's

18  fees and costs are to be determined pursuant to a post-judgment memorandum of costs and

19  motion for attorneys' fees and costs filed by KFT.

20       KFT is hereby awarded judgment in its favor on Albertson's first amended cross-

21  complaint.  Albertson's is to take nothing on its first amended cross-complaint.

22

23  DATED: April __, 2017                  JUDGE ROSS M. KLEIN

      5-2-

24                              HON. ROSS KLEIN

25

  Submitted by:

26

27  Hon. Patricia L. Collins, (retired) Judicial Referee

28

[PROPOSED] JUDGMENT

## **PROOF OF SERVICE**

I am employed in the County of Los Angeles, California. I am over the age of 18 years and not a party to the within action. My business address is 1801 Century Park East, Suite 1150, Los Angeles, CA 90067.

On April 27, 2017, I served the foregoing document(s) described as: **[PROPOSED] JUDGMENT** on the interested party(ies) in this action, addressed as follows:

David Jacobs, Esq.
J. Susan Graham, Esq.
Epstein Becker & Green, PC
1925 Century Park East, Suite 500
Los Angeles, CA 90067

( )    I am readily familiar with the business practice for collection and processing of correspondence for mailing within the United States Postal Service. I know that the correspondence is deposited with the United States Postal Service on the same day this declaration was executed in the ordinary course of business. I know that the envelope was sealed and with postage thereon fully prepaid, placed for collection and mailing on this date, following ordinary business practices in the United States mailed at Los Angeles, California.

( )    By Overnight Mail, I caused to be delivered such envelope via Federal Express to the office(s) of the addressee(s) noted above.

( )    By email, I caused the above-referenced document(s) to be transmitted to the party(ies) listed above.

(X)    By personal service, I delivered such envelope by hand to the offices of the addressee(s) noted above.

Executed this 27th Day of April 2017, at Los Angeles, California.

(X)    (State) I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

( )    (Federal) I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Candace Yang

# EXHIBIT B

# - L E A S E -

## INDEX

| Section Number | Title |
|---|---|
| 1 | PREMISES |
| 2 | RIGHTS IN COMMON AREA |
| 3 | TERM |
| 4 | RENT |
| 5 | FIXTURES |
| 6 | USE OF PREMISES |
| 7 | PAYMENT OF TAXES |
| 8 | DAMAGE TO PREMISES |
| 9 | INSURANCE AND INDEMNIFICATION |
| 10 | EXERCISE OF EMINENT DOMAIN |
| 11 | UTILITIES, ETC. |
| 12 | COVENANTS AGAINST LIENS |
| 13 | ASSIGNMENT AND SUBLETTING |
| 14 | NOTICES |
| 15 | RIGHT TO GO UPON PREMISES |
| 16 | MAINTENANCE |
| 17 | DEFAULT |
| 18 | SIGNS |
| 19 | OMITTED |
| 20 | CERTIFICATE OF TENANT |
| 21 | ATTORNEY'S FEES |
| 22 | CONDITION OF TITLE-SUBORDINATION |
| 23 | HOLDING OVER |
| 24 | ARBITRATION |
| 25 | SUCCESSORS IN INTEREST |
| 26 | RECORDING INDENTURE |
| 27 | REMEDIES ARE CUMULATIVE |
| 28 | QUIET POSSESSION |
| 29 | ALTERATION |
| 30 | CONTINUING OFFER |
| 31 | GENERAL CONDITIONS |

4/2/85-2

L E A S E

1       THIS LEASE, made this _16TH_ day of _AUGUST_ ,
2   1985, by and between STUART KAPLAN, IRWIN HARRIS and WELLS FARGO
3   BANK, N.A., Trustees of the Decedent's Children's Trust held for
4   the benefit of Stuart Kaplan under the Charles H. Kaplan Family
5   Trust No. 1 dated March 22, 1974, STUART KAPLAN, IRWIN HARRIS and
6   WELLS FARGO BANK, N.A., Trustees of the Decedent's Children's
7   Trust held for the benefit of Carolyn Harris under the Charles H.
8   Kaplan Family Trust No. 1 dated March 22, 1974, and STUART
9   KAPLAN, IRWIN HARRIS and WELLS FARGO BANK, N.A., Trustees of the
10  Survivor's Trust under the Charles H. Kaplan Family Trust No. 1
11  dated March 22, 1974, hereinafter collectively called "Landlord,"
12  and LUCKY STORES, INC., a California corporation, hereinafter
13  called "Tenant,"
14
15              W I T N E S S E T H :
16
17      1.   PREMISES
18
19              Landlord is owner of certain real property in the
20  City of Long Beach, County of Los Angeles, State of California,
21  described in Exhibit A, attached hereto and hereby incorporated
22  herein, upon which Landlord or Landlord's predecessor in interest
23  has erected a number of stores and buildings.  Tenant is present-
24  ly the successor tenant under a lease dated November 17, 1954,
25  which lease has heretofore been amended, pursuant to which Tenant
26  presently occupies a portion of the real property described in
27  Exhibit A, the term of which lease expires on April 23, 1986.
28
29              Landlord leases to Tenant, and Tenant leases from
30  Landlord, a portion of said real property described in Exhibit A,
31  which portion is depicted as cross-hatched on the plot plan which
32  is Exhibit B, attached hereto and hereby incorporated herein, to-
33  gether with a building containing approximately fifty-one thou-
34  sand five hundred (51,500) square feet of ground floor space, a
35  mezzanine containing approximately one thousand eight hundred
36  forty-five (1,845) square feet (for a total of approximately
37  fifty-three thousand three hundred forty-five [53,345] square
38  feet) and various appurtenances as shown on the plot plan which
39  is Exhibit B.  Said portion of said real property depicted on
40  Exhibit B and said building and appurtenances are hereinafter
41  referred to as the "demised premises."
42
43
44
45
46
47
48
49
50
51
52
53
54
55

KFT_000002
Page 033

2. <u>RIGHTS IN COMMON AREA</u>

Landlord agrees to provide and maintain during the term of this lease a common area as shown on the plot plan which is Exhibit B hereto which shall include, but shall not be limited to, pedestrian sidewalks, shopping cart ramps, landscaped areas, parking areas and areas for vehicular circulation, which shall be paved, marked and adequately lighted during the term hereof. Said common area shall contain facilities for parking and vehicular driveways at the ratio of the number of square feet of parking area and driveway area to the number of square feet of floor area contained in the building area on the real property described in Exhibit A hereto that is set forth on the plot plan which is Exhibit B hereto. No changes shall be made in said common area during the term of this lease, or any extension thereof, unless the prior written approval of Tenant has been obtained; provided that Landlord shall be entitled to make minor changes in the sidewalk area fronting the shop buildings on the real property described in Exhibit A and in the area to the rear of such shop buildings so long as such changes do not interfere with ingress and egress to and from the demised premises. Landlord agrees that during the term of this lease Tenant, its customers and invitees shall have nonexclusive easements over all of said common area for the purpose of parking and for ingress to and egress from the demised premises. Landlord agrees that customers and invitees of Tenant in common with the customers and invitees of other stores located on the real property described in Exhibit A shall during the term of this lease have reasonable free parking daily in said common area, provided that such parking shall not interfere with Tenant's use of the portions thereof adjacent to the demised premises for loading and unloading and other normal requirements of Tenant's business conducted on the demised premises. Landlord shall keep the common area adequately lighted at all times when lighting is necessary. Said common area shall not be used for any other purpose than the parking of motor vehicles and their ingress and egress and the ingress and egress of pedestrians.

3. <u>TERM</u>

The term of this lease shall commence at 12:01 a.m. on April 24, 1986 and shall continue for a period of twenty (20) years (plus additional fractional month), ending at midnight on April 30, 2006.

4.   RENT

(a)   Fixed Minimum Rent.  Tenant agrees to pay to Landlord as an annual fixed minimum rent for the demised premises during the term hereof the sum of Four Hundred Twelve Thousand Dollars ($412,000.00).

Such fixed minimum rent is to be paid in equal monthly installments in advance on the first day of each and every calendar month of the term hereof.  The fixed rent for the initial fractional month shall be prorated and paid with the fixed rent paid for the first full calendar month of the term. If the term ends on a day other than the last day of a month, the fixed rent for that month shall be prorated, and the portion applicable to the portion of the month occurring after the end of the term shall be paid by Landlord to Tenant within ten (10) days of the end of the term.

(b)   Common Area Costs.  Tenant agrees to pay to Landlord periodically, but no more often than quarterly, fifty-two and sixty-one one/100th percent (52.61%) of Landlord's actual costs incurred in the maintenance (which shall include sweeping, striping, cleaning, repairing and replacing), insuring at the limits required pursuant to Section 9(d) hereof and lighting of the common area on the real property described in Exhibit A hereto and in paying all real property taxes and assessments for public improvements paid by Landlord in connection with such common area; provided, however, that such costs shall not include any management fee in connection with the said common area or any portion of real property taxes resulting directly or indirectly from a sale, transfer, conveyance or other change in ownership occurring with respect to the real property described in Exhibit A hereto or any part thereof; and provided further, however, that Landlord shall not make or authorize any single expenditure regarding the maintenance, insuring and/or lighting of said common area exceeding Five Thousand Dollars ($5,000.00) without first obtaining the written consent of Tenant to such expenditure.  Any demand by Landlord to Tenant for payment of Tenant's proportionate share of the above common area expenses, real property taxes or assessments for public improvements shall be accompanied by a statement showing in reasonable detail the expenditures made by Landlord in connection with the common area, reasonable written data supporting the billing and showing the basis for the determination of Tenant's proportionate share and shall be limited to expenditures made within twelve (12) months prior to the submission of such statement.  The failure of Landlord to include any expenditure in a statement to Tenant within twelve (12) months of the date of such expenditure shall be deemed a waiver by Landlord of his right to demand payment by Tenant of Tenant's proportionate share thereof.  Tenant shall have the right to audit and examine the books and records of Landlord with respect to any billing to Tenant prior to Tenant's payment thereof.  Such audit shall be made at the sole cost and expense of Tenant and shall be completed with all reasonable diligence.

(c)   Percentage Rent.  In addition to the fixed

minimum rent hereinabove provided, Tenant shall pay to Landlord on or before the sixtieth (60th) day after the expiration of each of Tenant's fiscal years or fraction thereof (as such fiscal years may be established by Tenant) of the term of this lease a percentage rent equal to the percentages hereinafter set forth of the gross sales, as hereinafter defined, made by Tenant on the demised premises during such fiscal year:

(i)   One and one-half percent (1-1/2%) up to and including the amount of gross sales necessary to yield percentage rent equal to the sum of the annual fixed minimum rent payable pursuant to Section 4(a) hereof, real property taxes and assessments for public improvements paid by Tenant pursuant to Section 7(a) hereof and any amount paid by Tenant to Landlord as reimbursement for the cost of earthquake insurance pursuant to Section 9(a) hereof in excess of Five Thousand Dollars ($5,000.00) in any one (1) year.

(ii)   One and one-quarter percent (1-1/4%) of any gross sales, as hereinafter defined, in excess of the amount calculated in accordance with Section 4(c)(i).

For the purpose of this Section 4(c), percentage rent payable in respect of any fraction of a fiscal year at the end of the term shall be paid within sixty (60) days of the end of such term. Landlord and Tenant agree that any percentage rent payable in respect of the fraction of the calendar year at the end of the term of the lease pursuant to which Tenant presently occupies the demised premises shall be paid within sixty (60) days of the end of such term.

If during the term hereof, as long as the demised premises are being used for the purpose of conducting thereon a general food supermarket business, Landlord occupies or uses, or permits the occupation or use of, the real property described in Exhibit A hereto other than the demised premises, directly or indirectly, for (i) a general market, grocery store, delicatessen, or any combination thereof, or (ii) a meat market, fruit store, vegetable store, store selling alcoholic beverages or any combination thereof, effective upon the commencement of such use and continuing for the balance of the term hereof, the rate of percentage rent payable by Tenant pursuant to this Section 4(c) shall be reduced by one-half of one percent (1/2 of 1%) if such use is included in clause (i) above and/or by one-sixth of one percent (1/6 of 1%) for each of the uses included in clause (ii) above; provided that the foregoing shall not be applicable to the operation of a health food store and/or the sale of alcoholic beverages for on-premises consumption on the real property described in Exhibit A; provided, further, that Landlord shall not be deemed to have permitted the occupation or use of the real property described in Exhibit A for a use described in clause (i) or (ii) in the event that the lease of the occupant engaging in such use prohibits such use and Landlord has used its best efforts to enforce such provision of such lease.  In this connection, Landlord shall not be deemed to have permitted the

Section 4, Page 2                                    7/31/85-2

1  occupation or use of the real property described in Exhibit A for
2  a use described in clause (i) or (ii) unless Tenant shall have
3  notified Landlord in writing of such occupation or use and Land-
4  lord has failed to use its best efforts to enforce the provisions
5  of the lease prohibiting such use within thirty (30) days follow-
6  ing Landlord's receipt of such notice from Tenant nor shall Land-
7  lord be deemed to have permitted such occupation or use during
8  any time that Landlord diligently proceeds with the enforcement
9  of such provisions of such lease.  In the event that Landlord
10 files an action in court to cause the cessation of a use de-
11 scribed in clause (i) or (ii), Landlord shall be deemed to have
12 fulfilled its obligations under this paragraph with respect to
13 such use even if Landlord is not successful in prosecuting such
14 action and, in such event, the provisions of this paragraph shall
15 no longer apply to such use.
16
17             The term "gross sales" as used in this lease
18 shall mean the aggregate of all moneys received by Tenant from
19 sales of goods, wares, merchandise, and services to the public
20 made for cash or credit on the demised premises during the term
21 hereof (including sales by Tenant's concessionaires and subles-
22 sees, including the net proceeds to Tenant from sales through
23 vending machines, including the net proceeds to Tenant from sales
24 made and services performed by parties unrelated to Tenant and
25 not occupying a portion of the demised premises and including
26 with respect to automated teller machines only the rent received
27 by Tenant from the party placing said machine at the demised
28 premises) after deducting therefrom (i) all refunds, discounts
29 and allowances made to customers by Tenant, its concessionaires
30 and sublessees, in connection with merchandise sold or returned
31 to Tenant, its concessionaires and sublessees, (ii) any federal
32 excise tax on retailers' sales, and (iii) any amount of any city,
33 county, state, or federal sales, luxury, excise, or other tax on
34 such sales which is both added to the selling price (or absorbed
35 therein) and paid to the taxing authority by Tenant, its conces-
36 sionaires and sublessees, or any other impost or levy so payable
37 and measured by the volume of sales of any particular item or
38 items, whether such impost or levy be denominated "tax" or other-
39 wise.  There shall not be deducted therefrom any income, excess
40 profits, franchise or other taxes based upon or measured by in-
41 come.  Gross sales shall not include any sums received by Tenant
42 from the sale of an item or the performance of a service which is
43 incidental to the business conducted by Tenant in the demised
44 premises the nature of which may attract or retain customers for
45 such business, such as, but not limited to, recycling services
46 and the sale of transportation tickets, commuter books and money
47 orders; provided that gross sales shall include any handling
48 charge received by Tenant for the sale of lottery tickets.  The
49 return or transfer of merchandise from one of Tenant's stores to
50 another, or to any of Tenant's warehouses, shall not be deemed a
51 sale, nor shall the sale of Tenant's fixtures or equipment or all
52 or substantially all of its stock-in-trade and merchandise at a
53 sale other than at retail.
54
55             (d)   Fixed minimum rent paid by Tenant pursuant to

Section 4, Page 3                              8/13/85

Section 4(a) hereof, real property taxes and assessments for
public improvements paid by Tenant pursuant to Section 4(b) here-
of as a portion of Tenant's reimbursement to Landlord for common
area maintenance costs, real property taxes and assessments for
public improvements paid by Tenant pursuant to Section 7(a) here-
of and any amount paid by Tenant to Landlord as reimbursement for
a portion of the cost of earthquake insurance pursuant to Section
9(a) hereof in excess of Five Thousand Dollars ($5,000.00) in any
one (1) year shall be credited against or refunded from per-
centage rent paid or payable pursuant to Section 4(c) hereof.

     (e) <u>Statements</u>. Tenant shall keep accurate re-
cords of all sales made on the demised premises in accordance
with usual accounting practices applicable to Tenant's business,
and shall furnish Landlord, as soon as possible and in any event
within sixty (60) days after the termination of each fiscal year,
a verified statement showing the total gross sales on the demised
premises for such fiscal year calculated as herein provided.
Such annual statement shall be taken as final and correct, except
that Landlord (by a certified public accountant selected by it)
shall have the right after the close of each fiscal year to exam-
ine and audit Tenant's records of sales made on the demised prem-
ises during such fiscal year, upon giving Tenant written notice
to that effect within six (6) months after the expiration of such
fiscal year. Such audit or examination shall not be made more
often than once for any year, and shall be at the sole cost and
expense of Landlord, and must be completed with all reasonable
diligence. On termination of this lease by lapse of time or
otherwise, Tenant shall report to Landlord as "gross sales" the
unpaid balance of all credit sales, excluding only those past due
more than one (1) year and those balances which have been written
off Tenant's books as uncollectible.

     (f) Payments of rental shall be made payable to
Kaplan Family Trust, or as otherwise directed by Landlord in
writing, and shall be sent to the address specified in Section 14
hereof, or at such other place as Landlord may from time to time
in writing direct.

Section 4, Page 4                                        8/13/85

5.   **FIXTURES**

       Tenant at its own expense shall provide, install
and maintain all trade fixtures and equipment reasonably required
(and may substitute for and alter the same) to enable it to con-
duct its business in the demised premises in a good and business-
like manner.  Such fixtures and equipment shall remain the prop-
erty of Tenant and Tenant may remove the same or any part thereof
at any time prior to the expiration of thirty (30) days after the
termination of this lease.  Tenant shall repair at its own ex-
pense any damage to the demised premises caused by the removal of
said fixtures or equipment by the Tenant.  Any fixtures or equip-
ment installed by Tenant pursuant hereto shall not be subject to
and shall be free of any lien for the payment of rent by Tenant
or for the performance of any other obligation of Tenant under
this lease.

Section 5, Page 1
02852500

APR 2 1985

KFT_000008
Page 039

## 6.   USE OF PREMISES

Tenant shall not be required to continuously use the demised premises for any purpose nor shall Tenant be required to continuously occupy the demised premises.

Tenant may use the demised premises for the purpose of conducting thereon a general food supermarket, with the privilege of including in the premises a drugs and toiletries department, a notions department, a variety and soft goods department, a housewares and hardware department, an alcoholic beverage department, a ready-to-wear clothing and accessory department, a prescription pharmacy, an automotive accessory and supply department, and a department or departments selling other items compatible with the items offered by Tenant for sale in the foregoing enumerated departments and items sold and services offered from time to time in other general food supermarkets operated by Tenant, or for any other lawful purpose; provided that nothing contained in this lease shall prohibit any other occupant of the real property described in Exhibit A from selling or offering for sale the foregoing items.  Tenant may also use the demised premises for the installation and use of one (1) or more machines and/or devices which effect or facilitate the transfer, crediting and/or debiting of funds, the determination of account balances, the cashing of checks and/or any and all functions relating to such type of activities as may now or in the future be performed or facilitated by machines and/or devices.  Addendum 1:

Tenant shall conduct its business insofar as the same relates to Tenant's use and occupancy of the demised premises in a lawful manner and in strict compliance with all governmental laws, rules, regulations and orders applicable to the business of Tenant conducted in and upon the demised premises.

Landlord agrees that none of the property described in Exhibit A, other than the demised premises shall be occupied by any office building, entertainment facility.  As used herein, "entertainment facility" or "recreational facility" includes, but is not limited to, a bowling alley, skating rink, theater, billiard room, health spa, health studio, gymnasium, massage parlor, bar, tavern, amusement arcade, or other place of public amusement; and "training or educational facility" includes, but is not limited to, a beauty school, barber college, reading room, place of instruction, or any other operation catering primarily to students or trainees rather than to customers, it being the intent of this provision that the parking and other common facilities should not be burdened by either large scale or protracted use.

Addendum 1:  Not withstanding any other provision herein, Lessee shall not operate a commercial bank or self service carry-out restaurant in the demised premises.

KFT_00000
Page 040

## 7. PAYMENT OF TAXES

(a)   Tenant agrees that it shall pay before delin-
quency any real property taxes ("Taxes") and assessments for
public improvements ("Assessments") levied or assessed against
the demised premises and the improvements thereon during the term
hereof; provided, however, that Tenant shall not be obligated to
pay any portion of Taxes resulting directly or indirectly from
any sale, transfer, conveyance or other change in ownership oc-
curring with respect to the demised premises, and within twenty
(20) days of Landlord's receipt of Tenant's written request
therefor, Landlord shall pay to Tenant the portion of Taxes
resulting therefrom.   At the beginning and end of the term Taxes
and Assessments to be paid by Tenant shall be prorated so that at
the beginning of the term, with respect to any Taxes and Assess-
ments levied or assessed for a fiscal tax year commencing prior
to the beginning of the term, Tenant shall pay only such propor-
tion of said Taxes and Assessments as the portion of said fiscal
tax year following the beginning of the term bears to the entire
fiscal tax year, and so that at the end of the term, with respect
to any Taxes and Assessments levied or assessed for a fiscal tax
year extending beyond the end of the term, Tenant shall pay only
such proportion of said Taxes and Assessments as the portion of
the fiscal tax year preceding the end of said term bears to the
entire fiscal tax year.   Tenant shall only be responsible for the
payment, in the manner provided in this Section 7, of Taxes and
Assessments.   In the event any Tax or Assessment is levied or
assessed against the demised premises, which Tax or Assessment
becomes due and payable during the term of this lease which Tax
or Assessment may be legally paid in installments (whether by
subjecting the demised premises to bond or otherwise), Tenant
shall have the option to pay such Tax or Assessment in install-
ments.   In the event of such election, Tenant shall be liable
only for those installments of such Tax or Assessment which be-
come due and payable during the term of this lease.   Landlord
agrees to execute or join with Tenant in the execution of any
application or other instrument that may be necessary to permit
the payment of such Tax or Assessment in installments.   Taxes or
Assessments which may be paid in installments shall be prorated
at the beginning of the term or end of the term as hereinabove
provided.

(b)   Tenant shall also pay before delinquency any
and all taxes and assessments levied or assessed, and becoming
payable during the term, against Tenant's property located upon
the demised premises.

(c)   If, at any time during the term of this lease,
under the laws of the State of California or any political subdi-
vision thereof in which the demised premises are situated, a tax
or excise on rents or other tax, however described, is levied or
assessed by the State of California or said political subdivision
against Landlord on account of the rent payable hereunder, as a
substitute in whole or in part for taxes assessed or imposed by
the State of California or said political subdivision on land and

Section 7, Page 1                              4/2/85-2

buildings or on land or buildings, Tenant shall pay and discharge such tax or excise on rents or other tax, but only to the extent of the amount thereof which is lawfully assessed or imposed upon Landlord and which was so assessed or imposed as a direct result of Landlord's ownership of the demised premises or of this lease or of the rentals accruing under this lease.

(d)   Tenant may contest, or may join with Landlord in contesting, the existence, amount or validity of any Tax or Assessment affecting the real property described in Exhibit A hereto.  Landlord agrees to notify Tenant in writing within ten (10) days of Landlord's receipt of any notification which evidences an increase of greater than five percent (5%) in the Taxes or Assessments affecting the real property described in Exhibit A hereto.

Section 7, Page 2                                      6/27/85

8.  **DAMAGE TO PREMISES**

(a)  If during the term hereof the demised premises shall be damaged or destroyed by fire, or by any other cause whatsoever, Landlord, except as otherwise provided in this Section, shall forthwith proceed to repair and/or rebuild the same, including any additions or improvements made by Landlord or Tenant, on the same plans and design as existed immediately before such damage or destruction occurred, subject to such delays as may be reasonably attributable to governmental restrictions or failure to obtain materials or labor, or other causes (other than financial), whether similar or dissimilar, beyond the control of Landlord.  Materials used in repair and rebuilding shall be as nearly like original materials as may then be reasonably procured in regular channels of supply.  Tenant's interest in the proceeds of insurance carried on Landlord's improvements pursuant to Section 9(a) hereof, payable as a result of such damage or destruction shall be made available to Landlord for the purpose of such repair or rebuilding.

Tenant shall, at its own expense, replace and repair so much of Tenant's trade fixtures and equipment in said demised premises which may be damaged or destroyed by fire or any other cause whatsoever, as may, in the opinion of Tenant, be necessary for the resumption by Tenant of its business in the demised premises.  Such replacement or repair shall take place as soon after the damaging or destruction as may be reasonably possible, subject to delays beyond the control of Tenant.

(b)  In the event of a partial damage or destruction, Tenant shall continue to utilize the demised premises to the extent that it may be practicable to do so from the standpoint of good business.  All fixed minimum rent shall abate from the time any damage or destruction occurs until the demised premises are wholly restored, unless Tenant shall continue or resume using the demised premises, in which event the rent shall be equitably abated in the proportion that the unusable part of the demised premises bears to the whole thereof.

(c)  Either party hereto shall have the right to terminate this lease if, during the last three (3) years of the term of this lease, the building which is a portion of the demised premises is damaged in an amount exceeding sixty-six and two-thirds percent (66-2/3%) of the then reconstruction cost of said building (which reconstruction cost for the purposes of this Section 8[c] shall be limited to only the cost of actually reconstructing said building), provided that in such event such termination of this lease shall be effected by written notice within sixty (60) days of the happening of the casualty causing such damage.

(d)  Each of the parties hereto mutually releases the other from liability, and waives all right of recovery against the other, for any loss of or damage to the property of each, property of others for which either of the parties hereto

Section 8, Page 1                                    6/27/85

is liable, or may become liable, or as to which either may have
assumed liability, property of others in the actual or construc-
tive custody of either of the parties hereto, including earnings
derived therefrom, caused by or resulting from fire, the perils
of the commonly referred to Extended Coverage Endorsement and
leakage from automatic sprinkler systems, if any, or from perils
insured against under any insurance policies maintained by the
parties hereto, regardless of the cause of such loss or damage
even though it results from some act or negligence of a party
hereto, its agents or representatives; provided, however, that
this provision shall be inapplicable if it would have the effect,
but only to the extent that it would have the effect, of invali-
dating any insurance coverage of the parties hereto.  If Tenant
enters into a similar agreement with a subtenant of it, which
agreement extends to Landlord, the agreement of Landlord con-
tained in this paragraph shall also extend to such subtenant.

Section 8, Page 2                          4/2/85-2

KFT_000.18
Page 044

9.   INSURANCE AND INDEMNIFICATION

1
2
3          (a)  Tenant shall cause to be effected upon Land-
4 lord's building and appurtenances which are part of the demised
5 premises fire insurance (including the so-called "Extended Cover-
6 age Endorsement" and naming as insureds Landlord, Tenant and the
7 beneficiary or mortgagee of any first deed of trust or first
8 mortgage affecting the demised premises, provided that said bene-
9 ficiary or mortgagee has agreed in writing by an agreement in
10 recordable form and in form and content satisfactory to Tenant,
11 in Tenant's sole discretion, that the proceeds of such insurance
12 shall be made available to Landlord without diminution or offset
13 to effect the repair and/or rebuilding required pursuant to Sec-
14 tion 8[a] hereof), in a company or companies licensed to do busi-
15 ness in the state in which the demised premises are located, in a
16 total amount of not less than one hundred percent (100%) of the
17 replacement cost of said building and appurtenances.  Landlord
18 agrees that it shall not assign, transfer or convey to any party
19 its rights in or right to receive all or any portion of the pro-
20 ceeds of the insurance referred to in the preceding sentence
21 without the prior written consent of Tenant.  With respect to any
22 insurance effective for a term extending beyond the term of this
23 lease, Tenant shall be obligated to pay only such proportion of
24 the premium upon such insurance as that portion of the term of
25 the policy lapsing prior to the expiration of the term of this
26 lease bears to the entire term of the policy.  In the event that
27 Landlord, in its reasonable discretion, determines to carry
28 earthquake insurance on all buildings and appurtenances on the
29 real property described in Exhibit A, Tenant shall reimburse
30 Landlord for fifty-two and sixty-one/100th percent (52.61%) of
31 the cost thereof within twenty (20) days following Tenant's re-
32 ceipt of Landlord's billing therefor, which billing shall be
33 rendered no more often than the premium for such insurance falls
34 due and shall be accompanied by evidence of such premium and
35 Landlord's payment thereof.
36
37          (b)  Tenant, with respect to its use and occupancy
38 of the demised premises, agrees, at Landlord's option, to defend
39 Landlord, its agents, servants and employees, against any, all
40 and every demand, claim, assertion of liability, or action aris-
41 ing or alleged to have arisen out of any act or omission of Ten-
42 ant, its agents, servants, employees, whether such demand, claim,
43 assertion of liability or action be for damages, injury to person
44 or property, including the property of Landlord, or death of any
45 person, made by any person, group or organization, whether em-
46 ployed by either of the parties hereto or otherwise, and agrees
47 to assume legal liability for, indemnify and hold free and harm-
48 less Landlord, its agents, servants, employees, from any and all
49 loss, damages, liability, costs or expenses (including, but not
50 limited to, attorneys' fees, reasonable investigative and discov-
51 ery costs and court costs) and all other sums which Landlord, its
52 agents, servants and employees, may reasonably pay or become
53 obligated to pay on account of any, all and every demand, claim,
54 assertion of liability or action arising or alleged to have aris-
55 en out of any act or omission of Tenant, its agents, servants,

KFT_000014
Page 045

employees, whether such claim, demand, assertion of liability or
action be for damages, injury to person or property, including
the property of Landlord, or death of any person, made by any
person, group or organization, whether employed by either of the
parties hereto or otherwise.

        (c)   Landlord, with respect to its operation and
maintenance of the common area, the manner of construction and
design of the building which is part of the demised premises, and
the manner of construction and the design of the common area
agrees, at Tenant's option, to defend Tenant, its agents, ser-
vants, employees, officers and directors, against any, all and
every demand, claim, assertion of liability or action, arising or
alleged to have arisen out of any act or omission of Landlord,
its agents, servants, employees, whether such demand, claim,
assertion of liability or action be for damages, injury to person
or property, including the property of Tenant, or death of any
person, made by any person, group or organization, whether em-
ployed by either of the parties hereto or otherwise, and agrees
to assume legal liability for, indemnify and hold free and harm-
less Tenant, its agents, servants, employees, officers and
directors, from any and all loss, damages, liability, costs or
expenses (including, but not limited to, attorneys' fees, reason-
able investigative and discovery costs and court costs) and all
other sums which Tenant, its agents, servants, employees, offi-
cers and directors may reasonably pay or become obligated to pay
on account of any, all and every demand, claim, assertion of
liability or action arising or alleged to have arisen out of any
act or omission of Landlord, its agents, servants, employees,
whether such claim, demand, assertion of liability or action be
for damages, injury to person or property, including the property
of Tenant, or death of any person, made by any person, group or
organization, whether employed by either of the parties hereto or
otherwise.

        (d)   Tenant and Landlord each agrees that it shall
at its own expense maintain in force a policy or policies of
insurance written by one or more responsible insurance carriers
licensed to do business in the state in which the demised prem-
ises are located which shall insure against liability for injury
to and/or death of and/or damage to property of any person or
persons, with policy limits of not less than the following:
$1,000,000 combined single limit for injury to or death of any
number of persons or for damage to property of others arising out
of any one occurrence.  Said policy or policies shall provide,
among other things, blanket contractual liability insurance rec-
ognizing and insuring the assumption of liability assumed by the
purchaser thereof in Section 9(b) or Section 9(c) hereof, as
applicable.

        (e)   Each of the parties hereto agrees to maintain
and keep in force, during the term hereof, all Workers' Compen-
sation and Employers' Liability Insurance required under applica-
ble Workers' Compensation Acts.

Section 9, Page 2                              4/2/85-2

1         (f)  Each of the parties hereto agrees to deliver
2  to the other certificates of insurance evidencing the existence
3  in force of the policies of insurance hereinabove provided for.
4  Each of such certificates shall provide that such insurance shall
5  not be canceled or materially amended unless ten (10) days' prior
6  written notice of such cancellation or amendment is given to the
7  party designated on such certificate as the holder thereof.
8
9         (g)  Tenant, due to the extensive number of loca-
10  tions which it and its related companies occupy and the resultant
11  spreading of risks, may desire to self insure and/or assume the
12  risk of loss and liabilities on many risks, either through de-
13  ductibles or straight self insurance.  Landlord agrees that Ten-
14  ant may be a self insurer so long as the matters self insured
15  hereunder are so self insured in a manner customary for similar
16  locations in Tenant's program of insurance.  Tenant agrees to pay
17  the amount of any such deductibles or self insurance to the party
18  or parties entitled to the proceeds of insurance pursuant to the
19  provisions hereof.
20
21
22
23
24
25
26
27
28
29
30
31
32
33
34
35
36
37
38
39
40
41
42
43
44
45
46
47
48
49
50
51
52
53
54
55

Section 9, Page 3                    4/2/85-2

## 10.   EXERCISE OF EMINENT DOMAIN

An appropriation or taking under the power of eminent domain of all, or a portion, of the property described in Exhibit A, or the sale by private sale of all, or a portion, of the property described in Exhibit A in lieu thereof, are sometimes hereinafter called a "taking."

(a)   If twenty-five percent (25%) or more of the demised premises shall be taken, this lease shall terminate and expire as of the date of taking of actual physical possession of such portion of the demised premises by the condemnor or purchaser, and the parties hereto shall thereupon be released from any and all further liability hereunder; in such event Tenant shall be entitled to participate in any condemnation award or in the sale price paid so as to be compensated for the cost of removal and decrease in value, as a result of such taking of Tenant's fixtures, equipment and stock-in-trade located in the demised premises; provided that nothing in this Section 10 shall be construed as a waiver by Landlord of any rights vested in it by law to recover damages from a condemnor for the taking of its right, title, or interest in the property described in Exhibit A.

(b)   In the event of the taking of:

(i)   any portion of the demised premises so that the remainder thereof is not one undivided parcel of property;

(ii)   any portion of the demised premises, or of the property described in Exhibit A hereto, so that the remainder thereof is not reasonably adapted to the continued leasing of the demised premises by Tenant;

(iii)   any portion of the common area on the real property described in Exhibit A hereto so that a portion of said common area is so separated from the remainder thereof that in Tenant's opinion the common area available to customers of Tenant is so limited that the continued leasing of the demised premises by Tenant is impracticable or unprofitable; or

(iv)   access, whether by a taking or otherwise, of the property described in Exhibit A hereto to adjoining thoroughfares, so that such accessibility is so limited and reduced that in Tenant's opinion the continued leasing of the demised premises by Tenant will become impracticable or unprofitable,

then Tenant shall have the right to cancel and terminate this lease as hereinafter provided.  Within ninety (90) days after receipt by Tenant from Landlord of written notice that an action has been commenced in either the state or federal courts for the condemnation of any portion of the real property described in Exhibit A hereto, or of Landlord's intent to sell any portion of such property in lieu of condemnation, Tenant may, by written notice to Landlord, notify Landlord of its election to cancel and

Section 10, Page 1                                      6/27/85

KFT_000017
Page 048

terminate this lease pursuant to the provisions of this Section 10(b), which said notice may be conditioned upon an actual order of condemnation, taking of possession, or sale, and may be made to take effect as of the date of such order, taking or sale, or of the deprivation of access, or at any earlier date.  In the event of the termination of this lease by the giving of notice as aforesaid, the parties shall be released from any and all further obligations to carry out or perform any of the terms or provisions hereof from and after the effective date of the termination of this lease provided for in said notice and Tenant shall share in any award or sale price as provided in Section 10(a) hereof.

(c)  Except as provided in Section 10(a) and Section 10(b) above, this lease shall remain in full force and effect in the event of the taking of any portion of the property described in Exhibit A hereto.  Unless this lease is terminated as provided in Section 10(a) or Section 10(b) hereof, Landlord shall forthwith, at its expense, make all repairs and alterations to the property described in Exhibit A hereto and the improvements thereon (including without limitation the demised premises) necessitated by such taking or sale, and Tenant shall repair, alter, remove or replace its fixtures in the demised premises as necessitated by such taking or sale.  In such event, Tenant shall continue to utilize the demised premises for the operation of its business to the extent that it may be practicable to do so from the standpoint of good business.  If Tenant continues doing business in the demised premises prior to the completion of repair and restoration work by Landlord, the fixed minimum rent payable by Tenant shall be equitably abated in the proportion that the unusable part of the demised premises bears to the whole thereof.  Fixed minimum rent payable subsequent to the time Tenant completely resumes business in the demised premises as diminished by any taking or sale shall be reduced in the proportion which the area taken or sold bears to the total area of the demised premises.  In the event Tenant does not continue doing business in the demised premises prior to the completion of repair or restoration work by Landlord, all rent shall abate from the time of the actual taking or any disturbance of Tenant's possession of the demised premises and/or the enjoyment by Tenant of its rights in the property described in Exhibit A hereto pursuant to this lease, until completion of such repair and restoration work by Landlord, and the expiration of such further reasonable time as shall be necessary to enable Tenant to resume doing business in the demised premises.

(d)  Upon service on either party hereto of any legal process in connection with any condemnation proceedings, the party so served shall give immediate notice thereof to the other party hereto.

Section 10, Page 2                                      6/27/85

## 11.  UTILITIES, ETC.

Tenant shall pay during the term hereof all electric, water, gas, telephone and other public utility charges in connection with its occupancy and use of the demised premises, including all costs of operating and maintaining all equipment therein, all business licenses and similar permit fees.

## 12.  COVENANTS AGAINST LIENS

Tenant covenants and agrees that it shall not, during the term hereof, suffer or permit any lien to be attached to or upon the demised premises or any part thereof by reason of any act or omission on the part of Tenant, and hereby agrees to save and hold harmless Landlord from or against any such lien or claim of lien.  In the event that any such lien does so attach, and is not released within thirty (30) days after notice to Tenant thereof, or if Tenant has not indemnified Landlord against such lien within said thirty (30) day period, Landlord, in its sole discretion, may pay and discharge the same and relieve the demised premises therefrom, and Tenant agrees to repay and reimburse Landlord upon demand for the amount so paid by Landlord. In the event Tenant contracts for the performance of any construction on the demised premises, Tenant shall give Landlord written notice thereof at least ten (10) days prior to the commencement of such construction to permit Landlord to post a notice of non-responsibility on the demised premises.

Section 11, Page 1
Section 12, Page 1

6/27/85

13.   <u>ASSIGNMENT AND SUBLETTING</u>

Tenant shall neither assign this lease nor sublet more than fifty percent (50%) of the demised premises without the written consent of the Landlord to such assignment or subletting.  Landlord covenants and agrees that it shall consent to any such assignment or subletting when requested by Tenant to do so, unless the withholding of such consent by Landlord would be reasonable and not arbitrary.  No subletting or assignment shall relieve Tenant from any of its obligations as Tenant hereunder. Every such assignment or sublease shall recite that it is and shall be subject and subordinate to the provisions of this lease, and the termination or cancellation of this lease shall constitute a termination and cancellation of every such assignment or sublease.  Landlord agrees that no merger, consolidation or corporate reorganization of Tenant shall be deemed an assignment hereunder so as to require the consent of Landlord.

14.   NOTICES

Any notices required to be given hereunder, or which either party hereto may desire to give to the other, shall be in writing.  Such notice may be given by mailing the same by United States mail, registered or certified, return receipt requested, postage prepaid, addressed to Landlord at:

| 9350 Wilshire Blvd., | Beverly Hills | California | 90212 |
|---|---|---|---|
| Street | City | State | Zip Code |

and to Tenant, attention Real Estate Manager, at:

| 6565 Knott Avenue | Buena Park | California | 90622 |
|---|---|---|---|
| Street | City | State | Zip Code |

or to such other address as the respective parties may from time to time designate by notice given in the manner provided in this Section, and shall be deemed complete upon receipt thereof.  Such notice may also be given to Landlord by serving any of its officers, and may be given to Tenant by serving its president or secretary, and shall be deemed complete upon the making of such service.

If rental payable by Tenant hereunder is to be paid to Landlord at any address other than the address set forth above, such address is: _____

_____.

Section 14, Page 1                                         4/2/85

15.   RIGHT TO GO UPON PREMISES

Landlord hereby reserves the right for itself or its duly authorized agents and representatives at all reasonable times during business hours of Tenant during the term hereof to enter upon the demised premises for the purpose of inspecting the same, showing the same to any prospective purchaser or encumbrancer or posting notices of non-responsibility.

16.   MAINTENANCE

Tenant shall, at its own expense, maintain the demised premises.  At the end of the lease term or sooner termination of this lease, whether by operation of law, for failure to comply with the provisions hereof, or otherwise, Tenant shall deliver up the demised premises in the same order, condition and repair as when received by Tenant, alterations pursuant to Section 29 hereof and depreciation caused by ordinary wear and tear and the elements excepted.  Nothing contained in this Section 16(a) shall affect Landlord's obligations under the provisions of Sections 8 and 10 hereof respecting damage or destruction of the demised premises by fire or other causes and reconstruction in the event of condemnation.

Section 15, Page 1
Section 16, Page 1                                6/27/85

KFT_000022
Page 053

17.   DEFAULT

(a)   Should Tenant default in the performance of any covenant or agreement herein, and such default continue for thirty (30) days after receipt by Tenant of written notice there-of from Landlord, or if the default of Tenant is of a type which is not reasonably possible to cure within thirty (30) days, if Tenant has not commenced to cure said default within said thirty (30) day period and does not thereafter diligently prosecute the curing of said default to completion, Landlord may, so long as such default continues, either terminate this lease by written notice to Tenant, which written notice shall specify a date for such termination at least fifteen (15) days after the date of such notice, or not terminate this lease as a result of the default of Tenant.

(b)   In the event Landlord terminates this lease pursuant to the provisions of Section 17(a) hereof, Landlord may then, or at any time thereafter, reenter the demised premises, or any part thereof, and expel or remove therefrom Tenant and any other persons occupying the same, using such force as may be necessary so to do, and again repossess and enjoy the demised premises.   In the event of such termination by Landlord, neither Landlord nor Tenant shall have any further obligations under this lease, and Landlord shall not be permitted to anticipate or ac-celerate all or part of any rent or other payments not yet due, or which would not yet be due if this lease were not terminated, including, but not limited to, all or any portion of the rent for all, or any portion, of the balance of the term of this lease.

(c)   In the event Landlord does not terminate this lease as a result of the default of Tenant, Tenant shall remain and continue liable to Landlord under all of the terms of this lease; Landlord may evict Tenant and let or relet the demised premises or any or all parts thereof for the whole or any part of the remainder of the term hereof, or for a period of time in excess of the remainder of the term hereof, and out of any rent so collected or received, Landlord shall first pay to itself the expense of the cost of retaking and repossessing the demised premises and the expense of removing all persons and property therefrom, and shall, second, pay to itself any costs or expenses sustained in securing any new tenant or tenants, and shall, third, pay to itself any balance remaining, and apply the whole thereof or so much thereof as may be required toward payment of the liability of Tenant to Landlord then or thereafter unpaid by Tenant.   Any entry or reentry by Landlord, whether had or taken under summary proceedings or otherwise, if this lease shall not be terminated pursuant to Section 17(a) hereof, shall not absolve or discharge Tenant from liability hereunder.   The words "re-enter" and "reentry" as used in this lease are not restricted to their technical legal meaning.   The failure or refusal of Land-lord to relet the demised premises or any part thereof shall not release or affect Tenant's liability hereunder.   Should any rent so collected by Landlord after the payments aforesaid be insuffi-cient fully to pay Landlord a sum equal to all rent and other

APR 2   1985

KFT_0002A
Page 054

1 charges herein reserved, or should no rents be collected by Land-
2 lord, the deficiency shall be calculated and paid by Tenant
3 monthly following receipt of notice from Landlord of the amount
4 of such balance or deficiency, that is, upon each of the dates
5 for the payment of rent as provided in Section 4(a) hereof, and
6 Tenant shall pay to Landlord the amount of said deficiency then
7 existing and shall remain liable for any portion thereof not so
8 paid.
9
10         (d)   The remedies of Landlord in the event of the
11 default of Tenant as provided in this Section 17 are intended to
12 be exclusive and not subject to the provisions of Section 27
13 hereof.
14
15         (e)   Should Landlord default in the performance of
16 any covenant or agreement herein, and such default continue for
17 thirty (30) days after receipt by Landlord of written notice
18 thereof from Tenant (except as otherwise provided herein), or if
19 the default of Landlord is of a type which is not reasonably
20 possible to cure within thirty (30) days, if Landlord has not
21 commenced to cure said default within said thirty (30) day period
22 and does not thereafter diligently prosecute the curing of said
23 default to completion (except as otherwise provided herein), in
24 the event Landlord's default is of a type which can be cured by
25 the payment of money, Tenant may pay any sums necessary to per-
26 form any obligation of Landlord hereunder and deduct the cost
27 thereof, with interest at the highest rate not prohibited by law
28 at the date of Tenant's payment of said sums from the date of
29 Tenant's payment to the date of Tenant's reimbursement, from
30 rents due and to become due hereunder.
31
32
33
34
35
36
37
38
39
40
41
42
43
44
45
46
47
48
49
50
51
52
53
54
55

Section 17, Page 2
02852500

APR 2 1985

18.   SIGNS

Tenant shall have the right to install, erect and maintain upon the demised premises all signs necessary or appropriate to the conduct of its business, provided that, with respect to any permanent sign to be installed on the exterior of the building on the demised premises, other than Tenant's standard sign installed at its stores in Southern California, Tenant shall first obtain Landlord's written consent to such sign, which consent shall not be unreasonably withheld.  Tenant shall not install, erect or maintain any sign in violation of any applicable law, ordinance or use permit of any governmental authority.  Tenant may remove (but shall not be required to remove) the same or any thereof at any time during said term or upon the expiration thereof or sooner termination of this lease, or within thirty (30) days after such expiration or termination, and Tenant at its own expense shall repair any damage caused by the removal thereof by the Tenant.

Landlord shall not install, erect or maintain any signs on the demised premises during the lease term, except that, unless this lease shall have previously been extended or renewed, Landlord may erect a "To Rent" sign during the last two (2) months of such term; provided, however, that such sign shall not obstruct any sign of Tenant or interfere unreasonably with the conduct of Tenant's business.

Landlord agrees and covenants with Tenant that it will not allow occupants of any other building which may be erected on the property described in Exhibit A to erect, nor will Landlord erect, any signs or advertising matter of any nature whatsoever which are located on the common area included within the property described in Exhibit A, except for directional signs and signs shown on the plot plan which is Exhibit B hereto.

19.   OMITTED

Section 18, Page 1
Section 19, Page 1                                    6/27/85

20.    CERTIFICATE OF TENANT

Tenant agrees that, within thirty (30) days after written request therefor by Landlord or a proposed purchaser of, or beneficiary of a deed of trust affecting, the demised premises, Tenant will certify in writing that this lease in unmodified and in full force and effect (or, if there have been modification, that the same is in full force and effect as modified and stating the modifications), the date to which fixed minimum rent has been paid and stating whether Landlord has performed its obligations under this lease (and, if Landlord has not so performed, indicating the nature of such nonperformance), it being intended that such statement may be relied upon by any proposed purchaser of, or beneficiary of a deed of trust affecting, the demised premises.

KFT_000026
Page 057

21.   <u>ATTORNEY'S FEES</u>

    In the event that either party hereto brings or commences legal proceedings to enforce any of the terms of this lease or otherwise respecting the demised premises, the successful party in such action shall be entitled to receive and shall receive from the other party, in every such action, a reasonable sum as attorneys' fees and costs, to be fixed by the court or arbitrators in the action.

Section 21, Page 1                                    6/27/85-2

22. <u>CONDITION OF TITLE-SUBORDINATION</u>

Anything herein to the contrary notwithstanding, if any lien or encumbrance upon or affecting the property described in Exhibit A, or any part thereof, exists which is prior or superior to the rights of Tenant herein (excluding current real property taxes not delinquent and Exceptions Nos. _____ set forth in the Preliminary Report respecting the condition of title to the real property described in Exhibit A dated _____, 1985 and issued by _____ under its No. _____) this lease at the option of Tenant shall not become effective, unless prior to the commencement of the term Landlord shall procure from the holder of such lien or encumbrance an agreement in form satisfactory to Tenant in Tenant's sole discretion subordinating all such liens and encumbrances to this lease and to the interest of Tenant hereunder.

By Landlord's execution of this lease, Landlord represents and warrants to Tenant that no exceptions to title with respect to and/or encumbrances on the real property described in Exhibit A hereto other than those shown in the Preliminary Report referred to above exist on the date of this lease. During the period commencing with the date of this lease and continuing through and including the expiration or prior termination of the term hereof Landlord shall not create or suffer to be created any lien or encumbrance upon or affecting the property described in Exhibit A or any portion thereof which shall be prior or superior to this lease or to the interest of Tenant hereunder, except taxes and other liens created by operation of law upon the property of Landlord (which, except as to taxes required hereby to be paid by Tenant, Landlord shall pay and discharge before delinquency).

Landlord warrants that none of the terms or provisions of this lease conflict with any of the terms or provisions contained in any document or agreement, written or oral, affecting the real property described in Exhibit A hereto and that the terms and provisions of any document or agreement, written or oral, affecting the real property described in Exhibit A hereto do not conflict with any of the terms or provisions of this lease.

Section 22, Page 1                                    4/2/85-2

23. <u>HOLDING OVER</u>

If Tenant continues to occupy the demised premises after the expiration of the term of this lease and Landlord accepts rent thereafter, a monthly tenancy terminable by either party on one month's notice shall be created, which shall be upon the same rental, terms and conditions as those herein specified.

24. <u>ARBITRATION</u>

Any dispute or difference which shall arise between the parties relating to the construction, meaning or effect of this lease, or of the rights or liabilities of the parties hereunder, other than the payment of rent, shall be referred to arbitration by a board of disinterested arbitrators. Such board of arbitrators shall be appointed as follows: The party desiring arbitration shall appoint an arbitrator by written notice to the second party. Within fifteen (15) days of receipt by the second party of such notice, the second party shall appoint an arbitrator by written notice to the first party. Should the second party not appoint an arbitrator, the matter shall be arbitrated by the arbitrator appointed by the first party, and the cost of such arbitrator shall be shared equally by Landlord and Tenant. Should the second party appoint an arbitrator, the two (2) appointed arbitrators shall appoint a third arbitrator within thirty (30) days of the appointment of the second arbitrator. If the two (2) arbitrators cannot agree upon a third arbitrator within said time, the third arbitrator shall be appointed by the presiding judge of the highest level state trial court located in the county in which the demised premises are located. The three (3) arbitrators so appointed shall forthwith proceed to arbitrate the dispute. Each party shall bear the cost of the arbitrator appointed by it, and the parties shall share equally in the cost of the third arbitrator. To the extent said rules are not inconsistent with the provisions of this Section 24 the arbitration shall be conducted as provided in the rules of the American Arbitration Association.

25. <u>SUCCESSORS IN INTEREST</u>

Each and all of the covenants, agreements, obligations, conditions and provisions of this lease shall inure to the benefit of and shall bind the successors and assigns of the respective parties hereto.

26. <u>RECORDING INDENTURE</u>

It is agreed that a short form of this lease, in substantially the form of the annexed Exhibit C, shall be executed and acknowledged by the parties for the purpose of recording forthwith upon the execution of this lease. Such recordation shall be at the sole cost and expense of the party desiring recordation.

Section 23, Page 1
Section 24, Page 1
Section 25, Page 1
Section 26, Page 1

6/27/85

27.   REMEDIES ARE CUMULATIVE

        Remedies conferred by this lease upon the respec-
tive parties are not intended to be exclusive, but are cumulative
and in addition to remedies otherwise afforded by the law.


28.   QUIET POSSESSION

        Landlord covenants that Landlord owns in fee the
real property described in Exhibit A hereto, that Landlord has
full right to make this lease and that Tenant shall have quiet
and peaceful possession thereof as against any adverse claim of
any party.


29.   ALTERATION

        Any structural changes, alterations or additions in
or to the building which is part of the demised premises which
may be necessary or required by reason of any law, rule, regula-
tion or order promulgated by competent governmental authority
shall be made at the sole cost and expense of Landlord; provided
that in the event that any such structural changes, alterations
or additions are required solely as the result of Tenant's re-
modeling of the building on the demised premises or solely as the
result of the use then being made by Tenant of the building on
the demised premises, such structural changes, alterations or
additions shall be made at the sole cost and expense of Tenant.
Tenant may contest the validity of any such law, rule, regulation
or order, but shall indemnify and save Landlord harmless against
the consequences of continued violation thereof by Tenant pending
such contest.

        Tenant shall be permitted during the term hereof to
perform nonstructural alterations to the demised premises and to
revise the interior layout of the demised premises without Land-
lord's prior written consent.  However, Tenant shall obtain Land-
lord's written consent to any alterations or construction which
affect the structural nature of the demised premises.  Landlord's
consent shall not be unreasonably withheld.


30.   CONTINUING OFFER

        Execution of this lease by Landlord constitutes an
offer which shall not be deemed accepted by Tenant until Tenant
has executed this lease and delivered a duplicate original there-
of to Landlord.

Section 27, Page 1
Section 28, Page 1
Section 29, Page 1
Section 30, Page 1                                    6/27/85

31.   <u>GENERAL CONDITIONS</u>

Time is of the essence of this lease.  No waiver of any breach of the covenants, agreements, obligations and conditions of this lease to be kept or performed by either party hereto shall be construed to be a waiver of any succeeding breach of the same or any other covenant, agreement, obligation, condition or provision hereof.  The performance of each and every agreement of Landlord herein contained shall be a condition precedent to the right of Landlord to enforce this lease against Tenant. Tenant shall not be responsible for the payment of any commissions in relation to the leasing transaction represented by this lease.  Tenant shall not be obligated to join and/or make contributions to a merchant's association or similar organization.  The use herein of any gender or number shall not be deemed to make inapplicable the provision should the gender or number be inappropriate to the party referenced.  Landlord and Tenant have negotiated this lease, have had the opportunity to be advised respecting the provisions contained herein and have had the right to approve each and every provision hereof; therefore, this lease shall not be construed against either Landlord or Tenant as a result of the preparation of this lease by or on behalf of either party.  If any clause, sentence or other portion of this lease shall become illegal, null or void for any reason, or shall be held by any court of competent jurisdiction to be so, the remaining portions thereof shall remain in full force and effect.

IN WITNESS WHEREOF, upon the day and year first hereinabove written, the respective parties hereto have executed these presents, consisting of:  Sections 1 through 31 (omitting Section 19) and Exhibits A, B and C personally or by officers or agents thereunto duly authorized.

STUART KAPLAN, IRWIN HARRIS and WELLS FARGO BANK, N.A., Trustees of the Decedent's Children's Trust held for the benefit of Stuart Kaplan under the Charles H. Kaplan Family Trust No. 1 dated March 22, 1974

Federal Tax/ID No. _94-6470205_

By _Stuart Kaplan_
   Stuart Kaplan, Trustee

By _Irwin Harris_
   Irwin Harris, Trustee

By Wells Fargo Bank, N.A.
   a corporation, Trustee

By _____

By _____

(Signatures continued on following page)

Section 31, Page 1                          7/31/85-2

Lots 493 and 494 of Tract 17701, as per map recorded in Book 455, Pages 41 to 49 of Maps, in the office of the County Recorder of said County.

Excepting therefrom all oil, gas and other hydrocarbon substances in, under and/or that may be produced from a depth below 100 feet from the surface of said property, provided, that such reservation shall not entitle the Alamitos Land Company, a corporation, its successors or assigns to any use of or rights in or to any portion of the surface of said property to a depth of 100 feet below the surface thereof, and further reserving to Alamitos Land Company, a corporation, its successors and assigns the right to drill into, locate wells in, and produce oil, gas and other hydrocarbon substances from that portion of said property, as excepted and reserved by Alamitos Land Company, a corporation, in deed recorded January 4, 1952 in Book 37973, Page 115, Official Records.



**EXHIBIT A**





# EXHIBIT B



# EXHIBIT C

### <u>L E A S E</u>

1        THIS INDENTURE, made and entered into this _____ day
2 of _____, 1985, by and between STUART KAPLAN, IRWIN
3 HARRIS and WELLS FARGO BANK, N.A., Trustees of the Decedent's
4 Children's Trust held for the benefit of Stuart Kaplan under the
5 Charles H. Kaplan Family Trust No. 1 dated March 22, 1974, STUART
6 KAPLAN, IRWIN HARRIS and WELLS FARGO BANK, N.A., Trustees of the
7 Decedent's Children's Trust held for the benefit of Carolyn
8 Harris under the Charles H. Kaplan Family Trust No. 1 dated March
9 22, 1974, and STUART KAPLAN, IRWIN HARRIS and WELLS FARGO BANK,
10 N.A., Trustees of the Survivor's Trust under the Charles H.
11 Kaplan Family Trust No. 1 dated March 22, 1974, owner of the
12 herein described premises, and hereinafter collectively desig-
13 nated as "Landlord," and LUCKY STORES, INC., a California corpo-
14 ration, hereinafter designated as "Tenant,"
15
16                 <u>W I T N E S S E T H</u> :
17
18        Landlord hereby leases, demises and lets unto Tenant,
19 and Tenant hereby leases and takes from Landlord, a portion of
20 that certain real property situate in the City of Long Beach,
21 County of Los Angeles, State of California, more particularly
22 described in Exhibit A attached hereto and made a part hereof,
23 which portion is depicted as cross-hatched on the plot plan which
24 is Exhibit B, attached hereto and made a part hereof.
25
26        This lease is made upon all the terms and conditions set
27 forth in that certain lease agreement of even date herewith be-
28 tween Landlord and Tenant relating to said property, all of which
29 terms and conditions are made a part hereof.
30
31        The term of this lease shall commence at 12:01 a.m. on
32 April 24, 1986 and shall continue for a period of twenty (20)
33 years (plus initial fractional month), ending at midnight on
34 April 30, 2006.
35
36        This lease also grants to Tenant, its customers and in-
37 vitees certain parking privileges, and contains restrictions af-
38 fecting the ratio between the parking area and the building area,
39 and establishes requirements concerning the nature of construc-
40 tion of buildings, on the real property described in Exhibit A
41 hereto.
42
43        IN WITNESS WHEREOF upon the day and year first herein-
44 above written, the respective parties hereto have executed these
45 presents personally or by officers or agents thereunto duly au-
46 thorized.
47
48
49                      LUCKY STORES, INC.,
50                      a California corporation
51
52                      By_____
53
54                      By_____
55                                            Tenant

(Signatures continued on next page)

Indenture



6/27/85-2

(Signatures continued from previous page)

STUART KAPLAN, IRWIN HARRIS and
WELLS FARGO BANK, N.A., Trustees of
the Decedent's Children's Trust held
for the benefit of Stuart Kaplan
under the Charles H. Kaplan Family
Trust No. 1 dated March 22, 1974

By_____
   Stuart Kaplan, Trustee

By_____
   Irwin Harris, Trustee

By Wells Fargo Bank, N.A.
   a corporation, Trustee

By_____

By_____

STUART KAPLAN, IRWIN HARRIS and
WELLS FARGO BANK, N.A., Trustees of
the Decedent's Children's Trust held
for the benefit of Carolyn Harris
under the Charles H. Kaplan Family
Trust No. 1 dated March 22, 1974

By_____
   Stuart Kaplan, Trustee

By_____
   Irwin Harris, Trustee

By Wells Fargo Bank, N.A.
   a corporation, Trustee

By_____

By_____

STUART KAPLAN, IRWIN HARRIS and
WELLS FARGO BANK, N.A., Trustees of
the Survivor's Trust under the
Charles H. Kaplan Family Trust No. 1
dated March 22, 1974

By_____
   Stuart Kaplan, Trustee

By_____
   Irwin Harris, Trustee

By Wells Fargo Bank, N.A.
   a corporation, Trustee

By_____

By_____
                    Landlord

(To Be Notarially Acknowledged)

Indenture

KFT_00035
6/27/85
Page 066

(Signatures continued from previous page)

STUART KAPLAN, IRWIN HARRIS and
WELLS FARGO BANK, N.A., Trustees of
the Decedent's Children's Trust held
for the benefit of Carolyn Harris
under the Charles H. Kaplan Family
Trust No. 1 dated March 22, 1974

Federal Tax ID No. 94-6470206

By _____
      Stuart Kaplan, Trustee

By _____
      Irwin Harris, Trustee

By Wells Fargo Bank, N.A.
   a corporation, Trustee

By _____

By _____

STUART KAPLAN, IRWIN HARRIS and
WELLS FARGO BANK, N.A., Trustees of
the Survivor's Trust under the
Charles H. Kaplan Family Trust No. 1
dated March 22, 1974

Federal Tax ID No. 94-6470204

By _____
      Stuart Kaplan, Trustee

By _____
      Irwin Harris, Trustee

By Wells Fargo Bank, N.A.
   a corporation, Trustee

By _____

By _____
                                    Landlord

LUCKY STORES, INC.,
a California corporation
                                    I. OWEN
By _____   SENIOR VICE PRESIDENT

By _____
      CHRISTOPHER McLAIN
      VICE PRESIDENT             Tenant
      AND SECRETARY

(To Be Notarially Acknowledged)

Section 31, Page 2                  7/31/85-2

KFT_000036
Page 067

# EXHIBIT C

## FIRST AMENDMENT TO LEASE
(Albertson's #6154 - Spring & Palo Verde, Long Beach, CA)

**THIS FIRST AMENDMENT TO LEASE ("Amendment")** is made and entered into as of _MAY 1,_____, 2006, by and between **KFT ENTERPRISES, NO. 1, L.P.**, a California limited partnership ("**Landlord**"), and **LUCKY STORES, INC.**, a Delaware corporation ("**Tenant**"). Landlord and Tenant shall sometimes hereinafter be referred to collectively as the "**Parties**" and, individually, as a "**Party**"

### RECITALS

**A.**     Pursuant to that certain written Lease dated August 16, 1985 ("**Original Lease**"), as modified by that certain letter agreement dated March 22, 1990 ("**Letter Agreement**", together with the Original Lease, collectively, "**Lease**"), Landlord's predecessor-in-interest leased to Tenant's predecessor-in-interest the premises described in the Lease ("**Premises**"). The Premises includes a free-standing building located within a commercial shopping center commonly known as the Lakewood Plaza Shopping Center ("**Shopping Center**").

**B.**     The term of the Lease expires on April 30, 2006.

**C.**     Landlord and Tenant desire to enter into this Amendment to: (i) provide for an extension of the term of the Lease on a month-to-month basis; (ii) provide for an increase in the monthly installments of annual fixed minimum rent; and (iii) provide new notice addresses for the Parties, all in accordance with the terms and provisions of this Amendment.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements herein contained, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, Landlord and Tenant hereby agree as follows:

### AGREEMENT

**1.**     **Recitals/Defined Terms.** The foregoing Recitals are hereby incorporated herein in their entirety. All capitalized terms not otherwise defined in this Amendment shall have the meanings assigned to them in the Lease.

**2.**     **Term.** <u>Section 3</u> of the Lease is hereby amended to provide that effective May 1, 2006 ("**Extension Date**"), the original Term of the Lease shall be extended on a month-to-month basis. Such month-to-month tenancy shall be terminable by either Party by delivering prior written notice ("**Termination Notice**") to the other Party no less than one hundred and twenty (120) days prior to the effective date of such Termination Notice ("**Termination Date**"), which effective date must be the last day of any calender month.

KFT_000038
Page 069

## FIRST AMENDMENT TO LEASE
(Albertson's #6154 - Spring & Palo Verde, Long Beach, CA)

**THIS FIRST AMENDMENT TO LEASE** ("**Amendment**") is made and entered into as of ___ May 1 ___, 2006, by and between **KFT ENTERPRISES, NO. 1, L.P.,** a California limited partnership ("**Landlord**"), and **LUCKY STORES, INC.,** a Delaware corporation ("**Tenant**"). Landlord and Tenant shall sometimes hereinafter be referred to collectively as the "**Parties**" and, individually, as a "**Party**"

### RECITALS

**A.**     Pursuant to that certain written Lease dated August 16, 1985 ("**Original Lease**"), as modified by that certain letter agreement dated March 22, 1990 ("**Letter Agreement**", together with the Original Lease, collectively, "**Lease**"), Landlord's predecessor-in-interest leased to Tenant's predecessor-in-interest the premises described in the Lease ("**Premises**"). The Premises includes a free-standing building located within a commercial shopping center commonly known as the Lakewood Plaza Shopping Center ("**Shopping Center**").

**B.**     The term of the Lease expires on April 30, 2006.

**C.**     Landlord and Tenant desire to enter into this Amendment to: (i) provide for an extension of the term of the Lease on a month-to-month basis; (ii) provide for an increase in the monthly installments of annual fixed minimum rent; and (iii) provide new notice addresses for the Parties, all in accordance with the terms and provisions of this Amendment.

**NOW, THEREFORE,** in consideration of the mutual covenants and agreements herein contained, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, Landlord and Tenant hereby agree as follows:

### AGREEMENT

**1.**     **Recitals/Defined Terms.** The foregoing Recitals are hereby incorporated herein in their entirety. All capitalized terms not otherwise defined in this Amendment shall have the meanings assigned to them in the Lease.

**2.**     **Term.** **Section 3** of the Lease is hereby amended to provide that effective May 1, 2006 ("**Extension Date**"), the original Term of the Lease shall be extended on a month-to-month basis. Such month-to-month tenancy shall be terminable by either Party by delivering prior written notice ("**Termination Notice**") to the other Party no less than one hundred and twenty (120) days prior to the effective date of such Termination Notice ("**Termination Date**"), which effective date must be the last day of any calender month.

3.     **Rent**.   Section 4(a) of the Lease is hereby amended to provide as follows:
Notwithstanding anything to the contrary contained in the Lease, effective from and after the
Extension Date, and continuing through and including the Termination Date, Tenant shall pay to
Landlord, as annual fixed minimum rent for the Premises, an amount equal to Eight Hundred
Eighty-Nine Thousand Eight Hundred Thirty One Dollars ($889,831.00) per year ("**Annual
Fixed Minimum Rent**").  The Annual Fixed Minimum Rent shall be paid in equal monthly
installments in advance on the first day of each calendar month commencing as of the Extension
Date and continuing for the remainder of the Term as extended hereunder.

4.     **Notices**.  All notices given pursuant to this Amendment shall be in writing and shall be
given (a) by personal delivery; (b) by United States mail or by United States express mail or
other established express delivery service (such as Federal Express), postage or delivery charge
prepaid; or (c) by facsimile, addressed to the appropriate Party at the address set forth below:

|                  |                                              |
|------------------|----------------------------------------------|
| Landlord:        | KFT Enterprises, No. 1, LP                   |
|                  | c/o KFT Management, Inc.                     |
|                  | 11620 Wilshire Boulevard, Suite 420          |
|                  | Los Angeles, California 90025                |
|                  | Attn: Mark Kaplan                            |
|                  | Facsimile (310) 914-4606                     |
|                  |                                              |
| With a copy to:  | Friedman & Solomon LLP                       |
|                  | 9665 Wilshire Blvd., Suite 810               |
|                  | Beverly Hills, CA 90212                      |
|                  | Attn: Robert E. Solomon                      |
|                  | Facsimile (310) 553-7458                     |
|                  |                                              |
| Tenant:          | Lucky Stores, Inc.                           |
|                  | c/o Albertson's, Inc.                        |
|                  | 250 Parkcenter Boulevard                     |
|                  | P.O. Box 20                                  |
|                  | Boise, ID 83726                              |
|                  | Attn: 74200-Legal Department (Store #6154)   |
|                  | Facsimile (208) 395-6575                     |
|                  |                                              |
| With a copy to:  | Albertson's, Inc.                            |
|                  | Real Estate Department                       |
|                  | 1421 South Manhattan Avenue                  |
|                  | Fullerton, California  92831-5221            |
|                  | Attention: Jeff Dierck                       |
|                  | Facsimile (714) 300-6941                     |

With a copy to: Ward, Miller & Geyer, LLC
       165 South Main Street, Second Floor
       Salt Lake City, UT 84111
       Attention: Mark Geyer (Re:#6154)
       Facsimile (801) 521-3051

**4.1** **Change of Address.** The person and address to which notices are to be given may be changed at any time by any Party upon written notice to the other Party. All notices given pursuant to this Amendment shall be deemed given upon receipt.

**4.2** **Receipt.** For the purpose of this Amendment, the term "receipt" shall mean upon delivery if transmitted by facsimile, or if sent by any other means, the earlier of (a) the date of delivery of the notice or other document to the address specified pursuant to **Section 4** as shown on the return receipt, (b) the date of actual receipt of the notice or other document by the person or entity specified pursuant to **Section 4**, or (c) in the case of refusal to accept delivery of the notice or other document, the date of refusal to accept delivery.

**5.** **Miscellaneous Provisions.**

**5.1** **Attorney's Fees.** If either Party commences an action against the other Party arising out of or in connection with the Lease or this Amendment, the prevailing Party shall be entitled to recover from the losing Party reasonable attorneys' fees and costs of suit.

**5.2** **Conflicts.** Except as amended by this Amendment, the Lease shall remain in full force and effect. In the event of any inconsistency between the terms of the Lease and the terms of this Amendment, the terms of this Amendment shall prevail and control.

**5.3** **Counterparts.** This Amendment may be signed in multiple counterparts which, when signed by both Parties, shall constitute a binding agreement.

**5.4** **Entire Agreement.** This Amendment reflects, supersedes and merges all the prior agreements and negotiations of the Parties hereto with respect to its subject matter, and contains their entire agreement.

**5.5** **Governing Law; Interpretation.** This Amendment shall be construed and enforced in accordance with the laws of the State of California without regard to such state's conflict of laws provisions. This Amendment shall be construed according to its fair meaning, and not strictly for or against Landlord or Tenant. As used herein, the word "include(s)" means "include(s), without limitation," and the word "including" means "including, but not limited to."

**5.6** **No Partnership.** Nothing in this Amendment shall be construed to make Landlord or Tenant partners or joint venturers or render either Party liable for the debts or obligations of the other Party.

ABS #6154 - Spring & Palo Verde, Long Beach, CA
amendment.v02.wpd      3      04/1206

KFT_00044
Page 072

**5.7** **Severability**. If any one or more of the provisions contained herein shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision of this Amendment, but this Amendment shall be construed as if such invalid, illegal or unenforceable provision had not been contained herein.

**5.8** **Authority**. All individuals executing this Amendment represent and warrant that they have the power and authority to do so and to bind the respective Party on whose behalf they are executing this document.

**IN WITNESS WHEREOF**, the Parties hereto have executed this Amendment as of the day and year first above written.

LANDLORD:

**KFT ENTERPRISES, NO. 1 LP,**
a California limited partnership

By:    KFT MANAGEMENT, INC.,
a California corporation

By:_____

Its:_____

TENANT:

**LUCKY STORES, INC.,**
a Delaware corporation

By:_____

Its:   WILLIAM H. ARNOLD
    VICE PRESIDENT

KFT_000042
Page 073

**5.7    Severability**. If any one or more of the provisions contained herein shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision of this Amendment, but this Amendment shall be construed as if such invalid, illegal or unenforceable provision had not been contained herein.

**5.8    Authority**. All individuals executing this Amendment represent and warrant that they have the power and authority to do so and to bind the respective Party on whose behalf they are executing this document.

**IN WITNESS WHEREOF**, the Parties hereto have executed this Amendment as of the day and year first above written.

LANDLORD:

**KFT ENTERPRISES, NO. 1 LP,**
a California limited partnership

By:    KFT MANAGEMENT, INC.,
      a California corporation

By: _Walter Kaplan_

Its: _President_


TENANT:

**LUCKY STORES, INC.,**
a Delaware corporation

By: _[signature]_

Its: WILLIAM H. ARNOLD
~~VICE PRESIDENT~~

3.     **Rent.**  **Section 4(a)** of the Lease is hereby amended to provide as follows:
Notwithstanding anything to the contrary contained in the Lease, effective from and after the
Extension Date, and continuing through and including the Termination Date, Tenant shall pay to
Landlord, as annual fixed minimum rent for the Premises, an amount equal to Eight Hundred
Eighty-Nine Thousand Eight Hundred Thirty One Dollars ($889,831.00) per year ("**Annual
Fixed Minimum Rent**").  The Annual Fixed Minimum Rent shall be paid in equal monthly
installments in advance on the first day of each calendar month commencing as of the Extension
Date and continuing for the remainder of the Term as extended hereunder.

4.     **Notices.**  All notices given pursuant to this Amendment shall be in writing and shall be
given (a) by personal delivery; (b) by United States mail or by United States express mail or
other established express delivery service (such as Federal Express), postage or delivery charge
prepaid; or (c) by facsimile, addressed to the appropriate Party at the address set forth below:

| | |
|---|---|
| Landlord: | KFT Enterprises, No. 1, LP<br>c/o KFT Management, Inc.<br>11620 Wilshire Boulevard, Suite 420<br>Los Angeles, California 90025<br>Attn: Mark Kaplan<br>Facsimile (310) 914-4606 |
| With a copy to: | Friedman & Solomon LLP<br>9665 Wilshire Blvd., Suite 810<br>Beverly Hills, CA 90212<br>Attn: Robert E. Solomon<br>Facsimile (310) 553-7458 |
| Tenant: | Lucky Stores, Inc.<br>c/o Albertson's, Inc.<br>250 Parkcenter Boulevard<br>P.O. Box 20<br>Boise, ID 83726<br>Attn: 74200-Legal Department (Store #6154)<br>Facsimile (208) 395-6575 |
| With a copy to: | Albertson's, Inc.<br>Real Estate Department<br>1421 South Manhattan Avenue<br>Fullerton, California 92831-5221<br>Attention: Jeff Dierck<br>Facsimile (714) 300-6941 |

With a copy to:      Ward, Miller & Geyer, LLC
165 South Main Street, Second Floor
Salt Lake City, UT 84111
Attention: Mark Geyer (Re:#6154)
Facsimile (801) 521-3051

**4.1**     **Change of Address.** The person and address to which notices are to be given may be changed at any time by any Party upon written notice to the other Party. All notices given pursuant to this Amendment shall be deemed given upon receipt.

**4.2**     **Receipt.** For the purpose of this Amendment, the term "receipt" shall mean upon delivery if transmitted by facsimile, or if sent by any other means, the earlier of (a) the date of delivery of the notice or other document to the address specified pursuant to **Section 4** as shown on the return receipt, (b) the date of actual receipt of the notice or other document by the person or entity specified pursuant to **Section 4**, or (c) in the case of refusal to accept delivery of the notice or other document, the date of refusal to accept delivery.

5.    **Miscellaneous Provisions.**

**5.1**     **Attorney's Fees.** If either Party commences an action against the other Party arising out of or in connection with the Lease or this Amendment, the prevailing Party shall be entitled to recover from the losing Party reasonable attorneys' fees and costs of suit.

**5.2**     **Conflicts.** Except as amended by this Amendment, the Lease shall remain in full force and effect. In the event of any inconsistency between the terms of the Lease and the terms of this Amendment, the terms of this Amendment shall prevail and control.

**5.3**     **Counterparts.** This Amendment may be signed in multiple counterparts which, when signed by both Parties, shall constitute a binding agreement.

**5.4**     **Entire Agreement.** This Amendment reflects, supersedes and merges all the prior agreements and negotiations of the Parties hereto with respect to its subject matter, and contains their entire agreement.

**5.5**     **Governing Law; Interpretation.** This Amendment shall be construed and enforced in accordance with the laws of the State of California without regard to such state's conflict of laws provisions. This Amendment shall be construed according to its fair meaning, and not strictly for or against Landlord or Tenant. As used herein, the word "include(s)" means "include(s), without limitation," and the word "including" means "including, but not limited to."

**5.6**     **No Partnership.** Nothing in this Amendment shall be construed to make Landlord or Tenant partners or joint venturers or render either Party liable for the debts or obligations of the other Party.

**5.7     Severability**.  If any one or more of the provisions contained herein shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision of this Amendment, but this Amendment shall be construed as if such invalid, illegal or unenforceable provision had not been contained herein.

**5.8     Authority**.  All individuals executing this Amendment represent and warrant that they have the power and authority to do so and to bind the respective Party on whose behalf they are executing this document.

**IN WITNESS WHEREOF**, the Parties hereto have executed this Amendment as of the day and year first above written.

LANDLORD:

**KFT ENTERPRISES, NO. 1 LP,**
a California limited partnership

By:     KFT MANAGEMENT, INC.,
a California corporation

By:   _Willy R Kaplen_

Its:   _President_

TENANT:

**LUCKY STORES, INC.,**
a Delaware corporation

By:   _[signature]_

Its:   WILLIAM H. ARNOLD
~~VICE PRESIDENT~~

ABS #6154 - Spring & Palo Verde, Long Beach, CA
amendment.v02.wpd                                    4                                    04/1206

# Lucky

Stores, Inc.
Southern California Division

6565 Knott Ave.
Buena Park, CA 90620-1158
714/739-2200

March 22, 1990

MR STUART KAPLAN
KAPLAN FAMILY TRUST
9350 WILSHIRE BL STE 412
BEVERLY HILLS  CA  90212

> **Re:  LUCKY STORE NO. 454 — LONG BEACH, CALIFORNIA**
> AGREEMENT TO USE OUTSIDE SEATING AREA

Dear Mr. Kaplan:

Pursuant to a lease dated August 16, 1985, Lucky leases certain property from STUART KAPLAN, IRWIN HARRIS and WELLS FARGO BANK, N.A., Trustees of the Decedent's Children's Trust held for the benefit of Stuart Kaplan under the Charles H. Kaplan Family Trust No. 1 dated March 22, 1974, and STUART KAPLAN, IRWIN HARRIS and WELLS FARGO BANK, N.A., Trustees of the Decedent's Children's Trust held for the benefit of Carolyn Harris under the Charles H. Kaplan Family Trust No. 1 dated 3/22/74, and STUART KAPLAN, IRWIN HARRIS and WELLS FARGO BANK, N.A., Trustees of the Survivor's Trust under the Charles H. Kaplan Family Trust No. 1 dated 3/22/74, (hereinafter collectively referred to as "Landlord").

Lucky has requested that it be allowed but not obligated to use that portion of the common area (hereinafter referred to as the "area") which is outlined in red on "Exhibit A" attached hereto for an outside seating area for the recently remodeled and expanded bakery/deli/Chinese kitchen located on the leased premises.

Landlord hereby consents to such use by Lucky provided that:

1.  Lucky will maintain said area, including the tables, chairs and trash containers placed therein, in a clean and sanitary condition; and,

2.  Lucky, with respect to its use and maintenance of said area, agrees to indemnify and hold free and harmless Landlord, its agents, servants, employees, officers and directors, against any, all and every demand, claim, assertion of liability or action, arising or alleged to have arisen out of any act or omission of Tenant, its agents, servants, employees, whether such demand, claim, assertion of liability or action be for damages, injury to person or property, including the property of Landlord, or death of any person, made by any person, group or organization, whether employed by either of the parties hereto or otherwise.

Continued

Mr. Stuart Kaplan
March 22, 1990
Page Two


If the provisions of this letter agreement are now acceptable,
please so indicate by signing and dating where indicated on two (2)
copies of this letter and return them to me.

Very Truly Yours,

Chris J. Russ
Real Estate Analyst


cc:  F. D. Helm


AGREED TO THIS ___27___ DAY OF _March_ 1990.

STUART KAPLAN, IRWIN HARRIS and WELLS FARGO BANK, N.A.,
Trustees of the Decedent's Children's Trust held for the
benefit of Stuart Kaplan under the Charles H. Kaplan
Family Trust No. 1 dated 3/22/74, and

STUART KAPLAN, IRWIN HARRIS and WELLS FARGO BANK, N.A.,
Trustees of the Decedent's Children's Trust held for the
benefit of Carolyn Harris under the Charles H. Kaplan
Family Trust No. 1 dated 3/22/74, and

STUART KAPLAN, IRWIN HARRIS and WELLS FARGO BANK, N.A.,
Trustees of the Survivor's Trust under the Charles H.
Kaplan Family Trust No. 1 dated 3/22/74:


By _____
      Stuart Kaplan, Co-Trustee


Kaplan.ltr



KPT 000040
Page 080

# EXHIBIT D

## SECOND AMENDMENT TO LEASE

THIS SECOND AMENDMENT TO LEASE ("**Amendment**" or "**Second Amendment**") is made and entered into as of ___May 8_____, 2007, by and between **KFT ENTERPRISES, NO. 1, L.P.**, a California limited partnership ("**Landlord**"), and **AMERICAN STORES COMPANY, LLC**, a Delaware limited liability company ("**Tenant**").

## RECITALS

A.      Pursuant to that certain written Lease dated August 16, 1985 ("**Original Lease**"), as modified by that certain letter agreement dated March 22, 1990 ("**Letter Agreement**"), as further amended by that certain First Amendment to Lease dated as of May 1, 2006 ("**First Amendment**" and, together with the Original Lease, the Letter Agreement and the First Amendment, "**Lease**"), Landlord's predecessor-in-interest leased to Tenant's predecessor -in-interest the Premises described in the Lease ("**Premises**"). The Premises includes a free-standing building located within a commercial shopping center commonly known as the Lakewood Plaza Shopping Center ("**Shopping Center**"), as more particularly shown on the site plan attached hereto as **Exhibit A** ("**Amended Site Plan**").

B.      Pursuant to the terms of the First Amendment, Tenant currently leases the Premises on a month-to-month basis, terminable by either Landlord or Tenant on one hundred twenty (120) days notice. Landlord and Tenant now desire to amend and modify the Lease to, among other things, (i) extend the term of the Lease, (ii) provide Tenant options to further extend the term of the Lease, and (iii) provide for a remodeling of the Premises and the Shopping Center, in accordance with the terms and provisions of this Amendment.

C.      All capitalized terms not otherwise defined in this Amendment shall have the meanings assigned to them in the Original Lease.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, Landlord and Tenant hereby agree as follows:

## AGREEMENT

1.      **PREMISES AND MARKET**. The term "**Premises**" as used in this Amendment shall mean and refer to the Premises as delineated on the Amended Site Plan, which Premises includes all Service Facilities (as defined in **Section 12** of this Amendment) which are associated with the use of the Market (defined below) and either attached to the Market or otherwise shown on the Amended Site Plan. The term "demised premises" as it appears in the Lease shall be deemed to refer to the Premises. The building located on the Premises and occupied by Tenant is sometimes referred to in this Amendment as the "**Market**." The final gross leasable area of the

Premises shall be deemed to be Fifty Two Thousand Three Hundred Twenty-Seven (52,327) square feet and there shall be no adjustment of the rent payable hereunder if the actual size of the Premises is more or less than Fifty Two Thousand Three Hundred Twenty-Seven (52,327) square feet.

## 2. GOVERNMENTAL APPROVALS.

**2.1 Tenant's Approvals.** Other than Building Permits (as defined below), Tenant has obtained all discretionary permits and approvals from all applicable governmental authorities with jurisdiction which are required in connection with the construction of Tenant's Work (as defined in **Section 5.1**) (collectively, "**Tenant Discretionary Approvals**"). Any and all fees or charges that may be assessed in connection with the Tenant Discretionary Approvals (including, without limitation, any traffic, acreage, school, lighting district or other fees or charges), shall be paid by Tenant, and Tenant shall, at its sole cost and expense, comply with all conditions imposed on the Tenant Discretionary Approvals. Tenant shall pay all fees directly associated with the Tenant's operation of a supermarket in the Premises, including all fees directly related to Tenant's leasehold improvements and fixtures and equipment.

**2.2 Landlord's Approvals.** Other than Building Permits, Landlord has obtained all discretionary permits and approvals from all applicable governmental authorities with jurisdiction which are required in connection with the construction of Landlord's Work (as defined below) (collectively, "**Landlord Discretionary Approvals**"). Any and all fees or charges that may be assessed in connection with the Landlord Discretionary Approvals (including, without limitation, any traffic, acreage, school, lighting district or other fees or charges), shall be paid by Landlord, and except as otherwise specifically provided in **Section 5.1** below, Landlord shall, at its sole cost and expense, comply with all conditions imposed on the Landlord Discretionary Approvals.

## 3. EFFECTIVE DATE. The first date written above shall be the "**Effective Date**".

## 4. PROJECT SCHEDULE AND CONSTRUCTION PHASING PLAN.

**4.1 Schedule.**

**4.1.1 Initial Project and Phasing Schedule.** Landlord and Tenant have agreed upon a schedule which sets forth the timetable for the planning and completion of the Tenant's Work and Landlord's Work (as defined below) including the phasing of Landlord's Work ("**Initial Project and Phasing Schedule**"). The Initial Project and Phasing Schedule is attached hereto as **Exhibit H** and incorporated herein.

**4.1.2 Revised Project Schedule.** If Landlord and Tenant subsequently agree upon any scheduling changes, or if any scheduling changes are required as a result of unforeseen

Albertson's #6154: Long Beach
10Second Amendment

2

04/30/07

conditions, the parties shall promptly prepare a revised project and phasing schedule ("**Revised Project and Phasing Schedule**").

        **4.1.3   Performance**. Landlord and Tenant shall use commercially reasonable efforts to perform their respective obligations as described in this Amendment in accordance with the Initial Project and Phasing Schedule and any Revised Project and Phasing Schedule unless a specific requirement regarding timing is set forth in the text of this Amendment.

    **4.2**    **Construction Phasing**. Upon such time as sufficient information is available, and based upon the assumption that Landlord and Tenant shall each commence their respective work (as set forth in **Section 5** and **Section 6**, below) after January 1, 2007, Landlord and Tenant shall establish a "**Construction Phasing Plan**" with respect to the Landlord's remodeling of certain portions of the Shopping Center, with the intention that such improvements by Landlord shall not materially interfere with the Tenant's Work (as defined below) to be performed by Tenant, or with Tenant's "Grand Opening"of the Premises after the completion of the Tenant's Work (as defined below).

    **4.3**    **Blackout Period**. Notwithstanding anything to the contrary contained in this Amendment, and subject to Force Majeure (as defined in **Section 31**) delays: (i) Landlord shall not perform Landlord's Site Work, and (ii) Tenant shall not perform any portion of the Tenant's Work (as defined below) on the exterior of the Premises between November 15th and December 31st of any calendar year ("**Blackout Period**"). If either Landlord or Tenant suffers a Force Majeure delay or other delay beyond the reasonable control of the party and despite the party's exercise of commercially reasonable efforts (which efforts shall <u>not</u> require the party to incur extraordinary expense) which delay would extend the completion of either Landlord's Site Work or Tenant's Work into the Blackout Period (such party being a "**Delayed Party**"), the Delayed Party shall (x) provide the other party with such reasonable advance written notice as is commercially possible of the delay, including, without limitation an commercially reasonable estimate of the length of the delay, (y) shall use all commercially reasonable measures to minimize the impact (including visual and safety impacts) of the ongoing construction work during the Blackout Period on the other party's business operations ("**Mitigation Measures**"), and (z) shall coordinate such Mitigation Measures with the other party. If the Delayed Party is the Landlord, Mitigation Measures may include suspension of such portions of the Landlord's Work as the parties deem reasonably necessary to minimize interference with Tenant's business during the Blackout Period. Provided that Mitigation Measures are complied with, such delay into the Blackout Period shall not be deemed a default by the Delay Party under the terms of this Lease.

## 5.   TENANT'S WORK.

    **5.1**    **Generally**. Tenant shall, at Tenant's sole cost and expense, remodel the Premises ("**Tenant's Work**") substantially in accordance with the "**Approved Market Plans**" (as defined below) and shall diligently pursue the Tenant's Work to completion in accordance with the

KFT_0CQ52
Page 084

Project Schedule. Notwithstanding anything to the contrary contain in this Amendment, (i) Landlord and Tenant acknowledge and agree that the Tenant's Work does not include Tenant's fixtures, furniture and equipment ("**FF&E**"), and (ii) the Tenant's Work shall include the design and installation of any and all screening of Tenant's loading docks and areas required under the Landlord Discretionary Approvals.

**5.2    Tenant's Plans**. Tenant has employed, at its cost and expense, Johnson's Architects ("**Market Architect**"). The Market Architect has prepared plans for the Tenant's Work, and Landlord has approved such plans ("**Approved Market Plans**"). The Approved Market Plans are identified on **Exhibit B**.

**5.3    Effect of Approved Market Plans**. The Approved Market Plans supersede any restrictions in the Lease concerning the size, height or configuration of the Market, and the Lease shall be deemed amended hereby to the extent of any conflict between the Lease and this Amendment in this regard.

**5.4    Tenant's Building Permit**. Based upon the Project Schedule, Tenant shall timely apply for all Building Permits required for the Tenant's Work. Landlord shall reasonably cooperate (at no cost to Landlord) with Tenant in connection with Tenant's Building Permit applications.

**5.5    Changes to Approved Market Plans**. Once Building Permits for the Tenant's Work have been issued, Tenant shall deliver copies of the Approved Market Plans to Landlord. No material changes to or departures from the Approved Market Plans shall be made without Landlord's approval, which approval shall not be unreasonably delayed, withheld or conditioned; *provided, however*, that Landlord's approval shall not be required for changes required by the City of Long Beach as long as such changes do not involve material changes to the exterior of the Premises and/or adversely impact the Shopping Center.

**5.6    Tenant's General Contractor**. The general contractor ("**Contractor**") hired by Tenant to construct the Tenant's Work shall be subject to the approval of Landlord, which approval shall not be unreasonably withheld. Landlord hereby approves the following general contractors to construct the Tenant's Work: Eleven Western Builders, Palladeo Construction, Steve Julius Construction, Bush Décor and Kirkly Construction. Tenant acknowledges and agrees that Tenant shall have no right to hire Savant Construction to act as the Contractor or a subcontractor with respect to the Tenant's Work

**5.7    Liens**. Within ninety (90) days following the completion of the Tenant's Work, Tenant shall promptly obtain the full release of any claim of lien (of which Tenant has written notice) filed or recorded against the Premises or the Shopping Center resulting from the Tenant's Work by discharge, title indemnity, bond or otherwise.

**5.7.1    Landlord's Rights**. If Tenant fails to do so within thirty (30) days of notice of any such lien, Landlord shall have the right (after delivery of twenty (20) days prior

Albertson's #6154: Long Beach
10Second Amendment

4

04/30/07

written notice to Tenant) to pay such lien (without inquiry into the validity thereof) and Tenant shall reimburse Landlord on demand for such cost. However, notwithstanding any of the foregoing to the contrary, Landlord shall not have the right to pay any such lien that Tenant is contesting in good faith; *provided, however*, that Tenant agrees to remove any such lien by discharge, title indemnity, bond or otherwise in the event (i) such lien interferes with any pending sale or financing of the Shopping Center, or (ii) the existence of such lien constitutes a default or, with the giving of notice or passage of time, or both, would constitute a default, under Landlord's loan documents or any other agreement to which Landlord is a party or by which Landlord is bound.

        **5.7.2  Notice of Completion**. Additionally, promptly after completion of construction of Tenant's Work, Tenant shall cause a Notice of Completion to be recorded in the office of the Recorder of the County of Los Angeles in accordance with Section 3093 of the Civil Code of the State of California or any successor statute, and shall furnish a copy thereof to Landlord upon such recordation.

        **5.7.3  Landlord's Right to Post Certain Notices**. Tenant acknowledges and agrees that Landlord shall have the right to post and maintain on the Shopping Center (including the Premises) any notices that are required to protect Landlord and Landlord's interest in the Shopping Center from any liens for work and labor performed or materials furnished in connection with the Tenant's Work.

    **5.8  As-Built Drawings**. Promptly following completion of the Tenant's Work, Tenant shall cause the Market Architect to prepare and deliver to Landlord two (2) complete copies of a "record set" of reproducible as-built drawings and two (2) complete sets of CAD files of the as-built documents (current version of AutoCad) for the Tenant's Work.

## 6.   LANDLORD'S WORK.

    **6.1  Generally**. Landlord shall, at Landlord's sole cost and expense (except as otherwise set forth in this Amendment), (i) remodel certain portions of the common areas of the Shopping Center, including the parking lots ("**Landlord Site Work**"), and (ii) remodel the exterior portions of the buildings located within the Shopping Center, other than the Premises and the "John's Hamburgers" premises (collectively, "**Landlord's Work**"), substantially in accordance with the Approved Landlord Plans (as defined below).

    **6.2  Landlord's Plans**. Tenant has approved plans for the Landlord's Work ("**Approved Landlord Plans**"). The Approved Landlord Plans are identified on **Exhibit C** of this Amendment.

    **6.3  Landlord's Building Permit**. Landlord shall timely apply for all Building Permits required for Landlord's Work.

**6.4**  **Changes to Approved Landlord Plans**. Once Building Permits for Landlord's Work have been issued, Landlord shall deliver copies of the Approved Landlord Plans to Tenant. No material changes to or departures from the Approved Landlord Plans shall be made without Tenant's approval, which approval shall not be unreasonably delayed, withheld or conditioned.

**6.5**  **Liens**. Following the completion of Landlord's Work, Landlord shall promptly obtain the full release of any claim of lien filed or recorded against the Premises or the Shopping Center resulting from Landlord's Work by discharge, title indemnity, bond or otherwise.

**6.6**  **Landlord's Cart Containment Work**.

**6.6.1**  **Installation of Cart Containment System**. Landlord shall install a cart containment system in the common areas of the Shopping Center as part of Landlord's Work ("**Cart Containment Work**"). The Cart Containment Work shall conform to the specifications set forth in the bid attached hereto as **Exhibit I** and incorporated herein ("**Approved Bid**"), and shall otherwise be performed in accordance with the provisions of this Amendment applicable to Landlord's Site Work.

**6.6.2**  **Reimbursement**. Tenant shall reimburse Landlord ("**Cart Work Reimbursement**") for the lesser of (a) the actual costs and expenses incurred by Landlord in performing the Cart Containment Work ("**Cart Work Costs**") or (b) one hundred ten percent (110%) of the amount of the Approved Bid. Tenant shall pay the Cart Work Reimbursement within thirty (30) days of Landlord's final completion of the Cart Containment Work and Tenant's receipt of Landlord's written request for the Cart Work Reimbursement, which request shall include reasonable supporting documentation of the Cart Work Costs.

**7.**  **CONSTRUCTION AND RELATED INSURANCE; INDEMNIFICATION.**

**7.1**  **Contractor's Insurance**. Each of Landlord's and Tenant's general contractors and subcontractors shall procure and maintain until final completion of the Landlord's Work and the Tenant's Work, as appropriate, commercial general liability insurance with broad form coverage endorsement with combined single limits of not less than Two Million Dollars ($2,000,000.00) per occurrence (One Million Dollars [$1,000,000] per occurrence for each subcontractor). Such insurance must include broad form general liability endorsement and broad form property damage coverage including, but not limited to, damage arising from explosion, collapse of structures or other property and damage to underground utilities and property with any X.C.U. exclusion removed. The insurance must include contractor's protective liability insurance, product and completed operations coverage and contractual liability insurance. The commercial general liability policy shall be endorsed to include personal injury, libel, slander, wrongful eviction, and false arrest. All policies of insurance provided hereunder shall be written on an "occurrence" basis, if available, and, if not, on a "claims made" basis.

KFT_0095
Page 087

**7.2    Policy Requirements**. Each of the above policies of insurance shall name Landlord and Tenant as additional insureds. The general contractors and subcontractors shall furnish Landlord and Tenant with certificates (and, if requested by either party, with a copy of the insurance policy as well) showing such coverage and showing that coverage will not be cancelled without thirty (30) days prior written notice to Landlord and Tenant. If coverage is obtained by naming Landlord and Tenant as additional insureds, the policy must contain a "cross liability clause" and a "breach of warranty clause" (each as set forth below) and the certificate must so indicate. If the required coverage is obtained through a combination of commercial general liability and umbrella coverage, the certificate for umbrella coverage must also show that Landlord and Tenant will be given thirty (30) days prior written notice of cancellation. As to the interest of any additional insured, the insurance afforded by the policy shall not be invalidated by any breach or violation by the additional insured of any warranties, declarations or conditions, but not the exclusions, in the policy, but this shall not prevent exhaustion of the limits of liability by payment on behalf of any insured. The insurance afforded applies separately to each insured against whom claim is made or suit is brought, except with respect to the limits of the company's liability.

**7.3    Worker's Compensation**. Each of Landlord's and Tenant's general contractors and subcontractors must provide certificates showing statutory worker's compensation coverage and showing employer's liability coverage with minimum statutory limits. In addition, each general contractor will provide evidence that its subcontractors and their subcontractors carry similar coverage. Landlord and Tenant need not be named as additional insureds on the employer's liability coverage or the worker's compensation coverage. Landlord and Tenant must be given thirty (30) days prior written notice of cancellation of either coverage.

**7.4    Commercial Automobile Liability Insurance**. Each of Landlord's and Tenant's general contractors and subcontractors must provide certificates of insurance showing that they maintain commercial automobile liability insurance for all owned, non-owned and hired vehicles with single limits of at least Two Million Dollars ($2,000,000.00) per occurrence (One Million Dollars [$1,000,000] per occurrence for each subcontractor). Such coverage must name Landlord and Tenant as additional insureds. Each general contractor must provide a certificate (and, if requested by either party, a copy of the insurance policy as well) showing such coverage and showing that such coverage will not be cancelled without thirty (30) days written notice to Landlord and Tenant.

**7.5    Indemnification**. Each party shall indemnify, defend, protect and hold harmless the other party against any and all claims, demands, causes of action, liabilities, costs and expenses (including reasonable attorneys' fees) ("**Claims**") arising directly or indirectly out of or resulting from or in connection with the performance of the Tenant's Work by Tenant or the performance of Landlord's Work by Landlord, as the case may be, pursuant to this Amendment; *provided, however*, that such indemnity shall not extend or apply to (a) any Claims to the extent resulting from the negligent, willful or intentional act or omission of the indemnified party, its agents, contractors and/or its employees, (b) the indemnified party's breach of this Amendment,

KFT_0QQ56
Page 088

or (c) Claims for which the indemnified party has agreed to indemnify such party in other parts of this Amendment or the Lease.

**8.     COSTS OF CONSTRUCTION.** The costs of construction of the Landlord's Work shall be paid by Landlord and costs of construction of the Tenant's Work and the FF&E shall be paid by Tenant. Notwithstanding the foregoing to the contrary, all hard and soft costs, including the costs of (i) demolition of the existing parking surface; and (ii) site preparation, as set forth in the Approved Landlord Plans ("**Parking Lot Costs**") incurred by Landlord to repave, slurry coat and re-stripe the parking lots located within the Shopping Center as part of the Landlord's Work shall be included as a Common Area cost for calendar year 2007 (or such other year in which the same are completed); provided, (a) Landlord shall provide Tenant with reasonable supporting documentation of the Parking Lot Costs, and (b) Tenant's prorata share of such Parking Lot Costs shall be Two Hundred Thirty Five Thousand Dollars ($235,000.00).

**9.     REPRESENTATIONS AND WARRANTIES OF LANDLORD.** To induce Tenant to enter into this Amendment, Landlord makes the following representations and warranties as of the date hereof:

**9.1     Hazardous Materials.** To Landlord's actual knowledge, without a duty of inquiry or investigation, there are no Hazardous Materials, on, under, in or about the Common Areas. Tenant acknowledges and agrees that Landlord is not making any representations or warranties regarding the presence and/or absence of Hazardous Materials on, under, in or about the Premises or other portions of the Shopping Center other than the Common Areas.

**9.2     Eminent Domain.** To Landlord's knowledge, there are no pending or threatened proceedings in eminent domain or otherwise, which would affect the transaction contemplated by this Amendment.

**10.     TENANT'S RIGHT TO COMPLETE LANDLORD'S WORK.** If substantial completion of the of the Landlord Site Work has not occurred by the completion date set forth in the Project Schedule (subject to Force Majeure and/or delays caused by Tenant), and if Landlord fails to substantially complete such work within ten (10) days after receipt of written notice from Tenant, or if such work cannot reasonably be completed within such ten (10) day period, if Landlord fails to commence to complete such work within such ten (10) day period and thereafter fails to diligently pursue completion thereof, then as Tenant's sole and exclusive remedy Tenant may complete such construction and Landlord will reimburse Tenant for the actual out-of-pocket costs paid to unaffiliated third parties, plus ten percent (10%), incurred by Tenant to compete such work ("**Tenant's Completion Costs**"). If Tenant exercises its right to complete the construction of the Landlord Site Work and Landlord fails to reimburse Tenant for Tenant's Completion Costs within thirty (30) days after receipt of written notice from Tenant, which notice shall contain reasonable back-up information, Tenant shall have the right to offset Tenant's Completion Costs from rent next due until Tenant has offset from rent an amount equal to Tenant's Completion Costs.

**11.**     **NEW SITE PLAN EXHIBIT**.  **Exhibit B** of the Original Lease is hereby deleted in its entirety and the Amended Site Plan, attached hereto as **Exhibit A** is hereby substituted therefor.

**12.**     **COMMON AREA**. The following language is added at the end of **Section 2** of the Lease:

*"As used herein, the terms "**Common Areas**" and "**Common Area**" means all those areas in the Shopping Center which are not Building Area or Service Facilities. Canopies which extend over the Common Area, together with any columns or posts supporting same, shall be deemed to be a part of the building to which they are attached and not a part of the Common Area. "**Building Area**" means the Premises and all other buildings/structures within the Shopping Center which are reserved for the exclusive use of any Shopping Center occupants. "**Service Facilities**" means loading docks, trash compactors and enclosures, bottle storage areas, exterior coolers, electrical and refrigeration facilities and other similar service facilities which are appurtenant to buildings constructed within the Shopping Center.*

*As used herein, the term "**Floor Area**" means the area within the exterior surfaces of the exterior walls of any building or structure, excluding any "**Mezzanine**" (i.e., any floor area above the ground floor that does not extend over the entire ground floor area of the building and which is used in connection with the primary commercial use of such building, but is not used for sales area or generally open to the public) or Service Facilities, doors for ingress and egress, canopies and roof overhangs (including supporting columns or pillars) and required emergency exits (including stairs, landings, footings and foundations associated therewith).*

*Landlord shall at all times have the sole and exclusive control, management and direction of the Common Areas. Landlord may at any time and from time to time close all or any portion of the Common Areas to make repairs, improvements, alterations or changes as are required or permitted pursuant to this Lease, or, to the extent reasonably necessary in the opinion of Landlord, to prevent a dedication thereof or the accrual of any rights to any person or to the public therein.*

*Notwithstanding anything to the contrary contained in this **Section 2**, Landlord may make changes or alterations to those portions of the Common Areas, Building Areas and Service Facilities shown as "Landlord Change Areas" on the Site Plan; provided, Landlord shall not make any changes which would materially and adversely impact traffic circulation, including delivery access to the Premises, without the consent of Tenant, which consent may be granted or withheld in Tenant's sole, absolute and subjective discretion.*

*Additionally, Landlord may alter those portions of the Common Areas, Building Areas and Service Facilities shown as Restaurant Pad on the Site Plan; provided (i) in no event shall any Building Area located on the Restaurant Pad exceed Three Thousand Five*

KFT_000058
Page 090

*Hundred (3,500) square feet of Floor Area, (ii) any Building located on the Restaurant Pad shall be limited to one story, and (iii) in no event shall the Common Areas located on the Restaurant Pad be altered so as to allow any direct vehicular access into the balance of the Shopping Center.*

*Tenant agrees that it shall consider any proposal by Landlord to create new Building Area within that portion of the Shopping Center which is within the area shown as "Potential Pad Area" on the Site Plan in Tenant's reasonable business judgment taking into consideration the potential impacts on parking, traffic circulation, visibility of the Premises."*

## 13.   TERM.

**13.1   Amendment of Original Term.   Section 3** of the Original Lease is hereby amended to provide that effective upon the Effective Date, the original term of the Lease shall be extended so that it shall expire at midnight on the date that is twenty (20) years after the Effective Date. Upon the Effective Date, the First Amendment shall be terminated in its entirety.

**13.2   Extension Options.** Tenant shall have three (3) separate and successive options to extend the Term for periods of five (5) years per each of the first two options and for a period of four (4) years and eleven (11) months per the third option (for a total extension period of fourteen (14) years and eleven (11) months if all three options are exercised by Tenant) at the rental rates set forth in the schedule attached hereto as **Exhibit D** ("**Rental Rates Schedule**").

**13.2.1   Notice.** Each such option may be exercised by Tenant, at its election, by written notice to Landlord no later than twelve (12) months before the date of expiration of the original Term or nine (9) months before the date of expiration of the previous five-year extension period, as applicable.

**13.2.2   Conditions Precedent**. It shall be a condition to Tenant's right to exercise an extension option that: (i) Tenant is not then in default of any of the material terms or provisions of this Lease after the giving of notice and expiration of any applicable cure periods, and (ii) Tenant has for the prior six (6) month period operated its business in the Premises on a continuous basis, subject to closures for remodeling, damage, destruction, condemnation or events of Force Majeure (as defined in **Section 31**).

**13.2.3   Notice Failure/Second Notice.** If Tenant shall fail to exercise any option by the time provided for in the Lease, Tenant's right to exercise its option shall nevertheless continue until fifteen (15) days after Landlord gives Tenant notice of Landlord's election to terminate such right to exercise the option. Tenant may exercise such option at any time before the end of the fifteen (15) day period. If Tenant fails to exercise the option within the fifteen (15) day period after Landlord's notice, the Term will end at the expiration of the then-existing Term. Furthermore, if by fifteen (15) days before the end of the then-existing Term, Landlord has not given notice to Tenant of Landlord's election to terminate Tenant's right to exercise the

KFT_0@Q5@
Page 091

option, and by the end of the then-existing Term Tenant has not affirmatively exercised or notified Landlord that Tenant will exercise the applicable option, then the Term shall be automatically extended commencing after the end of the then-existing Term for succeeding one (1) month periods at a rental rate as set forth in the Rental Rates Schedule and otherwise on the same terms and conditions as of the end of the then-existing Term. During each such one (1) month extension, Tenant shall have the right to exercise its option to extend the Term for the balance of the applicable option by giving Landlord notice of its intention to exercise the same. Tenant's rights to exercise the then-applicable option shall continue until fifteen (15) days after Landlord gives Tenant notice of Landlord's election to terminate such right to exercise the option, and Tenant may exercise such option at any time before the end of the fifteen (15)-day period. If, after Landlord gives its notice, Tenant does not exercise the then-applicable option, the term shall end at the end of the existing one (1) month extension.

        **13.2.4  Term**.  The word "**Term**" as used in this Lease, when appropriate to the context, and not otherwise qualified, shall include any extensions of the Term as provided for herein.

        **13.2.5  Application of Lease Provisions**.  The terms and provisions of any option period shall be the same as those for the initial Term, except (i) the amount of the Annual Fixed Minimum Rent (as defined below) during such option period shall be the amount set forth on **Exhibit D**, and (ii) Landlord shall have no obligation to perform any improvements with respect to the Shopping Center.

**14.**    **RENT.**

    **14.1**    **Fixed Minimum Rent**.  Effective from and after the Effective Date, and continuing throughout the following five (5) years of the Term, Tenant shall pay to Landlord, as annual minimum rental for the Premises, an amount equal to Eight Hundred Eighty-Nine Thousand Five Hundred Fifty-Nine Dollars ($889,559.00) ("**Annual Fixed Minimum Rent**").

        **14.1.1  Rental Rates Schedule**. From and after the fifth (5th) anniversary of the Effective Date throughout the remainder of the Term (including any extension of the Term), the Annual Fixed Minimum Rent shall be adjusted in accordance with the Rental Rates Schedule.

        **14.1.2  Installments**. The Annual Fixed Minimum Rent shall be paid in equal monthly installments in advance on the first day of each calendar month commencing as of the Effective Date and continuing for the remainder of the Term.

    **14.2**    **Common Area Maintenance Costs**.  **Section 4(b)** of the Original Lease is hereby deleted in its entirety and replaced with the following:

"(*b*) *Common Area Maintenance Costs.*

*(i)* **Maintenance Costs.** *The cost of the management, operation, maintenance, replacement and repair of the Common Areas, shall be prorated by Landlord among all of the occupants of the Shopping Center and un-rented leaseable Building Area in the Shopping Center, including Tenant. Such costs (collectively, "**CAM Costs**") shall include, without limitation:*

*(A)* *the premiums for liability insurance maintained by Landlord for the Shopping Center allocable to the Common Areas of the Shopping Center;*

*(B)* *all sums expended by Landlord for common area rubbish removal (including, without limitation, installation, maintenance, repair and/or replacement of convenience refuse containers);*

*(C)* *resurfacing as necessary, replacing as necessary, painting, restriping, repair and replacement of sidewalks and curbs, tables and chairs, planters, Shopping Center pylon signs, directional signs and other markers and bumpers;*

*(D)* *repairs and maintenance of planting and landscaping;*

*(E)* *repairs and maintenance of lighting and other Common Area utilities;*

*(F)* *the Parking Lot Costs (payable pursuant to **Section 8** of this Amendment); and*

*(G)* *any Approved Security Costs (defined below).*

*(ii)* **Tenant's Share.** *Tenant's proportionate share of CAM Costs shall be the ratio of the total Floor Area of the Premises, divided by the total Floor Area of all buildings (which currently is 102,328 square feet), existing or to be constructed in the Shopping Center as shown on the Amended Site Plan. Accordingly, as of the execution of this Amendment, Tenant's proportionate share equals 51.14% ("**Tenant's Proportionate Share**").*

*(iii)* **Billing.** *During the Term, Landlord shall bill said prorated expenses quarterly at Landlord's election, but not less frequently than annually, and subject to **subsection (ix)** below, Tenant shall pay the amount of said bill to Landlord within thirty (30) days of receipt of such bill. Said bill shall set forth the portion of the charge which is the proration of taxes and assessments on the Common Area. Landlord shall be entitled to management fees not to exceed ten percent (10%) of the total CAM Costs (exclusive of insurance and taxes and individual items of expense which are not regularly incurred, such as replacing and restoring [as opposed to making periodic repairs to] curbs, walkways, paving and utility lines).*

KFT_00064A
Page 093

*(iv)*     ***CAM Expense Cap***.  *Landlord shall operate the Common Areas of the Shopping Center on a nonprofit basis (other than the payment of the management fee) to the end that those expenses expended will be reasonable and necessary, as reasonably determined by Landlord.  Notwithstanding anything to the contrary contained herein, Landlord shall not make or authorize any single non-regularly incurred expenditure (i.e., replacements as opposed to periodic repairs) regarding the maintenance, insuring and/or lighting of the Common Areas exceeding Ten Thousand Dollars ($10,000.00) ("**CAM Expense Cap**") without the prior written consent of the Tenant, which consent shall not be unreasonably withheld, conditioned or delayed.  The CAM Expense Cap shall increase, but never decrease, each calendar year during the Term by the annual percentage increases, if any, in the Consumer Price Index for All Urban Consumers, Los Angeles-Riverside-Orange County, CA, All Items (base years 1982-1984 = 100) ("**Index**"), published by the United States Department of Labor, Bureau of Labor Statistics, for the prior calendar year.  If the Index shall become unavailable to the public because publication is discontinued, or otherwise, then a comparable index which reflects changes in the cost of living or purchasing power of the consumer dollar published by an agency of the United States Government shall be substituted therefor, as reasonably designated by the Landlord.*

*(v)*     ***CAM Exclusions***.  *The following costs are specifically excluded from Tenant's Proportionate Share:*

*(A)     any maintenance, repair or replacement of roofs (unless otherwise agreed in writing that Landlord is responsible for maintenance of Tenant's roof);*

*(B)     any legal fees; accounting fees; any administrative expenses of Landlord, including office overhead, bookkeeping, salaries of clerical, administrative or other personnel;*

*(C)     any costs or assessments that relate to the original construction of the Shopping Center or any improvement, upgrade or expansion thereof (except if such improvement or upgrade is not made for an individual tenant or group of tenants in the Shopping Center [other than Tenant] or is required in connection with any improvements to the premises of any individual tenant or group of tenants [other than Tenant] required by any applicable laws, ordinances and regulations [collectively, "**Applicable Laws**"] which are enacted or first effective after the Effective Date, and only to the extent such costs exceed savings to Landlord resulting from the same);*

*(D)     any equipment or personal property taxes on equipment or property not substantially or exclusively used in connection with the maintenance or repairs of the Common Areas;*

(E)   any and all loan payments, principal or interest, or ground lease or similar payments;

(F)   any and all leasing costs, including consulting fees, brokerage commissions, vacancy costs, rent or other concessions, and/or refurbishment or improvement expenses;

(G)   any and all collection costs, including and/or bad debt losses or reserves;

(H)   any otherwise permissible fees or costs to the extent in excess of prevailing and competitive rates;

(I)   any costs or expenses resulting from Landlord's violation of any agreement to which it is a party or any Applicable Laws, or governmental rules, regulations or orders;

(J)   costs incurred by Landlord to the extent that Landlord is reimbursed by insurance proceeds, governmental agencies or entities, any tenant or other person;

(K)   costs, including compensation paid to clerks, attendants or other persons, in connection with any commercial concession operated by Landlord, including any parking facility serving the Shopping Center;

(L)   advertising and promotional expenditures and purchasing or constructing costs of signs, or the maintenance and repair thereof, in or on the Shopping Center identifying the owner of the Shopping Center or other tenants other than Tenant;

(M)   costs relating to the negligence of Landlord or its contractors, agents or employees of any payment of any claims or damages;

(N)   amounts incurred to remediate any Hazardous Materials;

(O)   any expenses relating to any repairs, improvements or alterations of any other buildings in the Shopping Center (excluding canopies, columns and other type projections that are consistent throughout the Shopping Center and are not for any particular tenant's benefit); and

(P)   any costs associated with repairs or maintenance of the Cart Containment System required because of defective parts or installation of the system during the one year period following final completion of the Cart Containment Work.

KFT_000068
Page 095

***(vi)*** *Amortization. In the event that Landlord makes any capital improvement, capital repair or capital replacement to the Common Areas in any given year, the amortized portion of the costs of such capital repair or capital replacement shall be included in the CAM Costs charged to tenants of the Shopping Center, including Tenant for such year. The cost of such capital repairs or capital improvements shall be amortized over the useful life (not to exceed ten [10] years) of the repaired or replaced item from the date of expenditure, including interest accrual at ten percent (10%) per annum.*

***(vii)*** *Security Costs. Landlord shall have the right but not the obligation to maintain licensed (through a state or local governmental licensing agency), uniformed security guard service to patrol the Common Areas of the Shopping Center substantially in the manner set forth in **Exhibit G** attached hereto ("**Baseline Security**"). The costs of the Baseline Security are collectively referred to as "**Approved Security Costs**". Baseline Security Costs shall be an allowable Common Area expense for which Tenant shall be responsible for Tenant's Proportionate Share, subject to Tenant's right to have Landlord rebid the Baseline Security pursuant to subsection (w) below. Notwithstanding the foregoing, Tenant shall not be obligated to pay any amounts in excess of the Approved Security Costs ("**Security Cost Increase**") unless: (a) such Security Cost Increase represents the third-party security provider's year-to-year increase in the costs of providing the Baseline Security, or (b) Landlord has provided Tenant with a written proposal detailing the proposed expansion of the Baseline Security (a "**Security Cost Increase Request**") and Tenant has approved such Security Cost Increase Request in writing, which approval shall be granted or withheld in Tenant's reasonable business judgment. If Tenant approves a Security Cost Increase Request, Tenant shall pay for Tenant's Proportionate Share of the increase in costs detailed in such Security Cost Increase Request ("**New Security Costs**") and such New Security Costs shall be deemed Approved Security Costs. Any dispute as to whether Tenant has unreasonably withheld its consent to any Security Cost Increase Request shall be an Arbitrable Dispute (as defined in **Section 16** of the Second Amendment to Lease) and shall be subject to the expedited arbitration provisions of **Section 24.3**. If any Arbitrable Dispute regarding Tenant's consent to any Security Cost Increases is resolved in favor of Landlord, Tenant shall pay for Tenant's Proportionate Share of the New Security Costs as specified in the Security Cost Increase Request which gave rise to the Arbitrable Dispute and such New Security Costs shall be deemed Approved Security Costs.*

***(viii)*** *Re-bidding CAM Contracts. Tenant shall have the right to request, no more than once per fiscal year, that Landlord put out any specified contract(s) for Common Area maintenance work (including, without limitation, the contract for Baseline Security) out to bid, in accordance with the following: specifications for any specified Common Area maintenance item shall be submitted for bid to at least two (2) bidders reasonably approved in writing by Tenant. Thereafter, the names of the bidding contractors or companies, the specifications and the amount of their respective bids shall be furnished to Tenant by Landlord within ten (10) days after Landlord's receipt thereof, and Landlord shall award the pertinent contract to the lowest qualified bidder, unless*

KFT_000064
Page 096

Landlord obtains Tenant's prior written consent to award the contract to a higher bidder, which consent shall not be unreasonably withheld if Landlord notifies Tenant that material factors make it commercially reasonable to award the contract to a higher bidder and Landlord provides Tenant with reasonable documentation to support awarding the contract to a higher bidder.

**(ix)**     **Year-End Reconciliation**.  As soon as reasonably practicable after the end of each calendar year, not to exceed one hundred twenty (120) days, Landlord shall send to Tenant a written statement of the total CAM Costs actually paid by Landlord during said calender year or part thereof ("**Actual Expenses**") and the difference between Tenant's Proportionate Share of the Actual Expenses and the sum of all quarterly payments made by Tenant during such calender year or part thereof ("**Reconciliation Statement**").  The first Reconciliation Statement shall also include corresponding information for the period between the Effective Date and the beginning of the first full calendar year with CAM Costs for such period being prorated on a per diem basis for those days.  The Reconciliation Statement shall be accompanied by complete copies of invoices, statements and documents supporting the expenses covered by said statement (collectively, "**Backup Invoices**") to the extent not already provided by Landlord with the billings to be submitted to Tenant pursuant to **subsection (iii)** of this **Section 4(b)**. Landlord shall, within fifteen (15) days after receipt of Tenant's written request, provide to Tenant such additional documentation as Tenant reasonably requests to substantiate the expenses (sometimes referred to herein as "**Additional Documentation**"), and Tenant's obligation to pay any invoice submitted by Landlord in the Reconciliation Statement shall be contingent upon its receipt of said Additional Documentation.  Tenant and Landlord shall, within thirty (30) days after Landlord submits the Reconciliation Statement to Tenant, make such adjustments and payments as necessary so that Landlord receives the entire amount (but no more) of Tenant's Proportionate Share of the Actual Expenses for the applicable calender year.  Any reimbursement that may be due by Landlord to Tenant may, if the Parties so agree, take the form of a credit on Tenant's next succeeding installment(s).  In the event Landlord fails to deliver a Reconciliation Statement within the time period required herein, Tenant shall have the right, upon written notice to Landlord, to withhold future monthly payments of Tenant's Proportional Share of the CAM Costs until such time as Landlord delivers the delinquent Reconciliation Statement.  Within thirty (30) days of Tenant's receipt of the delinquent Reconciliation Statement and any required Additional Documentation, Tenant shall release to Landlord any amounts so withheld.  Notwithstanding the foregoing to the contrary, Tenant acknowledges and agrees that the one hundred twenty (120) day time period for Landlord to furnish Tenant with a Reconciliation Statement shall not apply to any bills relating to supplemental or escaped taxes for such calendar year.

**(x)**     **Audit**.  Tenant may, upon not less than ten (10) days prior written notice to Landlord, inspect Landlord's records for all Common Area maintenance and insurance expenses incurred during the preceding calender year at Landlord's general offices or at such other location reasonably designated by Landlord at any time during reasonable

KFT_0@Q65
Page 097

*business hours within one hundred eighty (180) days after the completion of the year-end reconciliation for such calender year. If said inspection reveals an overpayment of CAM Costs (including the Service Charge), Landlord shall reimburse Tenant its Proportionate Share of any such overpayment within thirty (30) days after receipt of notice of determination, and of the amount, of such overpayment. If said inspection reveals an underpayment of CAM Costs (including the Service Charge but excluding all expenses for which a statement was not timely submitted pursuant to the terms hereof), Tenant shall reimburse Landlord its Proportionate Share of any such underpayment within thirty (30) days after receipt of proper billing therefor. If said inspection reveals that Landlord collectively overstated CAM Costs by more than five percent (5%), Landlord shall reimburse Tenant for all out-of-pocket costs reasonably incurred in making such inspection within thirty (30) days after receipt of notice of determination, and of the amount, of any such overpayment by Tenant. Landlord's CAM Costs for any calender year shall be deemed correct if Tenant does not give Landlord written notice of discrepancy within the one hundred eighty (180) day period provided herein. There shall be no more than one audit for each calendar year and such audit must be promptly completed. Tenant shall not conduct any audit on a contingency fee basis (or other similar basis where the compensation of the auditor is determined by the amounts recoverable from Landlord). Audits shall be conducted by either (a) Tenant's employees, or (b) a certified public accountant. Tenant shall not disclose, or permit its agents to disclose, to any third party the results of any audit, except confidentially to any other governmental authority requiring such information or to Landlord's accountant, or if discoverable in litigation or if subpoenaed or in any action between the parties or as otherwise mandated by law and Tenant's agents performing any audit permitted by this Section shall execute a commercially reasonable non-disclosure agreement if so requested by Landlord. Notwithstanding anything contained herein to the contrary, any dispute regarding an overstatement of CAM Costs arising during an audit by Tenant pursuant to this Section shall be an Arbitrable Dispute (as defined in **Section 16** of the Second Amendment to Lease) and shall be subject to the expedited arbitration provisions of **Section 24.3**.*

**14.3   Percentage Rent**. Sections **4(c)(i)** and **4(c)(ii)** of the Original Lease, commencing with "(i) one and one-half percent (1 ½%) up to…" and ending with "…in excess of the amount calculated in accordance with **Section 4(c)(i)**." are hereby deleted and replaced with the following:

*"(i) one and one-half percent (1 ½%) of Tenant's "**gross sales**" (as defined below) for such fiscal year, less the sum of (a) Annual Fixed Minimum Rent paid by Tenant for such fiscal year, and (b) real property taxes and assessments assessed against the Premises and paid by Tenant during such fiscal year."*

Additionally, the second to last paragraph of **Section 4(c)** of the Original Lease (which begins "*If, during the term hereof, as long as the demised premises...*") and all of **Section 4(d)** of the Original Lease are deleted in their entirety.

Albertson's #6154: Long Beach
10Second Amendment

17

04/30/07

**15.**    **FIXTURES**.  The second sentence of **Section 5** of the Original Lease is hereby deleted and replaced with the following:

> "*Such fixtures and equipment shall remain the property of Tenant, and Tenant may remove the same or any part thereof at any time prior to the expiration or earlier termination of the Term.*"

**16.**    **USE; RECAPTURE; ASSIGNMENT AND SUBLETTING; USE RESTRICTIONS.** **Section 6** and **Section 13** of the Original Lease are hereby deleted in their entirety and replaced with the following:

> **6.**    *Use; Recapture; Assignment and Subletting; Use Restrictions.*
>
> > **6.1**    *Definitions.*
> >
> > > "*Anchor Use*" *means (i) a Supermarket Use (defined below), or (ii) a type of use which, measured at the applicable date (except for the condition set forth in subsection (e) below), is (a) a national or regional retailer which operates more than one hundred (100) stores nationwide or fifty (50) stores in Los Angeles and Orange County combined or  thirty (30) stores in Los Angeles County, (b) able to reasonably demonstrate that is has sufficient financial resources to operate its business on a company wide basis, (c) customary for stores of at least the size of the Premises, (d) generally accepted in the Southern California marketplace as an anchor of outdoor shopping centers of at least one hundred thousand (100,000) rentable square feet, and (e) is not required pursuant to the City of Long Beach's zoning ordinance to have more parking spaces than  the number of parking spaces required for Tenant to operate the Premises as a Supermarket Use as of the Effective Date.  An Anchor Use shall also include an Supermarket Use which is operated on an ethnic-specific basis for the purposes of the application of **Section 6.3**.*
> > >
> > > "*Approved Anchor Use*" *means the use of substantially all of the Premises as an Anchor Use (subject to Landlord's Recapture Right as set forth in **Section 6.3**).*
> > >
> > > "*Arbitrable Dispute*" *means any dispute arising out of or related to this **Section 6** , including, without limitation, any dispute as to (i) whether Landlord has reasonably withheld its consent to any proposed Assignment pursuant to **Section 6.5**, (ii) whether any Proposed Assignment constitutes an Exempt Transaction, (iii) whether Landlord has properly exercised its Recapture Right (defined below), (iv) the amount of any Termination Price (defined below), or (v) whether a Proposed Use constitutes an Anchor Use.  In addition, Arbitrable Dispute shall include any dispute as to whether Tenant has reasonably withheld its consent to any Security Cost Increase Request.*

*"**Assignment**" means any assignment or proposed sublease of all of the Premises pursuant to the terms of this Lease, including, any assignment pursuant to a mortgage, pledge and/or encumbrance of the Lease by Tenant to secure any obligations of Tenant, except to the extent this Lease is so pledged by Tenant together with all or substantially all of the leases of Tenant in Los Angeles and Orange County, California. For purposes of the Lease, an "Assignment" shall also include (i) any change in control of Tenant if Tenant is a closely held corporation (i.e., whose stock is not publicly held and not traded through an exchange or over the counter), (ii) the sale, conveyance or transfer of an aggregate of forty-nine percent (49%) or more of the value of the unencumbered assets of Tenant, or (iii) the dissolution, merger, consolidation or other material reorganization of Tenant.*

*"**Assignment Notice**" means a written notice from Tenant to Landlord given not less than thirty (30) days or more than ninety (90) days prior to the effective date of any proposed Assignment, which notice shall include all applicable User Information (defined below).*

*"**Dark**" means the complete cessation of business operations in substantially all of the Premises, other than closures for restoration of casualty damage, repairs, refixturizing or remodeling, or closures due to the act of Landlord or due to any repairs for which Landlord is responsible or closures caused by Force Majeure (as defined in **Section 31** of this Amendment).*

*"**Dark Period**" means that the Premises is Dark for a period of twelve (12) months in any consecutive thirty-six (36) month period.*

*"**Exempt Transaction**" means an Assignment to either (i) a Responsible Entity (defined below) acquiring all or substantially all of the Tenant's Supermarket Use (defined below) stores in Southern California and meeting the Net Worth Requirement (defined below); or (ii) an Assignment to a Responsible Entity that operates a Grocery Chain (defined below).*

*"**Grocery Chain**" means a operator of at least thirty (30) Supermarket Use (defined below) stores in Los Angeles, County, California and Orange County, California combined, which operator is able to reasonably demonstrate that is has sufficient financial resources to operate its business on a company wide basis.*

*"**Net Worth Requirement**" means a net worth, as determined in accordance with generally accepted account principals, of at least Five Hundred Million Dollars ($500,000,000.00).*

*"**New Improvements**" means improvements (excluding trade fixtures, furniture and equipment) made to the Premises by or on behalf of Tenant from and after the date of this Amendment.*

"*Operational Subleases*" *means subleases or licenses or other use and/or occupancy agreements which in the aggregate do not exceed ten percent (10%) of the Floor Area of the Premises to users which typically operate in conjunction with a Permitted Use.*

"*Permitted Use*" *means the use of substantially all of the Premises as a Supermarket Use or an Approved Anchor Use.*

"*Proposed Use*" *means the business operations of any Anchor Use or any Supermarket Use.*

"*Proposed User*" *means the Responsible Entity (defined below) for any Proposed Use.*

"*Recapture Right*" *means the right to terminate this Lease as of the Termination Date (defined below), which right is conditioned upon Landlord's timely payment to Tenant of the Termination Price (defined below).*

"*Responsible Entity*" *means the entity responsible for the performance of the Tenant's obligations under the terms of this Lease (excluding any transferring entity which remains primarily liable under the terms of this Lease), whether directly as the named tenant hereunder or by an unconditional written payment and performance guaranty of all of the Tenant's obligations hereunder.*

"*Restaurant*" *means and includes a food service business which serve food to customers primarily within its premises as a full service "sit down" restaurant.*

"*Quick Service Use*" *means a food service business selling the majority of its food for either quick, non-table service on-premises consumption or for off-premises consumption, and includes, without limitation (a) Asian fast food such as "Panda Express", (b) a candy store such as "See's Candy", (c) taco/burrito shops such as "La Salsa", (d) take-out pizza shops such as "Dominos" or "Papa Murphy's", (e) coffee shops such as "Starbucks" or "Peets", (f) sandwich shops, such as "Blimpie", "Subway" or "Togos", (g) ice cream or yogurt shops such as "Baskin Robins" or "TCBY", and (h) juice bars such as "Zuka Juice" or "Jamba Juice".*

"*Supermarket Use*" *means the use of substantially all of the Premises as a (i) non-ethnic grocery store, general food supermarket, or (ii) non-ethnic combination grocery store/general food supermarket and drug store.*

"*Termination Date*" *means the date of termination of the Lease set forth in a Termination Notice.*

"**Termination Price**" means the unamortized out-of-pocket cost paid to unaffiliated third parties for all New Improvements amortized on a straight-line basis over the amortization period which Tenant has elected to apply to the New Improvements for tax purposes pursuant to generally accepted accounting principals.

"**Termination Notice**" means a notice of termination setting forth a Termination Date of not less then thirty (30) days or more than ninety (90) days from the date of the Termination Notice.

"**Use Change**" a change in the use of the Premises from a Supermarket Use to an Anchor Use.

"**User Information**" means a copy of a fully executed, non-contingent (other than Landlord's consent thereto) assignment and assumption agreement, the name and address of the Proposed User, a statement of the Proposed Use, current financial statements of the Proposed User certified by an officer, partner or owner thereof, and any other information and materials regarding the Proposed User reasonably required by Landlord; provided, if the Proposed User is Tenant, the User Information shall include only a statement of Tenant's Proposed Use.

   **6.2**   **Use**.  Tenant shall use the Premises only for a Permitted Use.

   **6.3**   **Recapture**.  Nothing in this Lease shall require Tenant to operate any business at the Lease Premises; provided, Landlord shall have the Recapture Right provided in this **Section 6.3**.

      **6.3.1**   **Trigger by Dark Period**.  If Tenant is Dark for a Dark Period, Landlord may exercise its Recapture Right by providing Tenant with a Termination Notice.  If, prior to the Termination Date, either (a) Tenant reopens for business with (i) the same use that Tenant was operating in the Premises immediately prior to the commencement of the Dark Period, or (ii) a different use as long as such use is a Permitted Use and Landlord has not exercised its Recapture Right in accordance with **Section 6.3.2** below), or (b) Tenant provides Landlord with written notice of its intention to reopen for business no later than ninety (90) days after receipt of the Termination Notice with (i) the same use that Tenant was operating in the Premises immediately prior to the commencement of the Dark Period, or (ii) a different use as long as such use is a Permitted Use and Landlord has not exercised its Recapture Right in accordance with **Section 6.3.2** below), and Tenant in fact reopens a Permitted Use within such ninety (90) day period, then the Termination Notice shall be null and void.

      **6.3.2**   **Triggered by Use Change**.  If Tenant proposes a Use Change to an Anchor Use, Landlord may exercise its Recapture Right by providing Tenant with a Termination Notice and paying the Termination Price.

KFT_000070
Page 102

**6.3.2.1** *Tenant may provide Landlord with a written notice ("**Use Change Notice**") stating that Tenant either (i) proposes a Use Change, or (ii) proposes an Assignment to a tenant who will use the Premises for an Anchor Use (collectively, "**Proposed Use Change**"). The Use Change Notice shall include all relevant User Information.*

**6.3.2.2** *Landlord shall have thirty (30) days from the date of such Use Change Notice to provide Tenant with a written notice stating whether Landlord elects to either (a) exercise its Recapture Right with respect to the Proposed Use Change, or (b) allow the Proposed Use Change on the terms set forth in the Use Change Notice.*

**6.3.2.3** *If Landlord elects to allow the Proposed Use Change, Landlord's election shall apply only to the Proposed Use Change set forth in the Use Change Notice. Any subsequent Use Change shall be subject to Landlord's Recapture Right.*

**6.3.3   Termination Price.** *If Landlord exercises its Recapture Right, and such termination is not nullified by Tenant pursuant to the terms above, then Tenant shall promptly deliver to Landlord written notice ("**Good Faith Notice**") of Tenant's good faith determination of the amount of the Termination Price.*

**6.3.3.1** *Within sixty (60) days of Landlord's receipt of the Good Faith Notice, Landlord shall pay to Tenant in immediately available funds the Termination Price; provided, however, that if Landlord reasonably disagrees with the Tenant's calculation of the Termination Price as set forth in the Good Faith Notice, (a) Landlord shall pay to Tenant within such sixty (60) day period the undisputed portion of the Termination Price ("**Undisputed Portion**"), and (b) if Landlord and Tenant are unable to resolve their disagreement with respect to the disputed portion of the Termination Price within sixty (60) days after Landlord's receipt of the Good Faith Notice, such disagreement shall be resolved by expedited arbitration pursuant to **Section 24.3**.*

**6.3.3.2** *If Landlord fails to deliver the Termination Payment (or the Undisputed Portion, if applicable) within such sixty (60) day period, Landlord's Termination Right as set forth in the applicable Termination Notice shall be null and void and of no further force or effect; provided, however, that Landlord shall continue to have its Termination Right as a result of any subsequent Dark Period or Proposed Use Change by Tenant.*

**6.4   Assignment.** *Except for Exempt Transactions, all Assignments shall require the prior written consent of Landlord, which consent shall not be unreasonably withheld, delayed or conditioned. In addition to any other grounds available hereunder or under Applicable Law for properly withholding consent to any proposed Assignment, it shall not be unreasonable for Landlord to withhold its approval to any Assignment if*

22

KFT_0007A
Page 103

*(i) the Proposed User intends to use any part of the Premises for any use other than a Supermarket Use or an Anchor Use, (ii) the Proposed User is not a Grocery Chain, (iii) as to any Proposed User other than a Grocery Chain, the Proposed User does not meet the Net Worth Requirement, or (iv) the proposed Assignment is sublease, license or other use or occupancy agreement for less than the entire Premises, other than Operational Subleases.*

*    **6.4.1**    Exempt Transactions shall not require the prior consent of Landlord; provided, Tenant shall provide Landlord with written notice of any Exempt Transaction not later than ten (10) business days prior to the effective date of any Exempt Transaction.*

*    **6.4.2**    The procedure for addressing a proposed Assignment for an Anchor Use is set forth in **Section 6.3.2**.*

*    **6.4.3**    Landlord shall approve or disapprove any Assignment within thirty (30) days of the date of any Assignment Notice ("**Reply Deadline**"). Landlord's failure to reply to an proposed Assignment by the Reply Deadline shall be deemed Landlord's consent to such proposed Assignment on the terms of the Assignment Notice.*

*    **6.4.4**    As to each proposed Assignment, Tenant shall pay Landlord's reasonable out-of-pocket expenses ("**Assignment Expenses**") not in excess of Five Thousand Dollars ($5,000.00) ("**Reimbursement Cap**") within thirty (30) days after written request by Landlord which request shall include reasonable evidence of the Assignment Expenses. The Reimbursement Cap shall increase ten percent (10%) every five (5) years during the Term. The Reimbursement Cap shall not apply to any attorneys' fees and costs awarded to Landlord under any arbitration proceeding initiated pursuant to **Section 24.2**. Tenant shall not be required to pay any Assignment Expenses with respect to (i) any Exempt Transaction or (ii) the first proposed Assignment as the Effective Date.*

*    **6.4.5**    Notwithstanding the consummation or attempted consummation of any Assignment under this **Section 6.4**, Tenant shall remain as fully and primarily liable for the payment of Rent and for the performance of all other obligations of Tenant contained in the Lease to the same extent as if the Assignment had not occurred, and any act or omission of any transferee, that violates the terms of this Lease shall be deemed a violation of this Lease by Tenant. If any transferee defaults beyond applicable cure and grace periods in the performance of any of the terms hereof, Landlord may proceed directly against Tenant without the necessity of exhausting its remedies against such transferee. Landlord may consent to subsequent Assignment of this Lease by transferees of Tenant, without obtaining the consent of Tenant or any prior transferee, and such action shall not relieve Tenant of its liability under this Lease.*

**6.5** **Tenant Use Restrictions.** *Notwithstanding any other provision herein, Tenant agrees: not to have an on-premises bank or thrift or act like a bank or thrift (provided, however, Tenant shall have the right to have on-premises ATMs and engage in other typical supermarket activities (for example, check-cashing).*

**6.6** **Landlord Use Restrictions.**

**6.6.1** **Supermarket and Pharmacy Restrictions.** *Except as set forth in this **Section 6.6**, and unless otherwise approved by Tenant in writing, which approval may be withheld or denied in Tenant's sole and absolute discretion, no part of the Shopping Center other than the Premises shall be used (i) as a supermarket (which shall be defined as any store or department containing at least five thousand (5,000) square feet of Floor Area, including aisle space and storage, primarily devoted to the retail sale of food for off-premises consumption); (ii) as a bakery or delicatessen; (iii) for the sale of fresh or frozen meat, fish, poultry or produce for off-premises consumption; (iv) for the sale of alcoholic beverages for off-premises consumption; or (v) for the sale or offer for sale of any ethical pharmaceutical products requiring the services of a registered pharmacist (collectively, "**Supermarket Restrictions**").*

**6.6.2** **General Restrictions.** *Except as set forth in this **Section 6.6**, and unless otherwise approved by Tenant in writing, which approval may be withheld or denied in Tenant's sole and absolute discretion, no part of the Shopping Center shall be used (i) as a bar, tavern, cocktail lounge, adult book or adult video store, automotive maintenance or repair facility, warehouse, car wash, entertainment or recreational facility or training or educational facility; (ii) for the renting, leasing or selling of or displaying for the purpose of renting, leasing or selling of any boat, motor vehicle or trailer; (iii) for industrial purposes; or (iv) for Restaurant or Office Uses (defined below). For the purpose of this **Section 6.6.2**, the phrase "entertainment or recreational facility" shall include, without limitation, a theater, bowling alley, skating rink, gym, health spa or studio, dance hall, billiard or pool hall, massage parlor, game parlor or video arcade (which shall be defined as any store containing more than four [4] electronic games for in-premises play). The phrase "training or educational facility" shall include, without limitation, a beauty school, barber college, reading room, place of instruction or any other operation catering primarily to students or trainees as opposed to customers. The foregoing are collectively referred to as "**General Restrictions**".*

**6.6.3** **Exceptions to Supermarket Restrictions.** *Notwithstanding the Supermarket Restrictions to the contrary, the following uses shall be allowed in the Shopping Center:*

**6.6.3.1** *Sale of alcoholic beverages for on premises consumption by a Restaurant or Quick Service Use.*

*6.6.3.2 A single vitamin or health food store which sells health or diet food items (a "**Health Food Store**");  provided (i) such Health Food Store does not exceed six thousand four hundred (6,400) square feet of Floor Area; and (ii) except as provided in <u>Section 6.6.6</u> as to the "Existing Health Food Store Tenant" or its successors or assigns, in no event shall such Health Food Store contain more that one thousand (1,000) square feet of Floor Area (inclusive of aisle space) devoted to the sale of fresh seafood, meat, poultry or produce.  Notwithstanding the foregoing, no other Health Food Store other than the Existing Health Food Store Tenant (as defined in <u>**Section 6.6.6**</u>) shall be permitted to operate in the Shopping Center during the time in which the Existing Health Food Store Tenant is operating in the Shopping Center without Tenant's prior written consent, which consent may be withheld or denied in Tenant's sole and absolute discretion.*

*6.6.3.3 The sale of fresh bakery items by a Panera Bread store, Corner Bakery Store or similar specialty bread store (a "**Specialty Bread Store**"); provided (i) any such Specialty Bread Store shall operate in substantially the same manner as a majority of such operator's other Specialty Bread Stores.; and (ii) such Specialty Bread Store shall not exceed four thousand eighty (4,080) square feet of Floor Area.*

*6.6.3.4 Baked goods sold as an incidental part of the business of a Restaurant or Quick Service use.*

*6.6.3.5 Deli items sold as an incidental part of the business of a Restaurant or Quick Service Use.*

*6.6.4 **Exceptions to General Restrictions**.  Notwithstanding the General Restrictions to the contrary, the following uses shall be allowed in the Shopping Center:*

*6.6.4.1 Major electronics retailers such as Circuit City or Best Buy shall be permitted to demonstrate entertainment products in their premises as an incidental portion of their primary business selling such items.*

*6.6.4.2 A single internet café or online gaming use; provided the same shall not exceed two thousand and forty (2,040) square feet of Floor Area.*

*6.6.4.3 Retail educational facilities such as "Score Learning Center" or "Sylvan" ("**Educational Uses**") shall be permitted in the Shopping Center so long as (i) only one single user ("**Single Educational User**") may occupy more than two thousand forty (2,040) square feet of Floor Area; provided such Single Educational User shall not occupy more than four thousand one hundred (4,100) square feet of Floor Area; (ii) no more than two (2) additional Educational Uses (other than the Single Educational User) shall be located in the Shopping Center; provided no such individual Educational Use shall exceed two thousand forty (2,040) square feet of Floor Area.*

**6.6.4.4** *Medical (including, without limitation, eye care or chiropractic), dental, professional or business offices (such as a real estate brokerage office, tax accounting office, etc.) typically found in neighborhood shopping centers ("**Office Uses**") shall be allowed in the Shopping Center; provided, (i) no single Office Use shall exceed four thousand one hundred (4,100) square feet of Floor Area, and (ii) no real estate Office Use shall exceed two thousand forty (2,040) square feet of Floor Area.*

**6.6.4.5** *Restaurants and Quick Service Uses shall be allowed in the Shopping Center, provided no single Restaurant or Quick Service Use shall exceed two thousand forty (2,040) square feet of Floor Area, except that one single Restaurant or Quick Service Use may occupy up to four thousand eighty (4,080) square feet of Floor Area."*

**6.6.4.6** *A boutique spa, gym or athletic training facilities or studio such as "Curves" shall be allowed in the Shopping Center; provided the same shall not exceed two thousand forty (2,040) square feet of Floor Area.*

**6.6.4.7** *National or major regional video retails, such as "Blockbuster" or "Hollywood Video" shall not be considered adult video stores if the same sell or rent such videos or DVDs or other media as are typically sold or rented in a majority of their other stores.*

**6.6.4.8** *A single weight loss center such as "Jenny Craig" shall be allowed in the Shopping Center; provided the same shall not exceed two thousand five hundred (2,500) square feet of Floor Area.*

**6.6.4.9** *A single tanning salon shall be allowed in the Shopping Center; provided the same shall not exceed two thousand five hundred (2,500) square feet of Floor Area.*

**6.6.4.10** *A single retail children's gymnasium or similar children's recreational facility such as "Gymboree" shall be allowed in the Shopping Center; provided the same shall not exceed four thousand eighty (4,080) square feet of Floor Area.*

**6.6.5** **Exceptions for Existing Leases.** *Landlord hereby represents and warrants as of the Effective Date that (a) Landlord has entered into no leases with tenants for the Shopping Center other than with the tenants listed on **Exhibit F** hereto (individually, a "**Current Tenant**" and collectively, the "**Current Tenants**"), and (b) Landlord has not granted rights to the Current Tenants which permit the Current Tenants to use their respective premises in a manner which materially violates the General Restrictions and/or Supermarket Restrictions, other than the rights granted to Young Lee, aka Tina Lee (Vitamin City), Golden Arches Realty Corporation and Tenant.*

**6.6.5.1** *Any breach of the representations set forth in **Section 6.6.5** shall be a default by Landlord pursuant to Section 17.3 of the Lease.*

**6.6.5.2** *From and after the Effective Date, Landlord shall use commercially reasonable means to enforce the Supermarket Restrictions and the General Restrictions (collectively, "**Use Restrictions**"), including, without limitation, seeking injunctive relief to enforce the Use Restrictions against any Current Tenant which violates its applicable use provision, except as expressly set forth in **Section 6.6.3**.*

**6.6.5.3** *Notwithstanding anything contained in the Lease to the contrary, in the event that Landlord fails to use commercially reasonable efforts to remedy a violation of the Use Restrictions within thirty (30) days after receipt of written notice from Tenant of such violation, Landlord's failure may be deemed by Tenant to be a default under this Lease, and Tenant shall have all of the rights and remedies set forth in this Lease for a default by Landlord. Provided Landlord acts in accordance with the requirements of **Section 6.6.5.2**, Landlord shall not have liability to Tenant as a result of another tenant or occupant of the Shopping Center violating the General Restrictions and/or the Supermarket Restrictions in violation of said tenant's or occupant's lease.*

**6.6.6** **Existing Heath Food Store.** *Notwithstanding anything contained herein to the contrary, with respect to that certain Shopping Center Lease, Lakewood Plaza Shopping Center, ("**Existing Health Food Store Lease**"), by and between KTF Enterprises No. 1, LP and Young Lee, aka Tina Lee ("**Health Food Store Tenant**"), dated July 10, 2000, Landlord shall not, without Tenant's prior written consent which consent may be withheld in Tenant's sole and absolute discretion: (i) consent to any change in the Current Health Food Store Tenant's business operations, including any change in the use provision, which would allow the Current Health Food Store Tenant to utilize any additional square footage of Floor Area for the sale of fresh seafood, meat, poultry or produce in excess of the current square footage of Floor Area utilized by the Health Food Store Tenant on the Effective Date for the sale of such items as of the Effective Date which the parties approximate equals six hundred (600) square feet of Floor Area; or (ii) allow for the expansion of the Health Food Store Tenant's Floor Area beyond the six thousand four hundred (6,400) square foot limitation set forth in **Section 6.6.3.2**.*

**6.6.7** **Termination of Supermarket Restrictions.** *In the event that Tenant changes its use at the Premises from a Supermarket Use to an Anchor Use which (a) is not a Supermarket Use, and (b) does not sell groceries as a significant component of its business operations, the exclusive rights granted to Tenant under **Section 6.6.1** shall cease and be of no further force and effect."*

17.   **TAXES.** The first sentence of <u>**Section 7(a)**</u> of the Original Lease is deleted and replaced with the following:

> "*Tenant agrees that it shall pay before delinquency any and all real property taxes ("**Taxes**") and assessments for public improvements ("**Assessments**") levied or assessed against the Premises and the improvements thereon during the Term. The term "Taxes" shall includes, without limitation, (i) any tax on the rent, right to rent or other income from the Premises, or any portion thereof, or against the business of leasing the Premises, or any portion thereof; (ii) any assessment, tax, fee, levy or charge in addition to, or in substitution, partially or totally, of any assessment, tax, fee, levy or charge previously included within the definition of real property tax, it being acknowledged by Landlord and Tenant that Proposition 13 was adopted by the voters of the State of California in the June 1978 election ("**Proposition 13**") and that assessments, taxes, fees, levies and charges may be imposed by governmental agencies for such services as fire protection, street, sidewalk and road maintenance, refuse removal and for other governmental services formerly provided without charge to property owners or occupants, and, in further recognition of the decrease in the level and quality of governmental services and amenities as a result of Proposition 13, real estate taxes shall also include any governmental or private assessments or the Premises contribution towards a governmental or private cost-sharing agreement for the purpose of augmenting or improving the quality of services and amenities normally provided by governmental agencies; (iii) any assessment, tax, fee, levy, or charge allocable to or measured by the area of the Premises or the rent payable hereunder, including, without limitation, any business or gross income tax or excise tax with respect to the receipt of such rent, or upon or with respect to the possession, leasing, operating, management, maintenance, alteration, repair, use or occupancy by Tenant of the Premises, or any portion thereof; and (iv) any assessment, tax, fee, levy or charge, upon this transaction or any document to which Tenant is a party. Notwithstanding anything to the contrary contained in this **Section 7(a)**, Tenant shall only be responsible to pay for increases in Taxes occasioned by up to three (3) changes in ownership of the Premises occurring during the Term.*"

18.   **DAMAGE.** <u>**Sections 8(a)**</u> and <u>**(b)**</u> of the Original Lease are hereby deleted in their entirety and replaced with the following:

> "***(a) Destruction Covered by Insurance.*** *In the event of a whole or partial destruction of the Premises, which destruction is covered by insurance, Tenant shall at its expense promptly commence and diligently pursue to completion the restoration of the Premises to the condition existing immediately before the casualty, in accordance with, and to the extent permitted under, Applicable Laws.*

> ***(b) Uninsured Destruction Exceeding 15%.*** *Notwithstanding anything to the contrary contained above, in the event of a destruction of the Premises to the extent of more than fifteen percent (15%) of the then full replacement cost (excluding footings and*

*foundations), where such casualty is not covered by casualty insurance (excluding deductibles but including Tenant's self-insurance, if applicable), then Tenant shall give Landlord written notice ("**Damage Notice**") within sixty (60) days following the date of the casualty of Tenant's election either to (i) commence repair, reconstruction or restoration and prosecute the same diligently to completion, in which event this Lease shall continue in full force and effect, or (ii) elect not to so repair, reconstruct or restore, in which event this Lease shall cease and terminate as of the date of Tenant's notice; provided, however, if Tenant elects not to repair, reconstruct or restore the casualty pursuant to subsection (ii) above, then Landlord shall have the right, in Landlord's sole discretion, to elect to repair, reconstruct or restore the Premises, and if Landlord elects to do so within thirty (30) days after receipt of the Damage Notice, Landlord shall promptly commence and diligently pursue to completion the restoration of the Premises (other than Tenant's furniture, fixtures and equipment) to the condition existing immediately before the casualty, Tenant shall reimburse Landlord for an amount equal to the cost incurred by Landlord to complete such restoration, such reimbursement obligation not to exceed fifteen percent (15%) of the then full replacement cost (excluding footings and foundations), Tenant's termination shall be null and void and this Lease shall continue in full force and effect.*

*Additionally, in the event of a destruction of the Premises to the extent of more than seven percent (7%) of the then full replacement cost (excluding footings and foundations) during the last three (3) years of the Term, as extended, where such casualty is not covered by casualty insurance (including Tenant's self-insurance, if applicable), then Tenant shall give Landlord written notice within thirty (30) days following the date of the casualty of Tenant's election either to (i) commence repair, reconstruction or restoration and prosecute the same diligently to completion, in which event this Lease shall continue in full force and effect, or (ii) elect not to so repair, reconstruct or restore, in which event this Lease shall cease and terminate as of the date of Tenant's notice. Notwithstanding the foregoing to the contrary, in no event shall Tenant have the right to terminate the Lease in the event of an uninsured casualty pursuant to the immediately preceding sentence if as of the date of such casualty Tenant has exercised its extension option pursuant to **Section 13.2** of the Second Amendment to Lease.*"

Additionally, the following is added as **Section 8(e)** of the Original Lease:

"**(e)** **Abatement of Rent.** *All rental provided herein shall be abated from the time of the casualty during restoration periods if Tenant is unable to use the Premises or if it is unfeasible for Tenant to remain open for business due to the restoration work. If Tenant remains open for business during a period of restoration, the Annual Fixed Minimum Rent and Tenant's Proportionate Share shall be reduced by the percentage of the ground Floor Area in the Premises which Tenant is unable to use or which it is unfeasible to use as a result of such casualty (as opposed to Tenant's voluntary reduction in its ground Floor Area) for Tenant's use, and Tenant does not use. If the ground Floor Area of the Premises is reduced after restoration, then all rental shall be reduced by the*

KFT_0078
Page 110

ratio that the ground Floor Area lost bears to the total ground Floor Area before the casualty. If this Lease is terminated as provided above on a day other than the last day of a calendar month, the rental for the last month of Tenant's occupancy shall be prorated, and Landlord agrees to refund to Tenant any unearned rent paid in advance."

19.    **INSURANCE.** **Section 9** of the Original Lease is hereby deleted in its entirety and replaced with the following:

"*9.    Insurance and Indemnification.*

*9.1    Tenant's Property Insurance. Except where providing insurance pursuant to **Section 9.3** below, Tenant agrees to keep in effect on the Premises insurance against damage caused by fire, lightning, windstorm, hail, smoke and all other risks from time to time included in "extended coverage" policies or endorsements generally available in the same geographic area as the Shopping Center in an amount not less than one hundred percent (100%) of the replacement value of the building improvements (excluding footings and foundations) located thereon, the proceeds of which shall be applied to restoration of the Premises. Policies for said insurance carried by Tenant shall provide that in the event of fire or other insured casualty the proceeds thereof shall be payable to Tenant, which Tenant shall use for the reconstruction and repair of the Premises. Tenant shall name Landlord as an additional insured on Tenant's property insurance policy, and Tenant shall name Landlord as a co-loss payee under Tenant's property insurance policy. If, however, Landlord encumbers the Shopping Center with a loan, upon the request of Landlord, Tenant shall name any lender of Landlord now or hereafter holding a first-lien mortgage on the Shopping Center as a co-loss payee under such property insurance policy.*

*9.2    Commercial General Liability. Landlord and Tenant shall each provide and maintain commercial general liability insurance with broad form coverage endorsement (including broad form property damage endorsement) covering its indemnity obligations under the Lease and insuring it against claims for personal injury, bodily injury or death, and property damage or destruction. Such insurance shall be written with an insurer authorized to do business in the state in which the Shopping Center is located and shall name the other Party as additional insured. The limits of liability of all such insurance shall be Five Million Dollars ($5,000,000.00) for personal injury or bodily injury or death of any one person, Five Million Dollars ($5,000,000.00) for personal injury or bodily injury or death of more than one person in one occurrence and One Million Dollars ($1,000,000.00) with respect to damage to or destruction of property; or, in lieu of such coverage, a combined single limit (covering personal injury, bodily injury or death and property damage or destruction) with a limit of Five Million Dollars ($5,000,000.00) per occurrence. Landlord and Tenant shall each deliver to the other Party evidence of the insurance required to be carried by such Party, which evidence shall be either: (i) available to the other Party by access to a freely accessible website or similarly convenient means of electronic access; or (ii) delivered to the other*

KFT_000079
Page 111

*Party within thirty (30) days of receipt of a written request for the same. The policies of such insurance shall provide that such insurance shall not be cancelled without the giving of thirty (30) days prior written notice to the holders of such insurance and the additional insureds under such policies. Tenant's commercial liability coverage shall include blanket contractual liability and shall include the Landlord and Landlord's lenders, as additional insured and shall be primary coverage for any liability arising out of the use or occupancy of the Premises and shall be endorsed to the effect that any other similar insurance carried by Landlord shall be considered non-contributing and excess - it being understood that any such insurance carried by Landlord is strictly excess, secondary and noncontributing with any insurance carried by Tenant.*

**9.3 Self-Insurance Program.** *Insurance coverage required by this Lease may contain the following elements, so long as the required coverage is not diminished, the required limits are not reduced, and the elements thereof are otherwise commercially reasonable: a Party's insurance program may include blanket, layered, umbrella, conventional and/or manuscript forms of policies, as well as retention levels and loss reserves which are charged against earnings or otherwise funded, and commercially reasonable deductibles.*

**9.4 Blanket Policies.** *All insurance which Tenant is required to maintain hereunder may be provided under a blanket policy provided such policy otherwise complies with the requirements of this Lease; provided, however, that the interests of Landlord shall thereupon be as fully protected as they would be otherwise under separate policies covering only the Premises, and Tenant shall provide Landlord with a certificate of insurance of Tenant's blanket policies upon request by Landlord.*

**9.5 Workers' Compensation.** *Tenant agrees to maintain and keep in force workers' compensation insurance or a program of self-insurance on its employees or use any other program which meets the requirements of the Workers' Compensation Act of the State of California.*

**9.6 Landlord's Casualty Insurance.** *Landlord shall, at its expense, maintain fire and extended coverage insurance full force and effect throughout the Term in an amount equal to one hundred percent (100%) of the replacement cost of the Common Area and all buildings and other improvements in the Shopping Center (excluding excavation, footings and foundations) except for the Premises and improvements insured by Tenant or any other tenant. Only the cost of the premiums for coverages relating to the Common Areas shall be reimbursable by Tenant pursuant to the provisions of **Section 4(b)** of the Original Lease.*

**9.7 Performance of Indemnity Agreements.** *All policies of liability insurance required hereunder shall insure the performance by Landlord or Tenant, as the case may be, of the indemnity agreements contained in this Lease. Each Party shall promptly notify the other Party of any asserted claim with respect to which such Party is or may be*

KFT_000080
Page 112

*indemnified against hereunder and shall deliver to such other Party copies of process and pleadings.*

**9.8** **Certificates.** *Upon request, each Party shall cause certificates of insurance reasonably evidencing compliance with the requirements of this* **Section 9** *of to be delivered to the other Party. The insurance policies and certificates required by this* **Section 9** *shall require the insurance company to furnish Landlord and Tenant, as the case may be, thirty (30) days prior written notice of any cancellation or lapse, or the effective date of any reduction in the amounts or scope of coverage.*

**9.9** **Indemnity.** *Each Party ("**Indemnifying Party**") hereby indemnifies, holds harmless and agrees to defend the other Party and its Related Parties ("**Indemnified Party**") from and against all Claims on account of injury to persons, loss of life, or damage to property occurring in the Shopping Center and on the ways immediately adjoining the Shopping Center, caused by the active or passive negligence or willful misconduct of the Indemnifying Party, its agents, servants or employees; provided, however, the Indemnifying Party does not indemnify the Indemnified Party against any injury, loss of life, or damage which is caused by the active or passive negligence or willful misconduct of the Indemnified Party, its or their agents, servants or employees. The parties' obligations with respect to indemnification hereunder shall remain effective, notwithstanding the expiration or termination of this Lease, as to Claims arising or accruing prior to the expiration or termination of this Lease. Tenant shall accept the tender of the defense of any action or proceeding which arises out of or results from any act which occurs (i) on the Premises, (ii) on the sidewalks immediately adjoining the Premises, or (iii) within the Shopping Center, upon an allegation of negligence or willful misconduct of Tenant, its agents, servants, or employees, or for which Landlord is otherwise indemnified against hereunder, except Tenant shall not be obligated to accept the tender of the defense of any action or proceeding which, though occurring within the Common Areas (other than the sidewalks immediately adjoining the Premises), there is an allegation of negligence or willful misconduct of Landlord, Landlord's other tenants, its or their agents, servants, or employees - it being understood that Tenant is obligated to accept the tender of the defense of any action or proceeding occurring in the Premises and/or the sidewalks immediately adjoining the Premises if there is an allegation of negligence or willful misconduct on the part of both Landlord, its agents, servants or employees, and Tenant, its agents, servants or employees. Landlord shall accept the tender of the defense of any action or proceeding which arises out of or results from any act (a) occurring in the Common Areas, or (b) which occurs on the Premises, upon an allegation of negligence or willful misconduct of Landlord, its other tenants, its or their agents, servants, or employees, or for which Tenant is otherwise indemnified against hereunder, except Landlord shall not be obligated to accept the tender of the defense of any action or proceeding which, though occurring in the Premises or the sidewalks immediately adjoining the Premises, there is an allegation of negligence or willful misconduct of Tenant, its agents, servants, or employees - it being understood that Landlord is obligated to accept the tender of the defense of any*

KFT_000084
Page 113

action or proceeding occurring in the Common Areas (other than the sidewalks immediately adjoining the Premises) if there is an allegation of negligence or willful misconduct on the part of both Landlord, its agents, servants or employees, and Tenant, its agents, servants or employees.  After a tender of defense has been accepted by either party pursuant to this **Section 9.9**, the obligation to continue the defense which has been tendered shall terminate upon the dismissal of the defending party from the applicable action.

**9.10    Policy Provisions/Evidence of Insurance**. All policies of insurance (other than self-insurance) enumerated above shall be provided by insurance carriers with a Best rating of not less than B+/VIII, unless such insurance is unavailable at commercially reasonable rates as determined by Landlord in its good faith reasonable judgment.  Landlord shall not be entitled to self-insure against any of the risks cited herein, except the amount of any commercially reasonable deductible shall be deemed to be self-insurance. Subject to Tenant's right to self-insure hereunder, upon commencement of the Term (as to casualty insurance), (ii) upon commencement of construction and (iii) no less than annually thereafter, Tenant and Landlord shall cause to be issued to each other in lieu of the original policy, a duplicate of such policy or appropriate certificates of insurance reasonably acceptable to the other party and evidencing compliance with the applicable covenants of this **Section 9**. Each such certificate shall provide that no expiration, cancellation or material change in the insurance evidenced thereby shall be effective unless thirty (30) days' unconditional notice of such expiration, cancellation or material change shall have been given to the certificate-holder. The limits of insurance carried by Landlord and Tenant hereunder shall not limit the liability of a party hereunder, except as specifically indicated herein to the contrary.

**9.11    Waiver of Right of Recovery and Subrogation**.  Landlord and Tenant hereby waive any rights each may have against the other on account of any loss of or damage to their respective property or its contents at the Shopping Center, arising from any risk covered by fire and extended coverage property insurance (if applicable), carried or required to be carried under this Lease.  If and to the extent permitted under each such policy of insurance required herein or carried by either party, the parties, on behalf of their respective insurance companies insuring the property of either Landlord or Tenant against any covered loss, waives any right of subrogation that such companies may have against the other party or its insurer.  To the extent available, at a commercially reasonable cost, such waiver of subrogation shall be included in all such policies or added by endorsement to such policies."

**20.    INTENTIONALLY OMITTED.**

**21.    NOTICES. Section 14** of the Original Lease is hereby amended to provide the following notice addresses for Landlord and Tenant:

|  |  |
|---|---|
| If to Landlord: | KFT Enterprises, No. 1, LP<br>c/o KFT Management, Inc.<br>11620 Wilshire Boulevard, Suite 420<br>Los Angeles, California 90025<br>Attention: Mark Kaplan<br>Telephone (310) 914-4600<br>Facsimile (310) 914-4606 |
| If to Tenant: | c/o SUPERVALU INC.<br>250 Parkcenter Boulevard, Boise ID 83706 (street address)<br>P.O. Box 20, Boise ID 83726 (mailing address)<br>ATTN: Legal Department - #74200R (Store #6154)<br>Facsimile (208) 395-6575 |
| With a copy to: | American Stores Company, LLC<br>c/o SUPERVALU INC.<br>ATTN: Legal Department (Store #6154)<br>11840 Valley View Road<br>Eden Prairie, MN 55344 |

**Section 14** of the Original Lease is further amended to provide that notices may be delivered via facsimile, Federal Express and/or personal delivery.

22.     **DEFAULT. Section 17** of the Original Lease is hereby deleted in its entirety and replaced with the following:

"*17.     Default*.

*17.1     Tenant's Default. Except as expressly provided below, Tenant shall be in default under this Lease if any of the following events occur:*

*17.1.1 Tenant shall fail to pay rent or other payments due hereunder to Landlord within ten (10) days after the same is due and Landlord has given Tenant written notice thereof. Any such notice shall be in lieu of, and not in addition to, any notice required under Section 1161 of the California Code of Civil Procedure;*

*17.1.2 Tenant shall fail to perform any of its obligations under this Lease, other than as described in **Section 17(a)(i)** above, within thirty (30) days following the date Landlord has given notice thereof to Tenant, provided; however where such performance cannot be accomplished within such thirty (30) day period, Tenant shall not be in default if Tenant commences such performance within such thirty (30) day period and uses diligent efforts to cure such failure of performance. Any such notice shall be in lieu of, and not in addition to, any notice required under Section 1161 of the California Code of Civil Procedure.*

**17.2    Remedies.** *In the event of a default by Tenant, Landlord shall have the right to bring suit for the collection of any amounts for which Tenant may be in default, or for the performance of any other covenant or agreement upon such other Party, or for specific performance, and/or exercise all other remedies provided by law or statute, and shall have the right (but not the obligation) to do such acts or expend such funds at the expense of Tenant as are reasonably required to cure Tenant's default; provided, however, Landlord shall have given Tenant at least thirty (30) days notice of Landlord's intention to cure Tenant's default prior to taking such acts or expending such funds. Notwithstanding the foregoing to the contrary, the remedies specified in <u>Section 17.3</u> are only available if the default of Tenant is the failure to pay a monthly installment of Annual Rent (other than Annual Rent or other amounts not paid to Landlord in the exercise of Tenant's offset rights set forth in <u>Section 17.7</u> below) or is otherwise material (other than Annual Rent or other amounts not paid to Landlord in the exercise of Tenant's offset rights set forth in <u>Section 17.7</u> below) following notice and the expiration of the applicable cure periods (collectively, "**Material Default**"). No remedy herein conferred upon, or reserved to Landlord or Tenant shall exclude any other remedy herein or by law provided, but each shall be cumulative.*

**17.3    Termination Remedies.** *Upon the occurrence of a Material Default by Tenant that is not cured by Tenant within the grace periods specified herein, Landlord shall, have the following rights and remedies in addition to all other rights and remedies available to Landlord at law or in equity:*

**17.3.1** *The rights and remedies provided by California Civil Code Section 1951.2 to terminate Tenant's right to possession of the Premises and to recover (i) the worth at the time of award of the unpaid rent which had been earned at the time of termination; (ii) the worth at the time of award of the amount by which the unpaid rent which would have been earned after termination until the time of award exceeds the amount of such rental loss that Tenant proves could be have been reasonably avoided; (iii) the worth at the time of award of the amount by which the unpaid rent for the balance of the Term after the time of award exceeds the amount of loss of such rental loss that Tenant proves could be reasonably avoided; and (iv) any other amount necessary to compensate Landlord for all the detriment proximately caused by Tenant's failure to perform its obligations under this Lease. The "worth at the time of award" of the amounts referred to in subsections (i) and (ii) above shall be computed by allowing interest at the discount rate of the Federal Reserve Bank of San Francisco at the time of award plus one percent (1%). The "worth at the time of award" of the amount referred to in subsection (iii) above shall be computed by discounting such amount at the discount rate of the Federal Reserve Bank of San Francisco at the time of award plus one (1) percent.*

**17.3.2** *The rights and remedies provided by California Civil Code Section 1951.4, that allows Landlord to continue this Lease in effect and to enforce all of its*

KFT_0084
Page 116

*rights and remedies under this Lease, including the right to recover rent as they become due, for so long as the Landlord does not terminate Tenant's right to possession.*

**17.4** **Landlord's Default**. *Landlord shall be in default under this Lease if Landlord shall fail to cure any breach of its obligations under this Lease if such failure shall continue for thirty (30) days following the date Tenant has given notice thereof to Landlord, provided (i) where such default cannot be cured within thirty (30) days, Landlord shall not be in default if Landlord commences to cure within such thirty (30) day period and uses diligent efforts to prosecute such default to completion, and (ii) in no event shall Landlord be in default if Landlord is unable to perform for reasons (other than financial) beyond Landlord's reasonable control.  Any liability of Landlord under this Lease shall be limited solely to its interest in the Shopping Center (and the rents, issues, profits and proceeds therefrom), and in no event shall any personal liability be asserted against Landlord, its partners, or their respective members, partners, shareholders, officers, directors, agents or employees, in connection with this Lease nor shall any recourse be had to any other property or assets of Landlord, its partners, or their respective members, partners, shareholders, officers, directors, agents or employees.  In no event shall Landlord be liable for consequential or special damages as a result of a breach or default under this Lease.  Except as specifically set forth in __Section 17.7__, and limited by, the terms of this Lease, Tenant hereby waives and relinquishes any and all rights which Tenant may have to terminate this Lease or to withhold Rent for any reason whatever, including without limitation on account of any default by Landlord of its obligations under this Lease.  Except as specifically set forth in __Section 17.7__, Tenant's sole remedy for a breach of this Lease shall be limited to an action for damages, injunctive relief or specific performance of this Lease.*

**17.5** **Dispute**. *Notwithstanding anything to the contrary in this Lease, if either party shall dispute, in good faith (i.e., the court makes no finding of bad faith), any obligation claimed by the other party as a breach of this Lease (other than Tenant's obligation to pay Annual Fixed Minimum Rent, except as to Tenant's right of offset or abatement as provided for in this Lease (taking into account all notice requirements as a condition thereto)), such alleged breaching party shall not be deemed in breach until a court or arbitrator has determined that such party is in breach and such party shall have failed to cure such breach within the time specified therefor (or earlier time if specified by the court) in this Lease following written notice from the non-breaching party.  Tenant and Landlord shall proceed diligently and in good faith to resolve any such dispute in a commercially reasonable manner.*

**17.6** **Default Interest**. *If either party shall fail to make any payment under this Lease when due, or if either party expends any sums of money under this Lease in the performance or payment of the obligations of the other party, the performing party shall be reimbursed by the non-performing party upon written demand with interest accruing from the date of such demand at rate of ten percent (10%) per annum ("__Default Rate__").*

**17.7** **Tenant's Right to Cure and Offset.** *If Landlord is in default under this Lease beyond any applicable notice and cure period, and in the event Landlord default is of a type which can be cured by the payment of money, Tenant may incur any reasonable expenses necessary to perform the obligations of Landlord as specified in the notice of default and may deduct such expenses from Annual Rent thereafter becoming due; provided, however, that in any month Tenant shall not be entitled to offset more than fifty (50%) of the base rent due for that month ("**Offset Cap**"). The Offset Cap shall not apply to any offset permitted pursuant to **Section 10** of the Second Amendment, and Tenant shall be entitled to offset any Tenant Completion Costs up to one hundred percent (100%) of base rent due for any month. Landlord hereby covenants and agrees that any offset by Tenant permitted pursuant to this **Section 17.7** shall not be deemed or alleged by Landlord to be a failure to pay rent under this Lease or to be the basis for any notice under California Code of Civil Procedure Section 1161, as amended or replaced, or any similar statute providing for summary proceedings to recover possession of real property unless and until such time a Landlord has obtained a final, non-appealable judgment (or award, as applicable) from a court (or arbitrator or referee, as applicable) of competent jurisdiction that such offset by Tenant was not permitted under this Lease and Tenant has failed to reimburse the amount of such offset within fifteen (15) days of such judgment or award. Any sum owing to Tenant under the terms and provisions of this **Section 17.7** by reason of Tenant's election to cure Landlord's default and offset the costs thereof against Annual Rent or otherwise owing to Tenant pursuant to this Lease which shall not be paid within ten (10) days of when due shall bear interest at the Default Rate from the date the same becomes due and payable by the terms and provisions of this Lease until paid.*"

**23.** **MAINTENANCE.** The first sentence of **Section 16** of the Original Lease is deleted in its entirety and replaced with the following:

"*Tenant shall be responsible, at its sole cost and expense, to maintain, repair and/or replace the entire demised premises, including, without limitation, the exterior, roofs, foundations and structural portions thereof - it being understood that Landlord shall have no maintenance, repair and/or replacement obligations with respect to the demised premises.*"

**24.** **SIGNS.**

**24.1** **Common Area Signs.** The last paragraph of **Section 18** of the Original Lease is hereby deleted in its entirety and replaced with the following:

"*With the exception of directional signs, signs identified on the Amended Site Plan and/or signs identified on the Approved Landlord Plans, Landlord shall not permit signs located within the Common Areas of the Shopping Center without Tenant's consent, which consent shall not be unreasonably withheld, conditioned or delayed.*"

KFT_00086
Page 118

**24.2   Building Signage**. Landlord may install or maintain, or may permit other tenants in the Shopping Center to install or maintain, signs on the exterior of Shopping Center buildings ("**Building Signs**") provided that such Building Signs are: (i) permitted by, and in compliance with, all Applicable Laws; and (ii) comparable in size, design and character to building signs in similarly situated shopping centers.

**25.    SUBORDINATION AND FINANCING. Section 22** of the Original Lease is hereby deleted in its entirety and replaced with the following:

"*22.    Subordination.*

*22.1    Subordination and Nondisturbance. Within thirty (30) calendar days after any request by Landlord, Tenant will, by execution of a subordination, non-disturbance and attornment agreement ("SNDA") in the form attached hereto as **Exhibit E**, subordinate its rights under this Lease to the lien of any mortgage under a deed of trust, or to the rights of any person holding a beneficial interest in any lien resulting from any other method of financing or refinancing now or hereafter in force against the Shopping Center or any portion thereof, whether now in existence or in the future acquired or constructed, and to all advances made or hereafter to be made upon the security thereof.*

*22.2    Attornment. If any proceedings are brought for foreclosure, or if the exercise of the power of sale under any mortgage or deed of trust encumbering the Premises occurs, or if Landlord transfers the Premises by deed in lieu of foreclosure, Tenant shall attorn to the purchaser upon any such foreclosure, sale or transfer and recognize such purchaser as Landlord under this Lease. Tenant shall have no right to assert the occurrence of a termination of this Lease as a result of such foreclosure or transfer.*"

**26.    HOLDING OVER. Section 23** of the Original Lease is hereby deleted in its entirety and replaced with the following:

"*23.    Holding Over. If Tenant remains in possession of the Premises after the expiration of the Term, Tenant, at the option of Landlord, shall be deemed to be occupying the Premises under a month to month tenancy, subject to all the terms and conditions of this Lease, except that Annual Fixed Minimum Rent for each month of any such tenancy shall equal one hundred fifty percent (150%) of the Annual Fixed Minimum Rent plus Percentage Rent payable for the last month of the Term.*"

**27.    ARBITRATION. Section 24** of the Original Lease regarding arbitration is hereby deleted in its entirety and replaced with the following:

KFT_0008A
Page 119

"**24.** *Waiver of Jury Trial; Arbitration.*

**24.1** *Waiver of Jury Trial.* **TO THE EXTENT PERMITTED BY APPLICABLE LAWS, EACH PARTY HEREBY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION SEEKING SPECIFIC PERFORMANCE OF ANY PROVISION OF THIS LEASE, FOR DAMAGES FOR ANY BREACH UNDER THIS LEASE, OR OTHERWISE FOR ENFORCEMENT OF ANY RIGHT OR REMEDY HEREUNDER.**

**24.2** *Arbitration in Lieu of Jury Trial Waiver.* To the extent that foregoing waiver of trial by jury is not enforceable, Landlord and Tenant agree that the following shall control:

**24.2.1** Except as set forth in **Section 24.2.3** below, if any action or proceeding is commenced by either party to enforce any right or recover any damages in connection with any claim arising out of or related to this Lease, all of the issues in such action, whether of fact or of law, shall be heard and decided by a judicial referee pursuant to the reference provisions of California Code of Civil Procedure Sections 638 through 645.1. Upon the commencement of any action or proceeding, the parties shall agree upon a retired Superior Court Judge or Supreme Court or Court of Appeal Justice affiliated with ADR Services, Inc. If the parties are unable to agree upon such an individual within sixty (60) days after the service of the complaint in the action or proceeding, or the referee selected by the parties is not willing to serve and the parties cannot agree on an alternate within fifteen (15) days, then either party may make application to the court in which the action or proceeding is pending for the appointment of a retired Superior Court Judge or Supreme Court or Court of Appeal Justice affiliated with ADR, Inc. The parties shall advance, in equal shares, the fees and expenses of the referee selected pursuant to this Section but the losing party in any such action or proceedings shall, in addition to paying any judgment awarded by the referee, reimburse the other party for any and all fees and expenses previously advanced by such party for the referee.

**24.2.2** If for any reason the judicial reference procedure set forth in **Section 24.2.1** is held to be unenforceable, the reference proceeding set forth in **Section 24.2.1** shall be conducted as an arbitration under California Code of Civil Procedure 1281 et. seq. and the referee appointed therein shall be deemed to be an arbitrator empowered to decide all matters concerning the dispute and this Lease, including but not limited to, the scope and enforceability of **Section 24.2.1** and **Section 24.2.2**.

**24.2.3** Notwithstanding anything to the contrary contained in this **Section 24.2**, the following matters are excluded from judicial reference/arbitration: (i) an unlawful detainer action, and (ii) any matter that is within the jurisdiction of a probate, small claims or bankruptcy court. The filing of a court action for order of attachment,

*receivership, injunction or other provisional remedies, shall not constitute a waiver of the judicial reference/arbitration provisions.*

*24.3    **Expedited Arbitration**. Notwithstanding anything to the contrary contained in the Lease, as to any Arbitrable Dispute, Landlord and/or Tenant shall submit the matter to expedited binding arbitration in accordance with the JAMS Streamlined Arbitration Rules & Procedures:*

*24.3.1 The place for filing and administration of such arbitration shall be the Los Angeles office of JAMS;*

*24.3.2 There shall be a single arbitrator, appointed in accordance with the JAMS' procedures;*

*24.3.3 The arbitrator's decision shall be based solely upon written submissions by the parties unless the arbitrator determines, after reviewing such submissions, that a hearing is required;*

*24.3.4 If the arbitrator, Landlord and Tenant agree, such hearing may be held by conference call, and will not extend for more than eight (8) hours unless the arbitrator determines that up to an additional four (4) hours is necessary, which time shall be allocated between the parties in such proportions as the arbitrator may determine;*

*24.3.5 The arbitrator shall render his award with seven (7) days after the later of his receipt of all written submissions or the date of the hearing; and*

*24.3.6 The parties shall be allowed reasonable discovery as determined by the arbitrator.  This decision shall be final and non-appealable.*

*24.4    **Waiver of Damages**. Notwithstanding anything to the contrary in this Lease, as to any Arbitrable Dispute, the sole remedy of Tenant shall be a declaratory judgment and an injunction for the relief sought without any monetary damages or other monetary relief (other than reimbursement of reasonable attorneys' fees and costs incurred to obtain a declaratory judgment and injunction).  Tenant waives to the maximum extent permitted by Applicable Law any and all other remedies, including, without limitation, Claims for damages and/or any right at law or equity to terminate this Lease with respect to any such claim."*

**28.    BROKERS.** Landlord and Tenant each covenant and warrant that it has had no dealings with any real estate brokers or agents in connection with the negotiation or consummation of the transaction contemplated by this Amendment.  Each party agrees to indemnify the other party for any costs incurred as a result of any other broker or agent claiming compensation through said party.

**29.    INTENTIONALLY OMITTED.**

**30.    TENANT ACKNOWLEDGMENT.** Tenant acknowledges that it has occupied the Premises since 1956 and is accepting the Premises in its as-is condition, without representation or warranty of any kind whatsoever. Notwithstanding any of Landlord's obligations set forth herein, Landlord has no obligation of any kind whatsoever to make any improvements or alterations to the Premises or to otherwise prepare the Premises for Tenant's continued occupation and operations.

**31.    FORCE MAJEURE.** If either party shall be delayed or prevented from the performance of any act required hereunder by reason of acts of God, strikes, lockouts, labor troubles, inability to procure materials, restrictive governmental laws, delays or regulations, delays caused by the other party, or other cause without fault and beyond the control of the party obligated (financial inability excepted) (such circumstances collectively referred to as **"Force Majeure"**), performance of such act shall be excused for the period of delay and the period for the performance of any such act shall be extended for a period equivalent to the period of such delay; provided, however, nothing in this **Section 31** shall excuse Tenant from the prompt payment of any rent payable pursuant to the terms of the Lease. A party claiming a Force Majeure delay shall give notice of such delay to the other party promptly after commencement of the event giving rise to the delay, together with a reasonable estimate of the time period of such delay.

**32.    MISCELLANEOUS PROVISIONS.**

    **32.1    Attorney's Fees.** **Section 21** of the Original Lease is deleted and replaced with the following:

> *"If either party commences an action against the other party arising out of or in connection with the Lease or this Amendment, the prevailing party shall be entitled to recover from the losing party reasonable attorneys' fees and costs of suit."*

    **32.2    Conflicts.** Except as amended by this Amendment, the Lease shall remain unmodified in full force and effect. In the event of any inconsistency between the terms of the Lease and the terms of this Amendment, the terms of this Amendment shall prevail and control.

    **32.3    Counterparts.** This Amendment may be signed in multiple counterparts which, when signed by all parties, shall constitute a binding agreement.

    **32.3    Entire Agreement.** This Amendment reflects, supersedes and merges all the prior agreements and negotiations of the parties hereto with respect to its subject matter, and contains their entire agreement.

    **32.4    Exhibits.** All exhibits, amendments, riders and addenda attached hereto are incorporated herein and made a part hereof.

KFT_00990
Page 122

**32.5    Further Assurances.** The parties agree to promptly sign all documents reasonably required to give effect to the provisions of this Amendment.

**32.6    Governing Law; Interpretation.** This Amendment shall be construed and enforced in accordance with the laws of the State of California. This Amendment shall be construed according to its fair meaning, and not strictly for or against Landlord or Tenant. As used herein, the word "include(s)" means "include(s), without limitation," and the word "including" means "including, but not limited to."

**32.7    No Partnership.** Nothing in this Amendment shall be construed to make Landlord or Tenant partners or joint venturers or render either party liable for the debts or obligations of the other party.

[THIS SPACE INTENTIONALLY LEFT BLANK]

KFT_00094
Page 123

**32.8    Severability**.  If any one or more of the provisions contained herein shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision of this Amendment, but this Amendment shall be construed as if such invalid, illegal or unenforceable provision had not been contained herein.

**IN WITNESS WHEREOF**, the parties hereto have executed this Amendment as of the day and year first above written.

LANDLORD:          **KFT ENTERPRISES, NO. 1 LP,**
a California limited partnership

By:  KFT MANAGEMENT, INC.,
a California corporation

By: _____
Name: _Mark Kaplan_____
Its: _President_____

By: _____
Name: _____
Its: _____

TENANT:          **AMERICAN STORES COMPANY, LLC,**
a Delaware limited liability company

By: _____
       John P. Breedlove
Its: _____Vice President_____

MLM / wmg

**EXHIBIT A TO SECOND AMENDMENT TO LEASE**

**AMENDED SITE PLAN**

(attach amended Site Plan)

Albertson's #6154: Long Beach
10Second Amendment

Exhibit A - page 1

04/30/07

KFT_000098
Page 125

04/02/2007 MON 09:33 FAX 562 624 4131       PATTERSON CONSTRUCTION          ☒002

Lakewood Plaza Shopping Center, Site Phase 1  →  Phase 3

| ID | O | Task Name | Duration | Start | Finish |
|----|---|-----------|----------|-------|--------|
| 1 | | Temporary Fence | 1 day | Mon 4/30/07 | Mon 4/30/07 |
| 2 | | Demo | 5 days | Tue 5/1/07 | Mon 5/7/07 |
| 3 | | Over-ex site | 3 days | Tue 5/8/07 | Thu 5/10/07 |
| 4 | | Survey curb | 2 days | Fri 5/11/07 | Mon 5/14/07 |
| 5 | | CMU Footings | 5 days | Tue 5/15/07 | Mon 5/21/07 |
| 6 | | Cut curb grade | 2 days | Tue 5/15/07 | Wed 5/16/07 |
| 7 | | Place site concrete | 5 days | Thu 5/17/07 | Wed 5/23/07 |
| 8 | | CMU | 7 days | Tue 5/22/07 | Wed 5/30/07 |
| 9 | | U.G. elec, storm & irriga | 10 days | Thu 5/24/07 | Wed 6/6/07 |
| 10 | | Finish grade site/planters | 3 days | Thu 6/7/07 | Mon 6/11/07 |
| 11 | | Base & Pave | 4 days | Tue 6/12/07 | Fri 6/15/07 |
| 12 | | Light Fixtures | 2 days | Mon 6/18/07 | Tue 6/19/07 |
| 13 | | Landscaping | 10 days | Mon 6/18/07 | Fri 6/29/07 |
| 14 | | Striping | 2 days | Mon 7/2/07 | Tue 7/3/07 |

*PHASE 2*

| ID | O | Task Name | Duration | Start | Finish |
|----|---|-----------|----------|-------|--------|
| 15 | | Temporary Fence | 1 day | Wed 7/4/07 | Wed 7/4/07 |
| 16 | | Demo | 5 days | Thu 7/5/07 | Wed 7/11/07 |
| 17 | | Over-ex site | 3 days | Thu 7/12/07 | Mon 7/16/07 |
| 18 | | Survey curb | 2 days | Tue 7/17/07 | Wed 7/18/07 |
| 19 | | Cut curb grade | 2 days | Thu 7/19/07 | Fri 7/20/07 |
| 20 | | Place site concrete | 5 days | Mon 7/23/07 | Fri 7/27/07 |
| 21 | | U.G. elec, storm & irriga | 10 days | Mon 7/23/07 | Fri 8/1/07 |
| 22 | | Finish grade site/planters | 3 days | Mon 8/13/07 | Wed 8/15/07 |
| 23 | | Base & Pave | 4 days | Thu 8/16/07 | Tue 8/21/07 |
| 24 | | Light Fixtures | 2 days | Wed 8/22/07 | Thu 8/23/07 |
| 25 | | Landscaping | 10 days | Wed 8/22/07 | Tue 9/4/07 |
| 26 | | Striping | 2 days | Wed 9/5/07 | Thu 9/6/07 |

*PHASE 3*

| ID | O | Task Name | Duration | Start | Finish |
|----|---|-----------|----------|-------|--------|
| 30 | | Temporary Fence | 1 day | Fri 9/7/07 | Fri 9/7/07 |
| 31 | | Demo | 5 days | Mon 9/10/07 | Fri 9/14/07 |

Project: Lakewood Plaza Site1.own
Date: Mon 4/2/07

| Task | | Milestone | | External Tasks |
| Split | | Summary | | External Milestone ◆ |
| Progress | | Project Summary | | Deadline |

Page 1

**Lakewood Plaza Shopping Center; Site Phase 1**

| ID | o | Task Name | Duration | Start | Finish | April | May | June | July | August | September | October | November |
|----|---|-----------|----------|-------|--------|-------|-----|------|------|--------|-----------|---------|----------|
| 32 | 🏗 | Over-ex site | 3 days | Mon 9/17/07 | Wed 9/19/07 | | | | | | | | |
| 33 | 🏗 | Survey curb | 2 days | Thu 9/20/07 | Fri 9/21/07 | | | | | | | | |
| 34 | 🏗 | Cut curb grade | 2 days | Mon 9/24/07 | Tue 9/25/07 | | | | | | | | |
| 35 | 🏗 | Place site concrete | 5 days | Wed 9/26/07 | Tue 10/2/07 | | | | | | | | |
| 36 | 🏗 | U.G. elec, storm & irriga | 10 days | Wed 10/3/07 | Tue 10/16/07 | | | | | | | | |
| 37 | 🏗 | Finish grade site/planters | 3 days | Wed 10/17/07 | Fri 10/19/07 | | | | | | | | |
| 38 | 🏗 | Base & Pave | 4 days | Mon 10/22/07 | Thu 10/25/07 | | | | | | | | |
| 39 | 🏗 | Light Fixtures | 2 days | Fri 10/26/07 | Mon 10/29/07 | | | | | | | | |
| 40 | 🏗 | Landscaping | 10 days | Fri 10/26/07 | Thu 11/8/07 | | | | | | | | |
| 41 | 🏗 | Striping | 2 days | Fri 11/9/07 | Mon 11/12/07 | | | | | | | | |

| | | |
|---|---|---|
| Project: LakewoodPlazaSltb1.mpp<br>Date: Mon 4/2/07 | Task | Milestone ◆ | External Tasks |
| | Split ............... | Summary | External Milestone ◈ |
| | Progress | Project Summary | Deadline ⇩ |

Page 2



## EXHIBIT I - SECOND AMENDMENT TO LEASE

## APPROVED BID FOR CART CONTAINMENT WORK

Approved bid for Cart Containment Work - $22,143.00



**EXHIBIT B TO SECOND AMENDMENT TO LEASE**

**APPROVED MARKET PLANS**

Albertson's Schedule of Drawings
City Submittal Set - 5/01/06

| Sheet No. | Sheet title |
|---|---|
| Sheet 1.0 | PARTIAL SITE PLAN & DETAILS |
| | |
| Sheet 2.0A | FOUNDATION PLAN |
| Sheet 2.0B | FOUNDATION DETAILS |
| Sheet 2.1A | SLAB PLAN |
| Sheet 2.1B | SLAB DETAILS |
| Sheet 2.2A | FRAMING PLAN |
| | |
| Sheet 3.0A | FLOOR PLAN |
| Sheet 3.0B | FLOOR PLAN (MEZZANINE) & DETAILS |
| Sheet 3.1A | DEMOLITION PLAN |
| Sheet 3.1B | DEMOLITION PLAN (MEZZANINE) & DETAILS |
| Sheet 3.2A | EXTERIOR ELEVATIONS & DETAILS |
| Sheet 3.2B | WALL SECTIONS & DETAILS |
| Sheet 3.3A | ROOF PLAN |
| Sheet 3.3B | ROOF PLAN DETAILS |
| Sheet 3.4A | ROOF FINISH SCHEDULE & DETAILS |
| Sheet 3.4B | ROOF FINISH SCHEDULE & DETAILS |
| Sheet 3.5 | INTERIOR ELEVATIONS |
| Sheet 3.6A | FLOOR FINISH PLAN |
| Sheet 3.6B | FLOOR FINISH PLAN (MEZZANINE) & DETAILS |
| Sheet 3.7A | REFLECTED CEILING PLAN |
| Sheet 3.7B | REFLECTED CEILING PLAN (MEZZANINE) & DETAILS |
| Sheet 3.7C | REFLECTED CEILING PLAN DETAILS |
| Sheet 3.8A | DOOR SCHEDULES & DETAILS |
| Sheet 3.8B | WINDOW TYPES & DETAILS |
| Sheet 3.9A | EQUIPMENT PLAN |
| Sheet 3.9B | EQUIPMENT PLAN, SCHEDULE & DETAILS |
| Sheet 3.10A | PHASING PLAN |
| Sheet 3.10B | PHASING PLAN |
| Sheet 3.11 | FIXTURE PLAN (FOR REFERENCE ONLY) |
| | |
| Sheet 4.0A | WASTE & VENT PLAN |
| Sheet 4.0B | WASTE & VENT PLAN (PLATFORM) & DETAILS |
| Sheet 4.1A | WATER & GAS PLAN |
| Sheet 4.0B | WATER & GAS PLAN (PLATFORM) & DETAILS |

Sheet 5.0A    MECHANICAL PLAN
Sheet 5.0B    MECHANICAL PLAN (PLATFORM) & DETAILS
Sheet 5.1     MECHANICAL SCHEDULES
Sheet 5.2     ENERGY CODE COMPLIANCE SHEETS

Sheet 6.0A    REFRIGERATION PLAN
Sheet 6.0B    REFRIGERATION PLAN
Sheet 6.0C    HOT GAS PIPING PLAN
Sheet 6.1A    REFRIGERATION WIRING DIAGRAMS
Sheet 6.1B    REFRIGERATION CONTROL WIRING DIAGRAM
Sheet 6.2     REFRIGERATION SCHEDULE

Sheet 7.0A    REFRIGERATION & HVAC PLAN
Sheet 7.0B    REFRIGERATION & HVAC PLANS (MEZZANINE) & DETAILS
Sheet 7.1A    LIGHTING PLAN
Sheet 7.1B    LIGHTING PLAN (MEZZANINE) & DETAILS
Sheet 7.1C    LIGHTING SCHEDULES & DIAGRAMS
Sheet 7.1D    TITLE 24 CALCULATIONS
Sheet 7.2A    POWER PLAN
Sheet 7.2B    POWER PLAN (MEZZANINE) & DETAILS
Sheet 7.2C    ELECTRICAL DIAGRAMS
Sheet 7.3A    CONTROLS & DATA PLAN
Sheet 7.3B    CONTROLS & DATA PLAN (MEZZANINE) & DETAILS
Sheet 7.4     PANEL SCHEDULES
Sheet 7.5     ELECTRICAL SCHEDULES
Sheet 7.6A    DEMOLITION PLAN
Sheet 7.6B    DEMOLITION PLAN (MEZZANINE) & DETAILS

Sheet 8.0A    FIRE ALARM / MONITORING PLAN
Sheet 8.0B    FIRE PROTECTION PLAN, DETAILS & SCHEDULES
Sheet 8.1A    FIRE SPRINKLER PLAN
Sheet 8.1B    FIRE SPRINKLER PLAN AND DETAILS

Albertson's #6154: Long Beach
10Second Amendment                 Exhibit B - Page 2                    04/30/07

**EXHIBIT C TO SECOND AMENDMENT TO LEASE**

**APPROVED LANDLORD PLANS**

**Sheet No.**    **Sheet Title**

| Sheet No. | Sheet Title |
|---|---|
| T 101 | TITLE SHEET |
| T 102 | ACCESSIBILITY NOTES & ADA STANDARDS |
| T 103 | CONDITIONS OF APPROVAL |

CIVIL DRAWINGS (FOR REFERENCE ONLY)

| | |
|---|---|
| C1 | TITLE SHEET |
| C2 | DEMOLITION PLAN |
| C3 | PRECISE GRADING & DRAINAGE PLAN |
| C4 | HORIZONTAL CONTROL PLAN |
| C5 | UTILITY PLAN |
| C6 | CONSTRUCTION & STANDARD DETAILS |
| C7 | STANDARD DETAILS & EROSION CONTROL |

LANDSCAPE

| | |
|---|---|
| L1.1 | IRRIGATION PLAN |
| L1.2 | IRRIGATION DETAILS |
| L2.1 | LANDSCAPE PLANTING PLAN |
| L2.2 | POTS PLANTING PLAN & PARKING LOT PLANTER DETAILS |
| L3.1 | PLANING DETAILS |

ARCHITECTURAL

| | |
|---|---|
| D010 | DEMOLITION SITE PLAN |
| D101 | DEMOLITION FLOOR PLAN |
| D121 | DEMOLITION CEILING PLAN |
| D131 | DEMOLITION ROOF PLAN |
| D201 | DEMOLITION BUILDING ELEVATIONS |
| | |
| A010 | OVERALL REFERENCE SITE PLAN |
| A011 | ENLARGED SITE PLAN |
| A012 | ENLARGED SITE PLAN |
| A013 | ENLARGED SITE PLAN |
| A014 | ENLARGED SITE PLAN |
| A015 | TYPICAL SITE DETAILS |
| A016 | MISC. SITE DETAILS |
| A017 | ENLARGED COLORED PAVING PLANS & SITE DETAILS |

A018     PLANTER ELEVATIONS, MISC. SITE DETAILS & PAVING PLANS

A101     FLOOR PLAN
A121     REFLECTED CEILING PLAN
A122     ENLARGED REFLECTED CEILING PLANS
A123     ENLARGED REFLECTED CEILING PLANS
A131     ROOF PLAN

A201     BUILDING ELEVATIONS

A301     WALL SECTIONS & DETAILS
A302     WALL SECTIONS & DETAILS
A303     WALL SECTIONS B DETAILS
A304     WALL SECTIONS & DETAILS
A305     PILASTER DETAILS & MISC. DETAILS

A601     DOOR/STOREFRONT TYPES, DOOR SCHEDULE, NOTES

A701     MISCELLANEOUS DETAILS

STRUCTURAL

S-1     CANOPY FOUNDATION 8 FRAMING PLANS - EAST
S-2     CANOPY FOUNDATION & FRAMING PLANS - EAST
S-3     CANOPY SECTIONS
S-4     CANOPY SECTIONS
S-5     CANOPY SECTIONS
S-6     GENERAL NOTES & TYPICAL DETAILS
S-7     SITE STRUCTURES

ELECTRICAL

E-1     SCHEDULES, DETAILS & NOTES
E-2     SITE LIGHTING PLAN
E-3     LIGHTING PLAN
SE-1     SITE LIGHTING PLAN PHOTOMETRICS

## EXHIBIT D TO SECOND AMENDMENT TO LEASE

### RENTAL RATES SCHEDULE

| Term (Lease Years): | Per Sq. Ft.: | Annual Rent: |
|---|---|---|
| 1 thru 5 | $17.00 | $889,559.00 |
| 6 thru 10 | $18.70 | $978,514.90 |
| 11 thru 15 | $20.57 | $1,076,366.39 |
| 16 thru 20 | $22.63 | $1,184,160.01 |
| Option Period 1 | $24.89 | $1,302,419.03 |
| Option Period 2 | $27.38 | $1,432,713.26 |
| Option Period 3 | $30.12 | $1,576,089.24 |

Albertson's #6154: Long Beach
10Second Amendment

Exhibit D - Page 1

04/30/07

KFT_0€€10&
Page 135

**EXHIBIT E TO SECOND AMENDMENT TO LEASE**

**FORM OF SNDA**

RECORDING REQUESTED BY,
AND WHEN RECORDED, RETURN TO:

Albertson's
c/o Ward, Miller & Geyer, LLC
165 South Main, Second Floor
Salt Lake City, UT 84111
Attn.: Mark Geyer (#6154)

_____
(space above this line for recorder's use)

**SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT**
Albertson's #6154: Spring & Palo Verde, Long Beach, CA

**THIS SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT** ("**Agreement**") is made as of the ____ day of _____, 200__, between **KFT ENTERPRISES, NO. 1, L.P.**, a California limited partnership ("**Landlord**"), **AMERICAN STORES COMPANY, LLC**, a Delaware limited liability company ("**Tenant**"), and _____, a[n] _____ ("**Lender**").

**RECITALS:**

A.    Tenant is the holder of a leasehold interest in that certain real property together with all easements, rights and appurtenances thereto located in the City of Long Beach, County of Los Angeles, State of California, as legally described on **Schedule I** attached hereto and incorporated herein by this reference ("**Leased Premises**") pursuant to that certain written Lease dated August 16, 1985, by and between Landlord's predecessor-in-interest and Tenant's predecessor-in-interest ("**Original Lease**"), as modified by that certain letter agreement dated March 22, 1990 ("**Letter Agreement**"), as further amended by that certain First Amendment to Lease dated as of May 1, 2006 ("**First Amendment**"), and that certain Second Amendment to Lease dated as of _____ 200__, between Landlord, as landlord, and Tenant, as tenant ("**Second Amendment**"), and a Memorandum of Lease, dated _____, 200__ and recorded on _____, 200__ as Instrument No._____ in the Official Records of Los Angeles County, California ("**Official Records**"). The Original Lease, the Letter Agreement, the First Amendment, the Second Amendment and the Memorandum of Lease are collectively referred to herein as the "**Lease**;" and

B.    The Leased Premises are part of a larger tract of land located in the City of Long Beach, County of Los Angeles, State of California, legally described in **Schedule II** attached hereto and incorporated herein by this reference ("**Shopping Center**"); and

**C.**     Lender has made or has agreed to make a loan to Landlord in the maximum [aggregate] principal amount of $_____, which loan shall be secured by that certain [Deed of Trust/Mortgage] encumbering all or a part of the Shopping Center, dated as of _____, 19___, and recorded on _____, 19___, as Instrument No. _____ in the Official Records ("**Mortgage**"); and

**D.**     The parties desire to subordinate the Lease to the Mortgage and to establish certain rights of quiet and peaceful possession to the Leased Premises for Tenant's benefit together with certain obligations of attornment, all in the manner hereafter provided.

The foregoing recitals are incorporated into and made an integral part of this Agreement.

<div align="center">

**AGREEMENT:**

</div>

**NOW, THEREFORE**, in consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, it is mutually agreed between the parties as follows:

**1.**     Subject to the terms and conditions set forth in this Agreement, the Tenant agrees that the Lease is and shall at all times be subordinate to the Mortgage.

**2.**     Lender agrees that, if no default exists under the Lease which at such time would then permit Landlord to terminate the Lease or to exercise any dispossessory remedy provided for therein, (a) Tenant will not be made a party in any action or proceeding to foreclose the Mortgage or to remove or evict Landlord from the Leased Premises or from any part of the Shopping Center unless such joinder is necessary to foreclose the Mortgage and then only for such purpose and not for the purpose of terminating the Lease; (b) Tenant will not be evicted or removed from the Leased Premises or from any part of the Shopping Center nor will its possession or right to possession of the Leased Premises or of any part of the Shopping Center under the Lease for the term thereof (including any and all extensions or renewals thereof effected in accordance with any option therefor in the Lease) be terminated or disturbed or in any way interfered with by any action taken by Lender to enforce any rights or remedies under the Mortgage, except to the extent any such action may be permitted under the Lease; and (c) Lender, upon succeeding to Landlord's interest in the Leased Premises, will recognize the Lease and Tenant as its direct tenant under the Lease for the full term thereof (including any and all extensions or renewals thereof effected in accordance with any option therefor in the Lease), and subject to the terms of **Section 4** below, will be bound by and perform all of the obligations of Landlord set forth in the Lease as if said person were originally named therein as the landlord thereunder.

**3.**     In the event that the Lender or any other person acquires title to the Leased Premises pursuant to the exercise of any remedy provided for in the Mortgage or under the law of the state where the Leased Premises is located, the Lease shall not be terminated or affected by said foreclosure or sale resulting from any such proceeding and the Lender hereby covenants

that any sale by it of the Leased Premises pursuant to the exercise of any rights and remedies under the Mortgage or otherwise, shall be made subject to the Lease and the rights of the tenant thereunder, subject to the terms of Section 4 below.

4.     Tenant agrees that, if the interest of Landlord in the Leased Premises shall be transferred to and owned by Lender by reason of foreclosure or other proceeding brought by it under any present or future lien against Landlord's interest in the Leased Premises, or by any other manner, Tenant shall be bound to the Lender under all of the terms, covenants, conditions and agreements set forth in the Lease for the balance of the term thereof remaining (including any and all extensions or renewals thereof effected in accordance with any option therefor in the Lease) with the same force and effect as if Lender were originally named therein as the landlord thereunder, and Tenant does hereby agree to attorn to Lender as its landlord thereunder so as to establish direct privity of estate and contract between Lender and Tenant, said attornment to be effective and self-operative without the execution of any further instrument on the part of either of the parties hereto immediately upon Lender succeeding to the interest of Landlord in the Leased Premises; *provided, however*, that Lender shall not be: (i) except as provided in subparagraph (ii), liable for any act or omission of any prior lessor (including Landlord); (ii) obligated to cure any default of any prior landlord (including Landlord) under the Lease which occurred prior to the date Lender acquires Landlord's interest in the Leased Premises; provided, however, that the foregoing shall not be deemed to constitute a waiver of any right of offset against rent or any right of termination which Tenant may have under the Lease; (iii) subject to any right of offset against rent or termination for any event of which Lender has not received written notice from Tenant pursuant to this Agreement; (iv) bound by any payment of rent or other amount by Tenant to any prior landlord (including Landlord) more than thirty (30) days in advance of the due date under the Lease, except to the extent said payment is required by the terms, covenants, conditions or agreements contained in the Lease or (v) liable for the return of any security deposit unless such security deposit shall have been actually deposited with Lender. Notwithstanding the foregoing, Lender shall be liable to Tenant, effective as of the date Lender acquires all or any portion of Landlord's interest in the Shopping Center, for the performance of all obligations of Landlord arising under the Lease from and after the date of such acquisition; provided, however, that the foregoing shall not in any event prevent recourse by the Tenant against all or any part of Lender's right, title and interest in and to the Leased Premises or the Shopping Center or any part thereof (including, without limitation, Lender's right, title and interest in and to the rents and other income or revenue receivable from the Leased Premises or the Shopping Center or any part thereof, or the consideration receivable from the sale or other disposition (including a condemnation) of all or any part of the Leased Premises or the Shopping Center or from any fire or other casualty affecting all or any of the improvements located on the Leased Premises or the Shopping Center). Lender's liability for any and all obligations of Landlord under the Lease shall be limited to Lender's interest in the Shopping Center.

5.     The parties acknowledge and agree that the Mortgage provides that, under certain circumstances, Lender shall be entitled to collect, receive and demand payment of all or any part of the rent and other sums due and payable to Landlord under the Lease to Lender. The parties agree that: (a) Tenant shall be under no obligation to pay rent or any other sums due and payable

to Landlord under the Lease to Lender until such time as Tenant receives written notice from Lender demanding payment of said amounts to Lender; and (b) Tenant shall be entitled to rely on any such written notice from Lender and shall not incur any liability to Landlord as a result of such reliance notwithstanding the existence of and dispute between Landlord and Lender with respect to the existence of any default or the satisfaction of any condition under the Mortgage or any other document executed in connection with the transaction which is the subject of the Mortgage which would entitle Lender to collect, receive or demand payment of said amounts from Tenant.

6.     Lender covenants and agrees that in the event of a conflict, whether in the express provisions or by reason of variation in inclusion of provisions, between the Mortgage and the Lease, the provisions of the Lease, to the extent approved by Landlord, shall govern for all purposes. From and after the date Tenant receives a fully executed copy of this Agreement, Tenant shall send a copy of any notice or statement of a default by Landlord under the Lease to Lender at the same time such notice or statement is sent to Landlord, at the address and pursuant to the provisions of **Section 10** below. Tenant agrees that Lender has the right (but not the obligation) to cure any breach or default specified in such notice within the time periods set forth below and Tenant will not declare a default of the Lease, as to Lender, if Lender cures such default within fifteen (15) days from and after the expiration of the time period provided in the Lease for the cure thereof by Landlord; provided, however, that if such default cannot with diligence be cured by Lender within such fifteen (15) day period, the commencement of action by Lender within such fifteen (15) day period to remedy the same shall be deemed sufficient so long as Lender pursues such cure with diligence.

7.     Lender agrees that all condemnation awards and insurance proceeds payable with respect to the Leased Premises shall be paid in accordance with the provisions for condemnation and casualty under the Lease. In no event shall the lien of the Mortgage affect or constitute a lien or charge on any trade fixtures, equipment or personal property owned by Tenant.

8.     For the purpose of this Agreement: (a) the term **"Lease"** shall be deemed to include the Lease as described above in Recital A along with all amendments, modifications and supplements thereto; provided, however, that no such amendment, modification or supplement shall be binding on Lender without Lender's written consent, which consent shall not be unreasonably withheld or delayed; (b) the term **"Foreclosure"** shall be deemed to include the acquisition of Landlord's interest in the Leased Premises by Foreclosure or pursuant to the exercise of any power of sale contained in the Mortgage, or by deed (or assignment) given in lieu of, or in anticipation of, foreclosure or the exercise of any such power of sale, or by any other means whatsoever; and (c) the term **"Lender"** shall be deemed to include anyone who succeeds to Landlord's interest in the Leased Premises pursuant to the Mortgage including, without limitation, any purchaser at foreclosure or pursuant to the exercise of any power of sale contained in the Mortgage, or any grantee of a deed (or assignment) given in lieu of, or in anticipation of, foreclosure or the exercise of any such power of sale.

**9.** If any term, covenant, condition or agreement contained in this Agreement or the application thereof to any person, firm or entity shall at any time or to any extent be deemed or found to be invalid or unenforceable by operation of law, judicial proceedings or otherwise, the remainder of this Agreement or the application of such term, covenant, condition or provision to persons or entities or to circumstances other than those as to which it is held invalid or unenforceable shall not be affected thereby, and each remaining term, covenant, condition or provision of this Agreement or the application thereof shall be valid and enforced to the fullest extent permitted by law.

**10.** All notices given pursuant to this Agreement shall be in writing and shall be given by personal delivery, by United States registered or certified mail, or by United States express mail or other established express delivery service (such as Federal Express), postage or delivery charge prepaid, return receipt requested, addressed to the appropriate party at the address set forth below:

Landlord:     KFT Enterprises, No. 1, LP
          c/o KFT Management, Inc.
          11620 Wilshire Boulevard, Suite 420
          Los Angeles, California 90025
          Attention: Mark Kaplan

Tenant:       American Stores Company, LLC
          c/o SUPERVALU INC.
          11840 Valley View Road
          Eden Prairie, MN 55344
          Attention: Legal Department (Store #6154)

with a copy to:       SUPERVALU INC.
          250 Parkcenter Boulevard, Boise, ID 83706 (street address)
          P.O. Box 20 Boise, Idaho 83726 (mailing address)
          Attention: Legal Department - #74200R (Store #6154)

Lender:       _____
          _____
          _____
          _____
          Attention: _____

The person and address to which notices are to be given may be changed at any time by any party upon written notice to the other party. All notices shall be deemed given upon receipt. For the purpose of this Agreement, the term **"receipt"** shall mean any of the following: (a) the date of delivery of the notice or other document as shown on the return receipt; (b) the date of actual receipt of the notice or other document by the person or entity specified pursuant to this section; or (c) in the case of refusal to accept delivery or inability to deliver the notice or other document,

the earlier of: (i) the date of the attempted delivery or refusal to accept delivery; (ii) the date of the postmark on the return receipt; or (iii) the date of receipt of notice of refusal or notice of nondelivery by the sending party.

11.     If any litigation is commenced between the parties hereto concerning this Agreement or the rights or obligations of any party in relation thereto, the prevailing party in such litigation shall be entitled, in addition to such other relief as may be granted, to a reasonable sum for its attorney's fees actually incurred in such litigation (including any appeal thereof), which sum shall be determined by the court in such litigation or in a separate action brought for that purpose.

12.     This Agreement shall bind and inure to the benefit of the parties hereto, their heirs, personal representatives, successors and assigns, including, without limitation, the mortgagee or beneficiary under any mortgage or deed of trust on Tenant's interest in the Lease or the Leased Premises, its successors and assigns.

13.     This Agreement may be executed in any number of counterparts, each of which shall for all purposes be deemed to be an original and all of which together shall constitute but one and the same instrument, and shall be effective upon execution of one or more of such counterparts by each of the parties hereto.

14.     This Agreement contains the entire agreement between the parties and supersedes all prior agreements, oral or written, with respect to the subject matter hereof. This Agreement may not be modified in any manner whatsoever except by an instrument in writing signed by each of the parties hereto.

15.     In construing the provisions of this Agreement and whenever the context so requires, the use of a gender shall include all other genders, the use of the singular shall include the plural, and the use of the plural shall include the singular.

16.    This Agreement shall be recorded in the Official Records.

**IN WITNESS WHEREOF,** the parties have executed this Agreement as of the day and year first above written.

**LENDER:**        _____

a _____

By: _____

Its: _____

**TENANT:**        **AMERICAN STORES COMPANY, LLC,**
a Delaware limited liability company

By:_____

Its:_____

**LANDLORD:**      **KFT ENTERPRISES, NO. 1 LP,**
a California limited partnership

By:  KFT MANAGEMENT, INC.,
a California corporation

By: _____
Name: _____
Its:_____

By: _____
Name: _____
Its:_____

[ATTACH APPROPRIATE NOTARY ACKNOWLEDGMENTS]

[ATTACH LEGAL DESCRIPTION OF LEASED PREMISES AND SHOPPING CENTER]

## EXHIBIT F - SECOND AMENDMENT TO LEASE

**CURRENT TENANTS**

1.   **Tenant:** Bank of America
     **Lease Date:**  June 30, 1995
     **Size:** unknown

2.   **Tenant:**  Seungo Hohng & Jison Hohng
     **Lease Date:** July 7, 2000
     **Size:** approx. 2,650 sq. ft.

3.   **Tenant: S&S Partners, Inc.** (trade name: Cal Jewelry)
     **Lease Date:** September 29, 1999
     **Size:** 2,040 sq. ft.

4.   **Tenant:** LRL Investments, Inc. (trade name: Century 21)
     **Lease Date:**  February 1, 2002
     **Size:** approx. 2,040 sq. ft.

5.   **Tenant:** Richard Venturini and Lynne Venturini (trade name: Hallmark Store)
     **Lease Date:** December, 1993
     **Size:** 4,590 sq. ft.

6.   **Tenant:** Regina Walter and Ronald Walter (trade name: Grounds Bakery Cafe)
     **Lease Date:** November 2, 2001
     **Size:** approx. 2,040 sq.ft.

7.   **Tenant:** Henry To and Xan To (trade name: Happy Hanger Cleaners)
     **Lease Date:** December 10, 1998
     **Size:** approx. 2,040 sq. ft.

8.   **Tenant:** H&R Block Tax Services, Inc.
     **Lease Date:** February 27, 2001
     **Size:** approx. 2,000 sq. ft.

9.   **Tenant:** Hollywood Entertainment Corporation (trade name: Hollywood Video)
     **Lease Date:** unknown
     **Size:** approx. 6,940 sq. ft.

10.  **Tenant:** Score! Educational Centers, Inc.
     **Lease Date:** July 7, 2000
     **Size:** approx. 2,040 sq. ft.

11.    **Tenant**: Score! Educational Centers, Inc.
       **Lease Date**: October 30, 2002
       **Size**: approx. 2,040 sq. ft.

12.    **Tenant**: Subway Real Estate Corp
       **Lease Date**: August 9, 1994
       **Size**: approx. 1,520 sq. ft.

13.    **Tenant**: Roca Enterprises (trade name: Mail Boxes Etc.)
       **Lease Date**: January 1, 1998
       **Size**: approx. 2,040 sq. ft.

14.    **Tenant**: Young Lee, aka Tina Lee (trade name: Vitamin City)
       **Lease Date**: July 10, 2000
       **Size**: approx. 6,400 sq. ft.

15.    **Tenant**: Golden Arch Realty Corporation (trade name: McDonald's)
       **Lease Date**: August 26, 1968
       **Size**: approx. 2,854 sq. ft.

## EXHIBIT G - SECOND AMENDMENT TO LEASE

### BASELINE SECURITY

1.  One unarmed security guard on site ten hours per day, seven days per week.

2.  The security guard will be provided a golf cart and phone.

3.  The current cost for an unarmed guard is approximately $16.25 per hour (with an increase for holidays).

4.  The current cost of the golf cart is approximately $150.00 per month, and phone is $60 per month.

5.  The current annual estimate of the initial yearly total Baseline Security costs is $67,500.00.

KFT_00118
Page 145

## EXHIBIT H - SECOND AMENDMENT TO LEASE

### INITIAL PROJECT AND PHASING SCHEDULE

(To be attached)

# EXHIBIT E

ALBERTSON'S LLC
250 Park Center Boulevard
Boise, Idaho 83706

March 29, 2013

**VIA FEDEX**

KFT Enterprises, No. 1, L.P.
c/o KFT Management, Inc.
11620 Wilshire Boulevard, Suite 420
Los Angeles, CA 90025

Re:     Lease (the "Lease") dated August 16, 1985 between KFT Enterprises, No. 1,
L.P. as landlord, and American Stores Company, LLC, a Delaware limited
liability company as tenant, with respect to leased premises located at 6235 E
Spring St, Long Beach, CA 90808

Ladies and Gentlemen:

Pursuant to Section 6.4 of the Lease, you are hereby notified that on March 21, 2013, as part of an internal reorganization, American Stores Company, LLC, a Delaware limited liability company ("Assignor"), assigned its interest under the Lease to Albertson's LLC, a Delaware limited liability company ("Assignee"), whose address is 250 Park Center Blvd., Boise, Idaho 83706. Assignor and Assignee are affiliated entities with common ownership.

*[The remainder of the page is intentionally blank; signature follows.]*

Store # 6154

ALBERTSON'S LLC
250 Park Center Boulevard
Boise, Idaho 83706

Sincerely,

ALBERTSON'S LLC,
a Delaware limited liability company

By: _____, its Attorney

Store # 6154

# EXHIBIT F

# KFT MANAGEMENT, INC.

**Notice of Further Default and Lease Termination**
March 18, 2021

Albertson's LLC ("Tenant")
250 Park Center Blvd.
Boise, Idaho 83706

Re:     Lease dated August 16, 1985 as amended ("Lease"); First Amendment to Lease entered into as of May 1, 2006, Second Amendment to Lease dated May 8, 2007 ("Second Amendment") regarding 6235 E. Spring Street, Long Beach, California 90808.

Sir or Madam,

As of the date set forth above, Landlord elects to proceed pursuant to California Civil Code Section 1951.2 and terminate the Lease and seek the damages detailed in that section.

Nothing in this notice shall be deemed an admission of any fact by Landlord, a waiver of any default or a waiver by Landlord of any right or remedy under the Lease, in law or in equity, all of which are hereby reserved.

**LANDLORD:**

KFT Enterprises No. 1 LP,
a California Limited Partnership

By:     KFT Management, Inc.
a California Corporation,
its Managing Agent

By: _____
Mark Kaplan, President

Ex. A
Page 151

| SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF LOS ANGELES | Reserved for Clerk's File Stamp |
|---|---|
| COURTHOUSE ADDRESS:<br>Governor George Deukmejian Courthouse<br>275 Magnolia Ave, Long Beach, CA 90802 | **FILED**<br>Superior Court of California<br>County of Los Angeles<br>11/16/2022<br>Sherri R. Carter, Executive Officer / Clerk of Court<br>By: _____ J. Ballesteros _____ Deputy |
| **NOTICE OF CASE ASSIGNMENT**<br><br>**UNLIMITED CIVIL CASE** | |
| **Your case is assigned for all purposes to the judicial officer indicated below.** | CASE NUMBER:<br>22LBCV00814 |

**THIS FORM IS TO BE SERVED WITH THE SUMMONS AND COMPLAINT**

| | ASSIGNED JUDGE | DEPT | ROOM | | | ASSIGNED JUDGE | DEPT | ROOM |
|---|---|---|---|---|---|---|---|---|
| ✔ | Mark C. Kim | S27 | | | | | | |

Given to the Plaintiff/Cross-Complainant/Attorney of Record

on 11/21/2022
    (Date)

Sherri R. Carter, Executive Officer / Clerk of Court

By J. Ballesteros_____, Deputy Clerk

LACIV 190 (Rev 6/18)
LASC Approved 05/06

**NOTICE OF CASE ASSIGNMENT – UNLIMITED CIVIL CASE**

Ex. A
Page 152

## INSTRUCTIONS FOR HANDLING UNLIMITED CIVIL CASES

The following critical provisions of the California Rules of Court, Title 3, Division 7, as applicable in the Superior Court, are summarized for your assistance.

### APPLICATION
The Division 7 Rules were effective January 1, 2007.  They apply to all general civil cases.

### PRIORITY OVER OTHER RULES
The Division 7 Rules shall have priority over all other Local Rules to the extent the others are inconsistent.

### CHALLENGE TO ASSIGNED JUDGE
A challenge under Code of Civil Procedure Section 170.6 must be made within **15** days after notice of assignment for all purposes to a judge, or if a party has not yet appeared, within 15 days of the first appearance.

### TIME STANDARDS
Cases assigned to the Independent Calendaring Courts will be subject to processing under the following time standards:

### COMPLAINTS
All complaints shall be served within 60 days of filing and proof of service shall be filed within 90 days.

### CROSS-COMPLAINTS
Without leave of court first being obtained, no cross-complaint may be filed by any party after their answer is filed.  Cross-complaints shall be served within 30 days of the filing date and a proof of service filed within 60 days of the filing date.

### STATUS CONFERENCE
A status conference will be scheduled by the assigned Independent Calendar Judge no later than 270 days after the filing of the complaint.  Counsel must be fully prepared to discuss the following issues: alternative dispute resolution, bifurcation, settlement, trial date, and expert witnesses.

### FINAL STATUS CONFERENCE
The Court will require the parties to attend a final status conference not more than 10 days before the scheduled trial date.  All parties shall have motions in limine, bifurcation motions, statements of major evidentiary issues, dispositive motions, requested form jury instructions, special jury instructions, and special jury verdicts timely filed and served prior to the conference.  These matters may be heard and resolved at this conference.  At least five days before this conference, counsel must also have exchanged lists of exhibits and witnesses, and have submitted to the court a brief statement of the case to be read to the jury panel as required by Chapter Three of the Los Angeles Superior Court Rules.

### SANCTIONS
The court will impose appropriate sanctions for the failure or refusal to comply with Chapter Three Rules, orders made by the Court, and time standards or deadlines established by the Court or by the Chapter Three Rules.  Such sanctions may be on a party, or if appropriate, on counsel for a party.

**This is not a complete delineation of the Division 7 or Chapter Three Rules, and adherence only to the above provisions is therefore not a guarantee against the imposition of sanctions under Trial Court Delay Reduction.  Careful reading and compliance with the actual Chapter Rules is imperative.**

### Class Actions
Pursuant to Local Rule 2.3, all class actions shall be filed at the Stanley Mosk Courthouse and are randomly assigned to a complex judge at the designated complex courthouse.  If the case is found not to be a class action it will be returned to an Independent Calendar Courtroom for all purposes.

### *Provisionally Complex Cases
Cases filed as provisionally complex are initially assigned to the Supervising Judge of complex litigation for determination of complex status.  If the case is deemed to be complex within the meaning of California Rules of Court 3.400 et seq., it will be randomly assigned to a complex judge at the designated complex courthouse.  If the case is found not to be complex, it will be returned to an Independent Calendar Courtroom for all purposes.

**NOTICE OF CASE ASSIGNMENT – UNLIMITED CIVIL CASE**

<table>
<tr><td colspan="2">

## SUPERIOR COURT OF CALIFORNIA
## COUNTY OF LOS ANGELES

</td><td>

Reserved for Clerk's File Stamp

**FILED**
Superior Court of California
County of Los Angeles

11/21/2022

Sherri R. Carter, Executive Officer / Clerk of Court

By: _____ J. Ballesteros _____ Deputy

</td></tr>
</table>

| | |
|---|---|
| COURTHOUSE ADDRESS:<br>Governor George Deukmejian Courthouse<br>275 Magnolia Ave, Long Beach, CA 90802 | |
| PLAINTIFF/PETITIONER:<br>KFT Enterprises, No. 1 L.P., a California limited partnership | |
| DEFENDANT/RESPONDENT:<br>Albertson's LLC, a Delaware limited liability company | |
| **CERTIFICATE OF MAILING** | CASE NUMBER:<br>22LBCV00814 |

I, the below-named Executive Officer/Clerk of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that on this date I served the Order to Show Cause Failure to File Proof of Service upon each party or counsel named below by placing the document for collection and mailing so as to cause it to be deposited in the United States mail at the courthouse in Long Beach, California, one copy of the original filed/entered herein in a separate sealed envelope to each address as shown below with the postage thereon fully prepaid, in accordance with standard court practices.

Gregory Paul Barchie
Sauer & Wagner LLP
1801 Century Park East, Suite 1150
Los Angeles, CA 90067

Robert Chapman
Sauer & Wagner LLP
1801 Century Park East
Suite 1150
Los Angeles, CA 90067

Sherri R. Carter, Executive Officer / Clerk of Court

Dated: 11/21/2022

By:  J. Ballesteros
Deputy Clerk

**CERTIFICATE OF MAILING**

Ex. A
Page 154

| SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF LOS ANGELES | Reserved for Clerk's File Stamp |
|---|---|
| COURTHOUSE ADDRESS:<br>Governor George Deukmejian Courthouse<br>275 Magnolia Ave, Long Beach, CA 90802 | **FILED**<br>Superior Court of California<br>County of Los Angeles<br>11/21/2022<br>Sherri R. Carter, Executive Officer / Clerk of Court<br>By: _____ J. Ballesteros _____ Deputy |
| PLAINTIFF(S):<br>KFT Enterprises, No. 1 L.P., a California limited partnership | |
| DEFENDANT(S):<br>Albertson's LLC, a Delaware limited liability company | |
| **ORDER TO SHOW CAUSE HEARING** | CASE NUMBER:<br>22LBCV00814 |

To the party / attorney of record:

You are ordered to appear for an Order to Show Cause Hearing on <u>02/06/2023</u> at <u>8:30 AM</u> in department <u>S27</u> of this court, <u>Governor George Deukmejian Courthouse</u>, and show cause why sanctions should not be imposed for:

[✔]    Failure to file proof of service.

Failure to comply or appear may result in sanctions pursuant to one or more of the following:  California Rules of Court, rule 2.30 and rule 3.1340; Code of Civil Procedure sections 177.5, 575.2, 583.150, 583.310, 583.360, 583.410, 583.420, 583.430; and Government Code section 68608.

[✔]    To avoid a mandatory appearance all required documents must be filed at least 5 days prior to the date of the hearing.

Dated: <u>11/21/2022</u>

_____
Mark C. Kim / Judge
Judicial Officer

**ORDER TO SHOW CAUSE HEARING**

LACIV 166 (Rev. 09/08)
LASC Approved 06-04

Cal. Rules of Court, rule 2.30
LASC Local Rules, Chapter 7

Ex. A
Page 155

# SUPERIOR COURT OF CALIFORNIA
# COUNTY OF LOS ANGELES

COURTHOUSE ADDRESS:
Governor George Deukmejian Courthouse
275 Magnolia Ave, Long Beach, CA 90802

PLAINTIFF:
KFT Enterprises, No. 1 L.P., a California limited partnership

DEFENDANT:
Albertson's LLC, a Delaware limited liability company

**FILED**
Superior Court of California
County of Los Angeles

11/21/2022

Sherri R. Carter, Executive Officer / Clerk of Court

By:        J. Ballesteros        Deputy

## NOTICE OF CASE MANAGEMENT CONFERENCE

CASE NUMBER:
22LBCV00814

TO THE PLAINTIFF(S)/ATTORNEY(S) FOR PLAINTIFF(S) OF RECORD:

You are ordered to serve this notice of hearing on all parties/attorneys of record forthwith, and meet and confer with all parties/attorneys of record about the matters to be discussed no later than 30 days before the Case Management Conference.

Your Case Management Conference has been scheduled at the courthouse address shown above on:

| Date: 04/20/2023 | Time: 8:30 AM | Dept.: S27 |
|---|---|---|

NOTICE TO DEFENDANT:   THE SETTING OF THE CASE MANAGEMENT CONFERENCE DOES NOT EXEMPT THE DEFENDANT FROM FILING A RESPONSIVE PLEADING AS REQUIRED BY LAW.

Pursuant to California Rules of Court, rules 3.720-3.730, a completed Case Management Statement (Judicial Council form # CM-110) must be filed at least 15 calendar days prior to the Case Management Conference. The Case Management Statement may be filed jointly by all parties/attorneys of record or individually by each party/attorney of record. You must be familiar with the case and be fully prepared to participate effectively in the Case Management Conference.

At the Case Management Conference, the Court may make pretrial orders including the following, but not limited to, an order establishing a discovery schedule; an order referring the case to Alternative Dispute Resolution (ADR); an order reclassifying the case; an order setting subsequent conference and the trial date; or other orders to achieve the goals of the Trial Court Delay Reduction Act (Gov. Code, § 68600 et seq.)

Notice is hereby given that if you do not file the Case Management Statement or appear and effectively participate at the Case Management Conference, the Court may impose sanctions, pursuant to LASC Local Rule 3.37, Code of Civil Procedure sections 177.5, 575.2, 583.150, 583.360 and 583.410, Government Code Section 68608, subdivision (b), and California Rules of Court, rule 2.2 et seq.

Dated: 11/21/2022

Mark C. Kim / Judge
Judicial Officer

## CERTIFICATE OF SERVICE

I, the below named Executive Officer/Clerk of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that on this date I served the Notice of Case Management Conference upon each party or counsel named below:

☑ by depositing in the United States mail at the courthouse in Long Beach, California, one copy of the original filed herein in a separate sealed envelope to each address as shown below with the postage thereon fully prepaid.

☐ by personally giving the party notice upon filing of the complaint.

Gregory Paul Barchie
1801 Century Park East, Suite 1150

Los Angeles, CA 90067

Sherri R. Carter, Executive Officer / Clerk of Court

Dated: 11/21/2022

By J. Ballesteros
Deputy Clerk

LACIV 132 (Rev. 07/13)
LASC Approved 10-03
For Optional Use

## NOTICE OF
## CASE MANAGEMENT CONFERENCE

Cal. Rules of Court, rules 3.720-3.730
LASC Local Rules, Chapter Three

Ex. A
Page 156

Electronically FILED by Superior Court of California, County of Los Angeles on 11/21/2022 04:37 PM Sherri R. Carter, Executive Officer/Clerk of Court, by J. Ballesteros,Deputy Clerk

**CM-015**

| | |
|---|---|
| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):*<br><br>Robert S. Chapman [SBN 70428]; Gregory P. Barchie [SBN 235022]<br>SAUER & WAGNER LLP<br>1801 Century Park East, Suite 1150<br>Los Angeles, CA 90067<br>TELEPHONE NO.: 310-712-8100   FAX NO. *(Optional)*: 310-712-8108<br>E-MAIL ADDRESS *(Optional)*: rchapman@swattys.com; gbarchie@swattys.com<br>ATTORNEY FOR *(Name)*: KFT ENTERPRISES, NO. 1 L.P. | *FOR COURT USE ONLY* |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF  LOS ANGELES
STREET ADDRESS: 275 Magnolia Avenue
MAILING ADDRESS: 275 Magnolia Avenue
CITY AND ZIP CODE:  Long Beach, CA 90802
BRANCH NAME: Governor George Deukmejian Courthouse

| | |
|---|---|
| PLAINTIFF/PETITIONER: KFT ENTERPRISES, NO. 1 L.P. | CASE NUMBER:<br>22LBCV00814 |
| DEFENDANT/RESPONDENT:  ALBERTSON'S LLC | JUDICIAL OFFICER:<br>Hon. Mark C. Kim |
| **NOTICE OF RELATED CASE** | DEPT.:<br>S27 |

*Identify, in chronological order according to date of filing, all cases related to the case referenced above.*

1. a. Title: KFT Enterprises, No. 1 L.P. v. Albertson's LLC

   b. Case number: NC060339

   c. Court: [X] same as above

   [ ] other state or federal court *(name and address):*

   d. Department: 27

   e. Case type: [ ] limited civil [X] unlimited civil [ ] probate [ ] family law [ ] other *(specify):*

   f. Filing date: October 28, 2015

   g. Has this case been designated or determined as "complex?" [ ] Yes [X] No

   h. Relationship of this case to the case referenced above *(check all that apply):*

   [X] involves the same parties and is based on the same or similar claims.

   [ ] arises from the same or substantially identical transactions, incidents, or events requiring the determination of the same or substantially identical questions of law or fact.

   [X] involves claims against, title to, possession of, or damages to the same property.

   [ ] is likely for other reasons to require substantial duplication of judicial resources if heard by different judges.

   [ ] Additional explanation is attached in attachment 1h

   i. Status of case:

   [ ] pending

   [ ] dismissed [ ] with [ ] without prejudice

   [X] disposed of by judgment

2. a. Title:

   b. Case number:

   c. Court: [ ] same as above

   [ ] other state or federal court *(name and address):*

   d. Department:

| | | |
|---|---|---|
| Form Approved for Optional Use<br>Judicial Council of California<br>CM-015 [Rev. July 1, 2007] | **NOTICE OF RELATED CASE** | Cal. Rules of Court, rule 3.300<br>*www.courtinfo.ca.gov* |

*LexisNexis® Automated California Judicial Council Forms*

Ex. A
Page 157

CM-015

| PLAINTIFF/PETITIONER: KFT ENTERPRISES, No. 1 L.P. | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: ALBERTSON'S LLC | 22LBCV00814 |

2. *(continued)*

   e.  Case type: ☐ limited civil ☐ unlimited civil ☐ probate ☐ family law ☐ other *(specify):*

   f.  Filing date:

   g.  Has this case been designated or determined as "complex?" ☐ Yes ☐ No

   h.  Relationship of this case to the case referenced above *(check all that apply):*

      ☐ involves the same parties and is based on the same or similar claims.

      ☐ arises from the same or substantially identical transactions, incidents, or events requiring the determination of the same or substantially identical questions of law or fact.

      ☐ involves claims against, title to, possession of, or damages to the same property.

      ☐ is likely for other reasons to require substantial duplication of judicial resources if heard by different judges.

         ☐ Additional explanation is attached in attachment 2h

   i.  Status of case:

      ☐ pending

      ☐ dismissed ☐ with ☐ without prejudice

      ☐ disposed of by judgment

3.  a.  Title:

   b.  Case number:

   c.  Court: ☐ same as above

      ☐ other state or federal court *(name and address):*

   d.  Department:

   e.  Case type: ☐ limited civil ☐ unlimited civil ☐ probate ☐ family law ☐ other *(specify):*

   f.  Filing date:

   g.  Has this case been designated or determined as "complex?" ☐ Yes ☐ No

   h.  Relationship of this case to the case referenced above *(check all that apply):*

      ☐ involves the same parties and is based on the same or similar claims.

      ☐ arises from the same or substantially identical transactions, incidents, or events requiring the determination of the same or substantially identical questions of law or fact.

      ☐ involves claims against, title to, possession of, or damages to the same property.

      ☐ is likely for other reasons to require substantial duplication of judicial resources if heard by different judges.

         ☐ Additional explanation is attached in attachment 3h

   i.  Status of case:

      ☐ pending

      ☐ dismissed ☐ with ☐ without prejudice

      ☐ disposed of by judgment

4.  ☐ Additional related cases are described in Attachment 4. Number of pages attached: _____

Date: November 21, 2022

| Gregory P. Barchie | ▶ |
|---|---|
| (TYPE OR PRINT NAME OF PARTY OR ATTORNEY) | (SIGNATURE OF PARTY OR ATTORNEY) |

*LexisNexis® Automated California Judicial Council Forms*

Ex. A
Page 158

1   ROBERT S. CHAPMAN (State Bar No. 70428)
    GREGORY P. BARCHIE (State Bar No. 235022)
2   SAUER & WAGNER LLP
    1801 Century Park East, Suite 1150
3   Los Angeles, California 90067
    Tel: (310) 712-8100 Fax: (310) 712-8108
4   Email: rchapman@swattys.com; gbarchie@swattys.com
5
    Attorneys for Plaintiff KFT Enterprises, No. 1 L.P.
6
7              SUPERIOR COURT OF THE STATE OF CALIFORNIA
8                   FOR THE COUNTY OF LOS ANGELES
9       GOVERNOR GEORGE DEUKMEJIAN COURTHOUSE (LONG BEACH)
10
11  KFT ENTERPRISES, NO. 1 L.P., a California )   CASE NO. 22LBCV00814
    limited partnership                       )   [Hon. Mark C. Kim, Dept. S27]
12                                            )
                      Plaintiff,              )   **NOTICE OF RULING ON NOTICE OF**
13                                            )   **RELATED CASE**
              v.                              )
14                                            )   Complaint filed:    November 16, 2022
    ALBERTSON'S LLC, a Delaware limited       )   Trial Date:         Not set
15  liability company, and DOES 1 through 10, )
    inclusive,                                )
16                                            )
                                              )
17                    Defendants.             )
                                              )
18  _____ )
19
20
21
22
23
24
25
26
27
28

SAUER & WAGNER LLP
1801 CENTURY PARK EAST, SUITE 1150
LOS ANGELES, CA 90067

NOTICE OF RULING

**TO THE COURT, THE PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that, on November 22, 2022 and following the filing of a notice of related case filed by Plaintiff KFT Enterprises, No. 1 L.P., found that this case, Case No. 22LBCV00814, is not related to the prior case *KFT Enterprises, No. 1 L.P. v. Albertson's LLC*, Case No. NC060339.  A true and correct copy of the Court's ruling is attached hereto as Exhibit "A."


DATED:  November 28, 2022                    SAUER & WAGNER LLP

By: _____
         Gregory P. Barchie
Attorneys for Plaintiff KFT Enterprises, No. 1 L.P.

SAUER & WAGNER LLP
1801 CENTURY PARK EAST, SUITE 1150
LOS ANGELES, CA 90067

1

# EXHIBIT A

| **SUPERIOR COURT OF CALIFORNIA** **COUNTY OF LOS ANGELES** | Reserved for Clerk's File Stamp |
|---|---|
| COURTHOUSE ADDRESS:<br>Governor George Deukmejian Courthouse<br>275 Magnolia Ave, Long Beach, CA 90802 | **FILED**<br>Superior Court of California<br>County of Los Angeles<br>**11/22/2022**<br>Sherri R. Carter, Executive Officer / Clerk of Court<br>By: _____ B. Viola _____ Deputy |
| PLAINTIFF/PETITIONER:<br>KFT Enterprises, No. 1 L.P., a California limited partnership | |
| DEFENDANT/RESPONDENT:<br>Albertson's LLC, a Delaware limited liability company | |
| **CERTIFICATE OF MAILING** | CASE NUMBER:<br>22LBCV00814 |

**I, the below-named Executive Officer/Clerk of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that on this date I served the Minute Order (Court Order) of 11/22/2022 upon each party or counsel named below by placing the document for collection and mailing so as to cause it to be deposited in the United States mail at the courthouse in Long Beach, California, one copy of the original filed/entered herein in a separate sealed envelope to each address as shown below with the postage thereon fully prepaid, in accordance with standard court practices.**

Robert Chapman
Sauer & Wagner LLP
1801 Century Park East
Suite 1150
Los Angeles, CA 90067

Sherri R. Carter, Executive Officer / Clerk of Court

Dated: 11/22/2022

By: B. Viola
Deputy Clerk

**CERTIFICATE OF MAILING**

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
### Civil Division
South District, Governor George Deukmejian Courthouse, Department S27

**22LBCV00814**
**KFT ENTERPRISES, NO. 1 L.P., A CALIFORNIA LIMITED**
**PARTNERSHIP vs ALBERTSON'S LLC, A DELAWARE**
**LIMITED LIABILITY COMPANY**

November 22, 2022
10:21 AM

Judge: Honorable Mark C. Kim
Judicial Assistant: B. Viola
Courtroom Assistant: None

CSR: None
ERM: None
Deputy Sheriff: None

APPEARANCES:

For Plaintiff(s): No Appearances

For Defendant(s):  No Appearances

**NATURE OF PROCEEDINGS:** Court Order

The Court finds that the following cases, 22LBCV00814 and NC060339, are not related within the meaning of California Rules of Court, rule 3.300(a).

Plaintiff is to give notice.

Certificate of Mailing is attached.

Ex. A
Page 163

**FILED**
Superior Court of California
County of Los Angeles

**MAY 03 2019**

Sherri R. Carter, Executive Officer/Clerk

By_____, Deputy
Rizalinda Mina

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

| | |
|---|---|
| IN RE LOS ANGELES SUPERIOR COURT )<br>— MANDATORY ELECTRONIC FILING )<br>FOR CIVIL )<br>)<br>)<br>)<br>_____ ) | FIRST AMENDED GENERAL ORDER |

On December 3, 2018, the Los Angeles County Superior Court mandated electronic filing of all documents in Limited Civil cases by litigants represented by attorneys. On January 2, 2019, the Los Angeles County Superior Court mandated electronic filing of all documents filed in Non-Complex Unlimited Civil cases by litigants represented by attorneys. (California Rules of Court, rule 2.253(b).) All electronically filed documents in Limited and Non-Complex Unlimited cases are subject to the following:

1) DEFINITIONS

   a) **"Bookmark"**   A bookmark is a PDF document navigational tool that allows the reader to quickly locate and navigate to a designated point of interest within a document.

   b) **"Efiling Portal"**   The official court website includes a webpage, referred to as the efiling portal, that gives litigants access to the approved Electronic Filing Service Providers.

   c) **"Electronic Envelope"**   A transaction through the electronic service provider for submission of documents to the Court for processing which may contain one or more PDF documents attached.

   d) **"Electronic Filing"**   Electronic Filing (eFiling) is the electronic transmission to a Court of a document in electronic form. (California Rules of Court, rule 2.250(b)(7).)

e) **"Electronic Filing Service Provider"** An Electronic Filing Service Provider (EFSP) is a person or entity that receives an electronic filing from a party for retransmission to the Court. In the submission of filings, the EFSP does so on behalf of the electronic filer and not as an agent of the Court. (California Rules of Court, rule 2.250(b)(8).)

f) **"Electronic Signature"** For purposes of these local rules and in conformity with Code of Civil Procedure section 17, subdivision (b)(3), section 34, and section 1010.6, subdivision (b)(2), Government Code section 68150, subdivision (g), and California Rules of Court, rule 2.257, the term "Electronic Signature" is generally defined as an electronic sound, symbol, or process attached to or logically associated with an electronic record and executed or adopted by a person with the intent to sign the electronic record.

g) **"Hyperlink"** An electronic link providing direct access from one distinctively marked place in a hypertext or hypermedia document to another in the same or different document.

h) **"Portable Document Format"** A digital document format that preserves all fonts, formatting, colors and graphics of the original source document, regardless of the application platform used.

2) MANDATORY ELECTRONIC FILING

a) Trial Court Records

Pursuant to Government Code section 68150, trial court records may be created, maintained, and preserved in electronic format. Any document that the Court receives electronically must be clerically processed and must satisfy all legal filing requirements in order to be filed as an official court record (California Rules of Court, rules 2.100, et seq. and 2.253(b)(6)).

b) Represented Litigants

Pursuant to California Rules of Court, rule 2.253(b), represented litigants are required to electronically file documents with the Court through an approved EFSP.

c) Public Notice

The Court has issued a Public Notice with effective dates the Court required parties to electronically file documents through one or more approved EFSPs. Public Notices containing effective dates and the list of EFSPs are available on the Court's website, at www.lacourt.org.

d) Documents in Related Cases

Documents in related cases must be electronically filed in the eFiling portal for that case type if electronic filing has been implemented in that case type, regardless of whether the case has been related to a Civil case.

3) EXEMPT LITIGANTS

a) Pursuant to California Rules of Court, rule 2.253(b)(2), self-represented litigants are exempt from mandatory electronic filing requirements.

b) Pursuant to Code of Civil Procedure section 1010.6, subdivision (d)(3) and California Rules of Court, rule 2.253(b)(4), any party may make application to the Court requesting to be excused from filing documents electronically and be permitted to file documents by conventional means if the party shows undue hardship or significant prejudice.

4) EXEMPT FILINGS

a) The following documents shall not be filed electronically:

   i) Peremptory Challenges or Challenges for Cause of a Judicial Officer pursuant to Code of Civil Procedure sections 170.6 or 170.3;

   ii) Bonds/Undertaking documents;

   iii) Trial and Evidentiary Hearing Exhibits

   iv) Any ex parte application that is filed concurrently with a new complaint including those that will be handled by a Writs and Receivers department in the Mosk courthouse; and

   v) Documents submitted conditionally under seal. The actual motion or application shall be electronically filed. A courtesy copy of the electronically filed motion or application to submit documents conditionally under seal must be provided with the documents submitted conditionally under seal.

b) Lodgments

Documents attached to a Notice of Lodgment shall be lodged and/or served conventionally in paper form. The actual document entitled, "Notice of Lodgment," shall be filed electronically.

//

//

5) ELECTRONIC FILING SYSTEM WORKING PROCEDURES

Electronic filing service providers must obtain and manage registration information for persons and entities electronically filing with the court.

6) TECHNICAL REQUIREMENTS

a) Electronic documents must be electronically filed in PDF, text searchable format **when** technologically feasible without impairment of the document's image**.**

b) The table of contents for any filing must be bookmarked.

c) Electronic documents, including but not limited to, declarations, proofs of service, and exhibits, must be bookmarked within the document pursuant to California Rules of Court, rule 3.1110(f)(4).  Electronic bookmarks must include links to the first page of each bookmarked item (e.g. exhibits, declarations, deposition excerpts) and with bookmark titles that identify the bookedmarked item and briefly describe the item.

d) Attachments to primary documents must be bookmarked.  Examples include, but are not limited to, the following:

   i)   Depositions;

   ii)  Declarations;

   iii) Exhibits (including exhibits to declarations);

   iv)  Transcripts (including excerpts within transcripts);

   v)   Points and Authorities;

   vi)  Citations; and

   vii) Supporting Briefs.

e) Use of hyperlinks within documents (including attachments and exhibits) is strongly encouraged.

f) Accompanying Documents

Each document acompanying a single pleading must be electronically filed as a **separate** digital PDF document.

g) Multiple Documents

Multiple documents relating to one case can be uploaded in one envelope transaction.

h) Writs and Abstracts

Writs and Abstracts must be submitted as a separate electronic envelope.

i) Sealed Documents

If and when a judicial officer orders documents to be filed under seal, those documents must be filed electronically (unless exempted under paragraph 4); the burden of accurately designating the documents as sealed at the time of electronic submission is the submitting party's responsibility.

j) Redaction

Pursuant to California Rules of Court, rule 1.201, it is the submitting party's responsibility to redact confidential information (such as using initials for names of minors, using the last four digits of a social security number, and using the year for date of birth) so that the information shall not be publicly displayed.

7) ELECTRONIC FILING SCHEDULE

a) Filed Date

i) Any document received electronically by the court between 12:00 am and 11:59:59 pm shall be deemed to have been effectively filed on that court day if accepted for filing. Any document received electronically on a non-court day, is deemed to have been effectively filed on the next court day if accepted.   (California Rules of Court, rule 2.253(b)(6); Code Civ. Proc. § 1010.6(b)(3).)

ii) Notwithstanding any other provision of this order, if a digital document is not filed in due course because of: (1) an interruption in service; (2) a transmission error that is not the fault of the transmitter; or (3) a processing failure that occurs after receipt, the Court may order, either on its own motion or by noticed motion submitted with a declaration for Court consideration, that the document be deemed filed and/or that the document's filing date conform to the attempted transmission date.

8) EX PARTE APPLICATIONS

a) Ex parte applications and all documents in support thereof must be electronically filed no later than 10:00 a.m. the court day <u>before</u> the ex parte hearing.

b) Any written opposition to an ex parte application must be electronically filed by 8:30 a.m. the day of the ex parte hearing.  A printed courtesy copy of any opposition to an ex parte application must be provided to the court the day of the ex parte hearing.

9) PRINTED COURTESY COPIES

a) For any filing electronically filed two or fewer days before the hearing, a courtesy copy must be delivered to the courtroom by 4:30 p.m. the same business day the document is efiled.  If the efiling is submitted after 4:30 p.m., the courtesy copy must be delivered to the courtroom by 10:00 a.m. the next business day.

b) Regardless of the time of electronic filing, a printed courtesy copy (along with proof of electronic submission) is required for the following documents:

   i)   Any printed document required pursuant to a Standing or General Order;

   ii)  Pleadings and motions (including attachments such as declarations and exhibits) of 26 pages or more;

   iii) Pleadings and motions that include points and authorities;

   iv)  Demurrers;

   v)   Anti-SLAPP filings, pursuant to Code of Civil Procedure section 425.16;

   vi)  Motions for Summary Judgment/Adjudication; and

   vii) Motions to Compel Further Discovery.

c) Nothing in this General Order precludes a Judicial Officer from requesting a courtesy copy of additional documents.  Courtroom specific courtesy copy guidelines can be found at www.lacourt.org on the Civil webpage under "Courtroom Information."

10) WAIVER OF FEES AND COSTS FOR ELECTRONICALLY FILED DOCUMENTS

a) Fees and costs associated with electronic filing must be waived for any litigant who has received a fee waiver.  (California Rules of Court, rules 2.253(b)(), 2.258(b), Code Civ. Proc. § 1010.6(d)(2).)

b) Fee waiver applications for waiver of court fees and costs pursuant to Code of Civil Procedure section 1010.6, subdivision (b)(6), and  California Rules of Court, rule 2.252(f), may be electronically filed in any authorized action or proceeding.

1   11) SIGNATURES ON ELECTRONIC FILING

2       For purposes of this General Order, all electronic filings must be in compliance with California

3       Rules of Court, rule 2.257.  This General Order applies to documents filed within the Civil

4       Division of the Los Angeles County Superior Court.

5

6           This First Amended General Order supersedes any previous order related to electronic filing,

7   and is effective immediately, and is to remain in effect until otherwise ordered by the Civil

8   Supervising Judge and/or Presiding Judge.

9

10  DATED:  May 3, 2019                                                          

11                                                         KEVIN C. BRAZILE

12                                                         Presiding Judge

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Superior Court of California, County of Los Angeles

<div style="border: 1px solid black; background-color: #e0e0e0; padding: 10px;">

## ALTERNATIVE DISPUTE RESOLUTION (ADR)
## INFORMATION PACKAGE

**THE PLAINTIFF MUST SERVE THIS ADR INFORMATION PACKAGE ON EACH PARTY WITH THE COMPLAINT.**

**CROSS-COMPLAINANTS** must serve this ADR Information Package on any new parties named to the action with the cross-complaint.

</div>

**What is ADR?**

ADR helps people find solutions to their legal disputes without going to trial. The main types of ADR are negotiation, mediation, arbitration, and settlement conferences. When ADR is done by phone, videoconference or computer, it may be called Online Dispute Resolution (ODR). These alternatives to litigation and trial are described below.

**Advantages of ADR**

- **Saves Time:** ADR is faster than going to trial.
- **Saves Money:** Parties can save on court costs, attorney's fees, and witness fees.
- **Keeps Control** (with the parties): Parties choose their ADR process and provider for voluntary ADR.
- **Reduces Stress/Protects Privacy:** ADR is done outside the courtroom, in private offices, by phone or online.

**Disadvantages of ADR**

- **Costs:** If the parties do not resolve their dispute, they may have to pay for ADR, litigation, and trial.
- **No Public Trial:** ADR does not provide a public trial or a decision by a judge or jury.

**Main Types of ADR**

1. **Negotiation**: Parties often talk with each other in person, or by phone or online about resolving their case with a settlement agreement instead of a trial. If the parties have lawyers, they will negotiate for their clients.

2. **Mediation**: In mediation, a neutral mediator listens to each person's concerns, helps them evaluate the strengths and weaknesses of their case, and works with them to try to create a settlement agreement that is acceptable to all. Mediators do not decide the outcome. Parties may go to trial if they decide not to settle.

> **Mediation may be appropriate when the parties**
> - want to work out a solution but need help from a neutral person.
> - have communication problems or strong emotions that interfere with resolution.
>
> **Mediation may <u>not</u> be appropriate when the parties**
> - want a public trial and want a judge or jury to decide the outcome.
> - lack equal bargaining power or have a history of physical/emotional abuse.

LASC CIV 271 Rev. 02/22
For Mandatory Use

## How to Arrange Mediation in Los Angeles County

Mediation for **civil cases** is voluntary and parties may select any mediator they wish. Options include:

a. **The Civil Mediation Vendor Resource List**
   If all parties in an active civil case agree to mediation, they may contact these organizations to request a "Resource List Mediation" for mediation at reduced cost or no cost (for selected cases).

   - **ADR Services, Inc.** Case Manager Elizabeth Sanchez, elizabeth@adrservices.com
     (949) 863-9800
   - **Mediation Center of Los Angeles** Program Manager info@mediationLA.org
     (833) 476-9145

**These organizations cannot accept every case and they may decline cases at their discretion**. They may offer online mediation by video conference for cases they accept. Before contacting these organizations, review important information and FAQs at www.lacourt.org/ADR.Res.List

**NOTE: The Civil Mediation Vendor Resource List program does not accept family law, probate or small claims cases.**

b. **Los Angeles County Dispute Resolution Programs**
   https://hrc.lacounty.gov/wp-content/uploads/2020/05/DRP-Fact-Sheet-23October19-Current-as-of-October-2019-1.pdf

   Day of trial mediation programs have been paused until further notice.

   **Online Dispute Resolution (ODR).** Parties in small claims and unlawful detainer (eviction) cases should carefully review the Notice and other information they may receive about (ODR) requirements for their case.

c. Mediators and ADR and Bar organizations that provide mediation may be found on the internet.

3. **Arbitration**: Arbitration is less formal than trial, but like trial, the parties present evidence and arguments to the person who decides the outcome. In "binding" arbitration, the arbitrator's decision is final; there is no right to trial. In "nonbinding" arbitration, any party can request a trial after the arbitrator's decision. For more information about arbitration, visit http://www.courts.ca.gov/programs-adr.htm

4. **Mandatory Settlement Conferences (MSC)**: MSCs are ordered by the Court and are often held close to the trial date or on the day of trial. The parties and their attorneys meet with a judge or settlement officer who does not make a decision but who instead assists the parties in evaluating the strengths and weaknesses of the case and in negotiating a settlement. For information about the Court's MSC programs for civil cases, visit http://www.lacourt.org/division/civil/C10047.aspx

Los Angeles Superior Court ADR website: http://www.lacourt.org/division/civil/C10109.aspx
For general information and videos about ADR, visit http://www.courts.ca.gov/programs-adr.htm

LASC CIV 271 Rev. 02/22

For Mandatory Use